EXHIBIT 1

Michael H. Riney, Esq. (116137)
VANTAGE LAW GROUP A.P.C.
600 West Broadway, Suite 950
San Diego, CA 92101
Telephone: (619) 330-3000
Facsimile: (619) 330-3010

Attorneys for Plaintiff Lowlife Corporation
Ltd.

FILED
CIVIL BUSINESS OFFICE 5
CENTRAL DIVISION

2007 MAR 19 P 3: 33

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

LOWLIFE CORPORATION LTD., a limited
company organized under the laws of the
United Kingdom,

                    Plaintiff,

v.

REALLY LIKEABLE PEOPLE, L.P., a
California limited partnership, ATTICUS
CLOTHING, INC., a California corporation,
MACBETH, INC., a California corporation,
LOSERKIDS.COM, INC., a California
corporation, JONATHAN W. HUMPHREY,
an individual, THOMAS MATTHEW
DELONGE, an individual, THOMAS
HELLEBERG, an individual, and DOES 1
through 75,

                    Defendants.

Case No.

GIC 881995

COMPLAINT FOR DECLARATORY
RELIEF, DAMAGES AND IMPOSITION
OF CONSTRUCTIVE TRUST

Plaintiff Lowlife Corporation, Ltd., alleges:

## THE PARTIES

1.     Plaintiff Lowlife Corporation, Ltd. ("Lowlife"), is a limited company organized
under the laws of the United Kingdom with its principle place of business in London, England.
Lowlife is engaged in the business of manufacturing and distributing branded soft goods,

COMPLAINT FOR DECLARATORY RELIEF, DAMAGES AND
IMPOSITION OF CONSTRUCTIVE TRUST

EXHIBIT _1_ PAGE _1_ OF _3_

1  including but not limited to casual clothing, headgear, footwear and other accessories bearing the

2  Atticus, Macbeth, Loserkids and Lowlife brands.

3      2.      Defendant Really Likeable People, LP ("RLP"), is a California limited partnership

4  doing business at 2251 Las Palmas Drive in the City of Carlsbad, County of San Diego.

5      3.      Defendant Atticus Clothing, Inc. ("Atticus"), is a California corporation doing

6  business at 2251 Las Palmas Drive in the City of Carlsbad, County of San Diego.  Lowlife is

7  informed and believes that Atticus is the registered owner of certain trademarks associated with

8  the Atticus brand.

9      4.      Defendant Macbeth, Inc. ("Macbeth"), is a California corporation doing business

10  at 2251 Las Palmas Drive in the City of Carlsbad, County of San Diego.  Lowlife is informed

11  and believes that Macbeth is the registered owner of certain trademarks associated with the

12  Macbeth brand.

13      5.      Defendant Loserkids.com, Inc. ("Loserkids"), is a California corporation doing

14  business at 2251 Las Palmas Drive in the City of Carlsbad, County of San Diego.  Lowlife is

15  informed and believes that Loserkids is the registered owner of certain trademarks and URLs

16  associated with the Loserkids brand.

17      6.      Defendant Jonathan W. Humphrey ("Humphrey") is an individual residing in the

18  County of San Diego and doing business at 2251 Las Palmas Drive in the City of Carlsbad,

19  County of San Diego.

20      7.      Defendant Thomas Matthew DeLonge ("DeLonge") is an individual residing in

21  the County of San Diego and doing business at 2251 Las Palmas Drive in the City of Carlsbad,

22  County of San Diego.

23      8.      Humphrey, DeLonge, RLP, Atticus, Macbeth, Loserkids and Does 1 through 50

24  are sometimes collectively referred to hereinafter as "RLP Defendants."

25      9.      Defendant Thomas Helleberg ("Helleberg") is an individual residing in Hamar,

26  Norway.  Helleberg is a sales agent who has since in or about 2002 been representing Lowlife in

27  the sale and distribution of its products, including but not limited to Atticus, Macbeth and

28  Loserkids branded products, in an agency capacity in the European Union.  Lowlife is informed

<div align="center">
2

COMPLAINT FOR DECLARATORY RELIEF, DAMAGES AND
IMPOSITION OF CONSTRUCTIVE TRUST
</div>

EXHIBIT __1__ PAGE __2__ OF __3__

1  and believes that Helleberg has traveled to the County of San Diego on multiple occasions for the

2  purpose of meeting with RLP Defendants in furtherance of the conspiracy alleged in this

3  complaint, and that the wrongful conduct complained of herein emanates from the County of San

4  Diego.

5       10.    Lowlife is ignorant of the true names and capacities of those defendants sued

6  herein as Doe 1 through Doe 75, and therefore sues these defendants by such fictitious names.

7  Lowlife will amend this Complaint to allege their true names and capacities after they have been

8  ascertained. Lowlife is informed and believes and thereon alleges that each of the fictitiously

9  named defendants is legally responsible in some manner for the occurrences alleged herein.

10       11.    Lowlife is informed and believes and thereon alleges that at all relevant times

11  each defendant acted as the agent, servant, representative, partner, joint-venturer, co-conspirator

12  and/or employee of the other defendants and, in doing the things hereinafter alleged was acting

13  within the scope of such agency, conspiracy or employment and with the knowledge, permission

14  and consent of each other defendant.

15  <center>**FIRST CAUSE OF ACTION**</center>

16  <center>**(Declaratory Relief Against RLP Defendants and Does 1 through 50 – Alter Ego)**</center>

17       12.    Lowlife incorporates by reference as though set forth in full at this paragraph 12,

18  each and every allegation of paragraphs 1 through 11 of this Complaint.

19       13.    Lowlife is informed and believes and based thereon alleges that Humphrey and

20  DeLonge dominated, influenced and controlled the business, property and affairs of RLP,

21  Atticus, Macbeth, Loserkids and Does 1 through 50.

22       14.    Lowlife is informed and believes and based thereon alleges that at all times

23  mentioned herein there existed and now exists such a unity of interest and ownership between

24  Humphrey, DeLonge, RLP, Atticus, Macbeth, Loserkids and Does 1 through 50 that the claimed

25  individuality and separateness of those persons and entities no longer exists. Adherence to the

26  fiction that defendants Humphrey, DeLonge, RLP, Atticus, Macbeth, Loserkids and Does 1

27  through 50 are separate persons and entities with legally distinct identities would sanction a fraud

28  and promote injustice.

<center>3
COMPLAINT FOR DECLARATORY RELIEF, DAMAGES AND
IMPOSITION OF CONSTRUCTIVE TRUST</center>

EXHIBIT 1 PAGE 3 OF 8

15.    Lowlife is informed and believes, and based thereon alleges, that at all times mentioned herein RLP, Atticus, Macbeth, Loserkids and Does 1 through 50 have been mere shells which Humphrey and DeLonge have used, in bad faith, as a conduit for their business, property and affairs.

16.    Lowlife is informed and believes, and based thereon alleges, that at all times mentioned herein RLP, Atticus, Macbeth, Loserkids and Does 1 through 50 have been used by Humphrey and DeLonge as obligors for the assumption of obligations and liabilities which were the obligations and liabilities of Humphrey and DeLonge.

17.    If the acts, obligations and liabilities of RLP, Atticus, Macbeth, Loserkids and Does 1 through 50 are treated as obligations and liabilities separate from those of Humphrey and DeLonge, an inequitable result will follow.

18.    Lowlife is informed and believes, and based thereon alleges, that Humphrey, DeLonge, RLP, Atticus, Macbeth, Loserkids and Does 1 through 50 deny that they are alter egos and contend that recognizing their purported separate existences would not sanction a fraud and promote and injustice and that they therefore should be recognized as legally separate persons and entities in a court of law.

19.    Lowlife therefore desires a judicial determination that Humphrey, DeLonge, RLP, Atticus, Macbeth, Loserkids and Does 1 through 50 are alter ego entities whose purported separate identities should be disregarded in this action in order to avoid a fraud and promote justice.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty Against RLP Defendants and Does 1 through 50)

20.    Lowlife incorporates by reference as though set forth in full at this paragraph 20, each and every allegation of paragraphs 1 through 19 of this Complaint.

21.    In or about June 2005, Lowlife and RLP defendants entered into a joint venture agreement to create and operate a single business for profit. The parties' joint venture was and is the e-commerce site *www.Loserkids.uk.com.* That joint venture e-commerce site was created and launched by the parties in furtherance of their joint interest in expanding the sales of Atticus,

4

COMPLAINT FOR DECLARATORY RELIEF, DAMAGES AND
IMPOSITION OF CONSTRUCTIVE TRUST

EXHIBIT __1__ PAGE __7__ OF __9__

Macbeth and Loserkids branded products in the United Kingdom and throughout the European Union and beyond. In furtherance of this joint venture agreement, between June 2005 and the present, Lowlife created, launched and operated the *www.Loserkids.uk.com* website. Also pursuant to the parties' joint venture agreement, Lowlife distributed profits from the operations of the joint venture e-commerce entity 50% to Lowlife and 50% to RLP Defendants.

22. By virtue of the joint venture relationship between Lowlife, on the one hand, and RLP Defendants, on the other hand, a fiduciary duty exists between the parties with respect to the sale and distribution of Atticus, Macbeth and Loserkids branded products. Pursuant to that fiduciary duty, RLP Defendants, and each of them, owe to Lowlife the duties of a fiduciary, including the duty to treat Lowlife with the highest loyalty and utmost good faith in all matters related to the business of selling and distributing Atticus, Macbeth and Loserkids branded products.

23. Lowlife is informed and believes and thereon alleges that RLP Defendants, and each of them, breached their fiduciary obligations to Lowlife by engaging in conduct designed to squeeze Lowlife out of the chain of distribution of Atticus, Macbeth and Loserkids branded products, including but not limited to:

    a. Inducing Lowlife to spend many tens of thousands of dollars in support of the marketing and sales of Atticus, Macbeth and Loserkids branded products for the Spring and Fall 2007 seasons by engaging in conduct designed to lead Lowlife to the reasonable conclusion that its annual distribution agreements for Atticus and Macbeth would be renewed for calendar year 2007, while secretly negotiating with Lowlife's sales agent Helleberg to take over Lowlife's exclusive territory during 2007;

    b. Conspiring with Lowlife's sales agent Helleberg to take over the benefits of Lowlife's business operations as related to Atticus and Macbeth branded products; and

    c. Purporting to expel Lowlife from the *www.Loserkids.uk.com* e-commerce business and to seize that business opportunity for themselves.

COMPLAINT FOR DECLARATORY RELIEF, DAMAGES AND
IMPOSITION OF CONSTRUCTIVE TRUST

EXHIBIT __1__ PAGE __5__ OF __8__

24.    Lowlife has been damaged as a proximate result of RLP Defendants' breach of fiduciary duty in an amount which will be proven with reasonable certainty at trial but which Lowlife believes is in the millions of dollars.

25.    The above-described conduct of RLP Defendants and Does 1 through 50 was willful and fraudulent, and was intended to cause injury to Lowlife. RLP Defendants and Does 1 through 50 are therefore liable for exemplary or punitive damages.

## THIRD CAUSE OF ACTION

**(Breach of Fiduciary Duty and Conspiracy To Breach Fiduciary Duty Against RLP Defendants, Helleberg and Does 25 through 75)**

26.    Lowlife incorporates by reference as though set forth in full at this paragraph 26 each and every allegation of paragraphs 1 through 25 of this Complaint.

27.    Lowlife alleges that Helleberg, as an independent sales agent representing the interests of Lowlife in connection with the sale and distribution of Atticus, Macbeth and Loserkids branded products, owed to Lowlife the duties of a fiduciary including the duty to communicate to Lowlife all information known to Helleberg that relates to the current or prospective business interests of Lowlife, including but not limited to information relating to any actual or potential threats to the status of Lowlife's exclusive sales and distribution territory for Atticus, Macbeth and Loserkids branded products.

28.    Lowlife is further informed and believes that Helleberg, in breach of his duties to Lowlife, entered into secret negotiations with RLP Defendants and Does 25 through 75 to usurp Lowlife's exclusive sales and distribution territory for Atticus, Macbeth and Loserkids branded products.

29.    Helleberg's conduct breached his duties to Lowlife as Lowlife's sales agent and is independently actionable as a conspiracy between RLP Defendants, Does 25 through 75, and Helleberg to breach RLP Defendants' fiduciary duties to Lowlife.

30.    Lowlife has been damaged as a proximate result of Helleberg's breach of his duties as Lowlife's sales agent and by the conspiracy between Helleberg, RLP Defendants and

1  Does 25 through 75, in an amount which will be proven with reasonable certainty at trial but

2  which Lowlife believes is in the millions of dollars.

3       31.    The above-described conduct of defendants was willful and fraudulent, and was

4  intended to cause injury to Lowlife. Defendants are therefore liable for exemplary or punitive

5  damages.

6                          **FOURTH CAUSE OF ACTION**

7  **(Wrongful Interference with Prospective Economic Advantage Against Helleberg and Does**
   **50 through 75)**

8

9       32.    Lowlife incorporates by reference as though set forth in full at this paragraph 32,

10 each and every allegation of paragraphs 1 through 31 of this Complaint.

11      33.    Lowlife's ongoing business relationships with RLP Defendants created a

12 reasonably probability of continuing economic benefit that was known to Helleberg.

13      34.    When Helleberg and Does 50 through 75 entered into secret negotiations with

14 RLP Defendants to usurp Lowlife's exclusive sales and distribution territory for Atticus,

15 Macbeth and Loserkids branded products, he did so with the intent of disrupting the relationships

16 between Lowlife and RLP Defendants.

17      35.    The conduct of Helleberg and Does 50 through 75 in seeking to usurp from

18 Helleberg's sales principal the exclusive sales and distribution territory for Atticus, Macbeth and

19 Loserkids branded products was wrongful in that it was in violation of the independent duties

20 arising out of the sales agency relationship between Lowlife and Helleberg.

21      36.    The conduct of Helleberg and Does 50 through 75 was a substantial factor in

22 causing the disruption of the business relationships between Lowlife and RLP Defendants.

23      37.    Lowlife has been damaged as a proximate result of said wrongful interference

24 with Lowlife's business relationships with RLP Defendants, in an amount which will be proven

25 with reasonable certainty at trial but which Lowlife believes is in the millions of dollars.

26      38.    The above-described conduct of Helleberg and Does 50 through 75 was willful

27 and fraudulent, and was intended to cause injury to Lowlife. Helleberg and Does 50 through 75

28 are therefore liable for exemplary or punitive damages.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### PRAYER FOR RELIEF

WHEREFORE, plaintiff Lowlife Corporation, Ltd., prays for judgment as follows:

1.    For damages, according to proof;

2.    For the imposition of a constructive trust over one-half of the profits earned from the sale or distribution of Atticus, Macbeth and Loserkids branded products through any e-commerce site operated by defendants, or any of them;

3.    For punitive damages in an amount appropriate to punish and set an example of defendants, and each of them.

5.    For costs of suit; and

6.    For such other and further relief as the Court may deem just and proper.

Dated: March 19, 2007

VANTAGE LAW GROUP, A.P.C.

By:
    Michael H. Riney
Attorneys for Plaintiff Lowlife Corporation, LTD

COMPLAINT FOR DECLARATORY RELIEF, DAMAGES AND
IMPOSITION OF CONSTRUCTIVE TRUST

EXHIBIT _1_ PAGE _9_ OF _9_

EXHIBIT 2

Heads of Agreement

BETWEEN Lowlife Corporation Ltd ("Lowlife"), and Really Likeable People Inc,
Atticus Clothing Inc., Macbeth, Inc and LoserKids, Inc. (collectively, "RLP"), for
valuable consideration the receipt and sufficiency of which is hereby acknowledged:

Introduction

1. The parties hereto, intending to be legally bound, agree that these Heads of
Agreement are binding on all parties hereto except to the extent that they
are replaced by binding written agreements executed by the parties in the
future.

2. These Heads of Agreement shall govern so far as applicable the terms of
the acquisition agreement for the Atticus "Assets" (defined below) and the
extension/wind down agreements in relation to the brands commonly
known as:

2.1 "Atticus";

2.2 "Macbeth"; and

2.3 LoserKids UK website/business ("LoserKids")

Offer to Purchase. RLP hereby offers to sell to Lowlife the "Assets" described on
Schedule 1 attached hereto and incorporated herein by this reference for the agreed sale
price of USDS4,200,000no on the following essential terms:

3. Essential Terms:

3.1 Lowlife shall pay RLP USD $450,000 no later than 3 business
days following execution of these Heads of Agreement in
connection with the payment of certain account payables described
below in Section 4;

3.2 Lowlife shall pay RLP USD $550,000 no later than April 7, 2007,
which funds will be treated as a deposit towards the purchase of
the Assets or alternatively as an on-account payment of royalties,
as more particularly described in Section 5.

3.3 Lowlife shall notify RLP whether it wants to proceed with the
acquisition of the Assets no later than April 16, 2007;

3.4 The parties shall use their best efforts to draft, finalize and execute
the definitive purchase agreement for the Assets no later than 5pm
Californian time April 30 2007; and

EXHIBIT 2 PAGE 1 OF 11

3.5 Provided that Lowlife has paid the deposit of USD$550,000 to RLP as provided herein, the closing of the acquisition of the Assets shall occur on or before June 30, 2007, when Lowlife has paid the remaining sum due of USD $3,650,000 to RLP in full and cleared funds.

This offer shall remain open until 5pm Californian time May 10, 2007 (or such later time as may be necessary due to an arbitration between the parties as to the provisions and conditions of the purchase agreement), only if Lowlife has confirmed to RLP in writing by April 16, 2007 at the latest that it intends to proceed with the acquisition of the Assets, and may not be amended or revoked by RLP before that time. Should Lowlife confirm its intention not to proceed with the acquisition of the Assets this offer may be revoked by RLP advising Lowlife in writing of its revocation. The agreed purchase price assumes that the Assets will be sold on a debt-free and lien-free basis and are not subject to any third-party claims known to RLP at the time of entering into these Heads of Agreement. The purchase price will be subject to a reasonable adjustment for any deviation from the foregoing assumptions. RLP acknowledges and agrees that it will give reasonable representations, warranties and indemnities to Lowlife in the definitive purchase agreement for the Assets.

Provided that Lowlife has, by April 16, 2007 indicated its intent to complete the purchase of the Assets, then if the parties cannot acting reasonably and in good faith finalize the definitive purchase agreement on or before April 30, 2007, the parties shall utilize an arbitrator to decide the final definitive terms of the agreement, and the parties shall execute the definitive agreement on May 10, 2007 or such other dates as the arbitrator shall set. The arbitration shall be conducted in accordance with Section 29 hereof.

If and when the Assets are transferred to Lowlife, RLP shall immediately provide Lowlife all books, records, agreements, correspondence, designs, samples, customer and supplier lists and all other information and documents in RLP's possession or control related to the Assets only.

Payments in Advance

4. The payment of USD $450,000 referenced in Section 3 represents an on account payment in relation to:

4.1 Sums due in respect of Atticus and Macbeth royalties for the fourth quarter of 2006;

4.2 Sums due for the 2006 full calendar year royalty for LoserKids;

4.3 All other amounts due and payable in relation to Atticus, Macbeth and LoserKids in the ordinary course of business.

EXHIBIT 2 PAGE 2 OF 11

4.4    Any excess payment to be applied to payment for royalties for first quarter of 2007.

5.    The payment of USD $550,000 referenced in Section 3 shall, in the first instance, be treated as a deposit on the agreed purchase price of USD $4,200,000. However, should:

5.1    Lowlife notify RLP that it does not intend to proceed with the acquisition of the Assets by April 16, 2007; or

5.2    The Parties not execute the acquisition agreement by May 10, 2007; or

5.3    Lowlife not pay sums when due pursuant to the acquisition agreement;

then such payment shall be treated as an on account payment of royalties due for the 2007 calendar year in relation to Atticus, Macbeth and LoserKids with a full accounting of the sums required between the parties by no later than January 31 2008. Lowlife (without offset) shall pay RLP any outstanding amount within 14 days (ie by no later than 14 February 2008) and RLP (without offset) shall refund any overpayment within 14 days (ie by no later than 14 February 2008).

Royalties for Q107, Q207, Q307 and Q407

6.    In addition to the payments provided for above, Lowlife shall make payment to RLP and shall provide a detailed accounting of all royalties for:

6.1    Q107 by no later than April 15, 2007;

6.2    Q207, upon the earlier of July 15, 2007 or upon the actual transfer of the Assets pursuant to these Heads of Agreement.

6.3    Q307 by no later than October 15, 2007; and

6.4    Q407 by no later than January 15, 2008.

Royalty rates and calculations will be consistent with those used during the 2006 calendar year. For the avoidance of doubt, Sections 6.3 and 6.4 above shall have no application to the Atticus Brand in the event Lowlife acquires the Assets as provided herein.

EXHIBIT _2_ PAGE _3_ OF _11_

Due Diligence and Confidentiality

7.　The commercial and legal due diligence for the Assets shall be completed by April 16, 2007. The commercial due diligence is limited to only include non-European dealings. Such due diligence is to relate to a reasonable and proportionate list of due diligence items.

8.　Lowlife shall exercise reasonable proportionality in any requests made and RLP shall use its best efforts to comply with such requests as soon as is practicable.

9.　The parties agree that they shall keep confidential and not release to any third parties, unless obliged by Court Order so to do, any and all information which either of them provide to the other in connection with these Heads of Agreement.

Fall 07 Orders

10.　Upon the execution of these Heads of Agreement by the parties, Lowlife shall immediately provide to RLP all of the Fall 07 Orders for UK and Europe that it is currently in possession of for Atticus, Macbeth and LoserKids.

11.　Lowlife shall also immediately instruct its Agents, Officers, Distributors and Employees to turn over to RLP any Fall 07 Orders that have not yet been provided to Lowlife.

12.　RLP shall be entitled to undertake any reasonable audit to verify the Fall 07 Orders provided.

13.　Atticus and Macbeth Fall 07 Orders shall be manufactured by current suppliers or by mutually agreed suppliers at prices previously advised. Lowlife to have full access to the Fall 07 manufacturers for the Atticus Brand only for quality control purposes.

Exclusive Dealing

14.　Subject to Clause 15, upon execution of these Heads of Agreement and until June 30, 2007 or, until receipt of notification in writing from Lowlife that it will not proceed with the acquisition of the Assets, whichever occurs earlier, RLP agrees that it will deal exclusively with Lowlife in relation to the purchase of the Assets.

15.　Should Lowlife fail to notify RLP of its decision as to whether it intends to proceed with the acquisition by April 16, 2007 or fail to pay any monies when due under these Heads of Agreement, the anticipated

EXHIBIT 2 PAGE 4 OF 11

acquisition/purchase agreement or the extension/wind down agreements to
be negotiated in respect of Atticus, Macbeth and LoserKids, any
agreement regarding exclusive dealings shall cease to have any effect.

<u>Extension/Wind Down Agreements</u>

16.  RLP and Lowlife shall negotiate in good faith with the intention to enter
     into mutually agreeable extension/wind down agreements in relation to
     LoserKids and Macbeth (and Atticus should Lowlife not proceed to the
     acquisition of the Assets) by no later than April 30 2007, the essential
     terms of which are set forth on <u>Schedule 2</u> attached hereto and
     incorporated herein by this reference. From the date of these Heads of
     Agreement until the execution of new extension/wind down agreements,
     the provisions and conditions of the parties' most recent written
     agreements for the brands at issue shall govern and control the conduct of
     the parties, save for any amendments by implication expressly agreed
     herein.

17.  Provided that Lowlife has not breached any of its obligations under this
     Agreement, RLP expressly consents to Lowlife's assignment in respect of
     the acquisition of the Assets, to an affiliate or assignee of Lowlife, which
     may include a new entity formed by either Lowlife or Dale Masters for the
     purpose of acquiring the Assets.

18.  For all other proposed assignments by Lowlife, Lowlife shall first obtain
     the express written consent of RLP, which consent shall not be
     unreasonably conditioned, delayed or withheld.

19.  Lowlife accepts that any assignment of its rights as provided for in Clause
     18 shall be to an assignee of reasonably satisfactory financial standing and
     capacity. Evidence of the financial standing and capacity of the proposed
     assignee to be provided by Lowlife before any written consent is required
     to be given. Such written consent will not be unreasonably conditioned,
     delayed or withheld by RLP.

20.  If there is an assignment as provided for in Clause 18 Lowlife accepts that
     any assignment of its rights under any extension/wind down agreement of
     Macbeth and/or LoserKids (and/or Atticus should Lowlife not proceed to
     the acquisition of the Assets) to an affiliate or assignee of Lowlife will
     result in more detailed reporting and auditing controls on the affiliate or
     assignee as provided for in Schedule 2.

21.  RLP will maintain global control of sales for the Spring 08 season with
     regards to the Macbeth brand, and, in the event Lowlife does not proceed
     with the purchase of the Atticus Brand, RLP will assume global control of
     sales for the Atticus Brand beginning with the Spring 08 selling season.

EXHIBIT _2_ PAGE _5_ OF _11_

Lowlife will only be entitled to operate the LoserKids website until December 31, 2007 and on January 1, 2008 this shall revert to RLP's full control and ownership.

## General Obligations

22. Lowlife shall provide an accounting (and if requested disclosure) to RLP in respect of LoserKids for the 2006 calendar year by no later than April 10, 2007.

23. RLP and Lowlife agree to a mutual release in relation to all past and present claims whether filed or not (and any claims that have been filed by either party against the other shall be dismissed with prejudice), including those intimated against the agents and/or employees of the other. For the avoidance of doubt, Lowlife's release shall extend to Tom Helleberg only in the event that, within 21 business days after the execution hereof, Tom Helleberg and Lowlife execute a mutual release and non-disparagement agreement in favor of each other, including a release of any and all monies that are or may be payable by Lowlife to Tom Helleberg.

24. The parties shall be entitled to specific performance of these Heads of Agreement. Time is of the essence for the obligations to be performed hereunder.

25. After the signing of these Heads of Agreement, each of the Parties, and their respective affiliates, parents, subsidiaries, and each of their respective officers, directors, employees and agents, successors and assigns shall not make any statement to any person likely to result in disparagement or adverse publicity for the other party or any of such party's affiliates, parents, subsidiaries or any their respective officers, directors, employees or agents, successors or assigns.

26. After the signing of these Heads of Agreement, Lowlife and RLP, and their respective affiliates, parents, subsidiaries, and each of their respective officers, directors, employees and agents, successors and assigns shall not interfere with the on-going business activities of each other.

27. Each of the parties will be responsible for and bear all of their own costs and expenses (including any legal fees and expenses) incurred at any time in connection with pursuing or consummating this Heads of Agreement.

28. The parties shall negotiate in good faith and shall use their best efforts to finalize and execute the extension/wind down agreements contemplated hereby and the acquisition agreement for the Assets. The parties covenant and agree that neither of them will seek to avoid the obligations created by

EXHIBIT _2_ PAGE _6_ OF _11_

these Heads of Agreement on the theory that the parties have failed to state the essential terms of their agreement.

29. Any dispute, claim or controversy arising out of or relating to these Heads of Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this letter of intent to arbitrate, shall be determined by arbitration in San Diego, California before three arbitrators, one of which shall be elected by each of Lowlife and RLP, and the third of which shall be elected by the other two arbitrators. The arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures. Judgment on the award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

30. These Heads of Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument.

31. These Heads of Agreement shall be governed and construed under the laws of the State of California, without taking into account conflict of laws provisions.

Duly executed 29th March 2007:

LOWLIFE CORPORATION LTD.,

a _____

By: _____
    Dale Masters, Chief Operating Officer

REALLY LIKEABLE PEOPLE, INC.,
a Delaware corporation

By: _____
    Jon W. Humphrey, President

ATTICUS CLOTHING, INC.,
a California corporation

By: _____
    Jon W. Humphrey, President

EXHIBIT 2 PAGE 7 OF 11

MACBETH, INC.,
a California corporation

By: _____
    Jon W. Humphrey, President


LOSERKIDS, INC.,
a California corporation

By: _____
    Jon W. Humphrey, President

EXHIBIT __2__ PAGE __8__ OF __11__

SCHEDULE 1

ASSETS:

All of the right, title and interest in, to and under the registered and unregistered domestic and foreign servicemarks, trademarks, trademark applications, trade names and copyrights associated with the "Atticus" brand of clothing and related products, which are owned by RLP or to which RLP otherwise has rights as of the date of this Agreement (all of the foregoing referred to herein as the "Atticus Marks"), together with the goodwill of the business associated with the Atticus Marks only and which is symbolized thereby; all rights to sue for infringement of any Atticus Marks, whether arising prior to or subsequent to the date of the final acquisition agreement and any and all renewals and extensions thereof that may hereafter be secured under the laws now or hereafter in effect in the United States, Australia, Canada, the United Kingdom, the European Union, and in any other jurisdiction, the same to be held and enjoyed by the RLP, their parents, subsidiaries, affiliates, successors and assigns from and after the date hereof as fully and entirely as the same would have been held and enjoyed by the RLP had the final acquisition agreements not been made; all distribution or sales agency agreements for products sold under the Atticus Marks (provided, however, to the extent the foregoing cannot be assigned without obtaining a third-party's consent, RLP will use its reasonable efforts to obtain such consent but will not be obligated to assign such agreements to Lowlife in the absence of such consent) lien-free ownership of the URL www.atticusclothing.com and all Atticus "myspace" (the Atticus Marks, together with the foregoing rights, the "Assets")

EXHIBIT _2_ PAGE _9_ OF _11_

SCHEDULE 2

ESSENTIAL TERMS:

**Term:** The license term of all extension/wind down agreements shall be extended through December 31, 2007 (except as otherwise provided below).

**Accounts Payable:** Future amounts payable to RLP for "Macbeth" brand purchases (e.g., samples) shall be paid no later than 15 days after Lowlife's receipt of an invoice from RLP.

Royalty payments due for "LoserKids.com.uk" shall be made on a quarterly basis (in arrears) by the 30th calendar day following each calendar quarter beginning with the 2007 first quarter. The royalty payment for the first calendar quarter of 2007 will be due and payable on April 30, 2007.

Lowlife shall make payment to RLP for "Atticus" and "Macbeth and shall provide a detailed accounting of all royalties for:

Q107 by no later than April 15, 2007;

Q207, upon the earlier of July 15, 2007 or upon the actual transfer of the Assets pursuant to these Heads of Agreement.

Q307 by no later than October 15, 2007; and

Q407 by no later than January 15, 2008.

**Restrictions:** RLP, as applicable, will retain all responsibility for the manufacture of the "Macbeth" brand products (and Atticus should Lowlife not proceed to the acquisition of the Assets).

Lowlife will retain the right to sell and ship "Macbeth" brand (and Atticus should Lowlife not proceed to the acquisition of the Assets) products through December 31, 2007, but the Spring 2008 sales for the "Macbeth" brand (and Atticus should Lowlife not proceed to the acquisition of the Assets) of products will pass to RLP effective July 1, 2007. The LoserKids.com.uk website will function normally and will be subject to RLP's approval of content, newsletters, brands, and other matters in accordance with the parties' customary practice and procedures. Lowlife will only be entitled to operate the LoserKids website until December 31, 2007 and on January 1, 2008 this shall revert to RLP's full control and ownership.

**Audit/Inspection:** Lowlife accepts that the extension/wind down agreements in respect of Atticus and Macbeth will contain further restrictions as to reporting and supervision than are contained in the Macbeth and Atticus agreements

EXHIBIT _2_ PAGE _10_ OF _11_

which expired on December 31 2007. The further restrictions shall be:
1.  Regular and complete monthly reporting by Lowlife in relation to financial and other performance of Atticus/Macbeth brands.
2.  RLP to have to right to regularly audit/inspect Lowlife with 5 days notice to Lowlife of such an audit/inspection occurring

In the event the parties cannot agree on the other non-essential terms of the extension/wind down agreements, then such extension/wind down agreements shall contain the same provisions and conditions of the parties' most recent written agreements for the brands in question, except that in the event of a conflict between the terms of this Schedule 2 and the terms in the previous agreements, the terms of this Schedule 2 shall govern and control.

EXHIBIT 2 PAGE 11 OF 11

EXHIBIT 3

VANTAGE
LAW
GROUP

May 3, 2007

VIA FACSIMILE AND U.S. MAIL

Michael A. Treska, Esq
Latham & Watkins
633 West 5th St #4000
Los Angeles, CA 90071

Re:   Lowlife Corporation Ltd. v. RLP *et al*
      Our File No.: 1163 07001

Dear Mr Treska:

This letter is being delivered along with a formal demand for arbitration pursuant to the Heads of Agreement between Lowlife and RLP. Please note that it is Lowlife's intention to continue negotiations in the hope of reaching agreement on a formal purchase agreement. However, the timeline mandated by the Heads of Agreement compels Lowlife to commence arbitration at this time.

Please let me know if you have any questions, or if you wish to discuss the arbitration procedures.

Very truly yours,

Michael H. Riney
VANTAGE LAW GROUP, A P C.

MHR:ld

cc:    David Dorne, Esq

EXHIBIT 3 PAGE 1 OF 13

VANTAGE
LAW
GROUP

May 3, 2007

Via Hand Delivery

JAMS
401 "B" Street, Suite 2100
San Diego, CA 92101

Re:    Lowlife Corporation Ltd. v. RLP *et al*
       Our File No.: 1163 07001

Dear Sir/Madam:

My client Lowlife Corporation Ltd. is a party to an agreement calling for arbitration
administered by JAMS pursuant to JAMS' Streamlined Arbitration Rules and Procedures.
Pursuant to the terms of that agreement, Lowlife wishes to commence arbitration concerning the
terms of an asset purchase agreement. The opposing party to the arbitration will be Really
Likeable People, Inc. ("RLP"). RLP may be contacted through its attorney, Michael A. Treska,
Esq., Latham & Watkins, 633 West 5th St #4000, Los Angeles, CA 90071 (213) 485-1234).

Pursuant to JAMS' procedures, enclosed please find the following:

(1)    Lowlife's demand for arbitration dated May 3, 2007;

(2)    A check in the sum of $400 representing Lowlife's case management fee;

(3)    The Heads of Agreement between the parties containing the arbitration clause
       (see paragraphs 3 and 29); and,

(4)    A proof of service reflecting service upon RLP of Lowlife's demand for
       arbitration.

Please note that the arbitration provisions of the parties' Heads of Agreement anticipate a near-
immediate arbitration, including a provision anticipating that the arbitrators' work will complete
"on May 10, 2007 or such other dates as the Arbitrator shall set." (Heads of Agreement, para. 3.)
Also, please note that the arbitration agreement anticipates an arbitration "before three
arbitrators, one of which shall be elected by each of Lowlife and RLP, and the third of which
shall be elected by the other two arbitrators." As evidenced by the enclosed demand for
arbitration, Lowlife has designated the Hon. J. Richard Haden as its elected arbitrator.

EXHIBIT 3  PAGE 2 OF 19

JAMS
May 3, 2007
Page 2


Thank you for your professional cooperation in this matter. If you have any questions or require further information, please do not hesitate to contact me at your convenience

Very truly yours,

Michael H. Riney
VANTAGE LAW GROUP, A.P.C.

MHR:ld

cc (via fax and U.S. Mail):     Michael A. Treska, Esq. (without enclosures)
                                David J. Dorne, Esq. (without enclosures)

EXHIBIT ___3___ PAGE ___3___ OF ___18___

# VANTAGE LAW GROUP

May 3, 2007

**VIA FACSIMILE AND U.S. MAIL**

Michael A. Treska, Esq.
Latham & Watkins
633 West 5th St #4000
Los Angeles, CA 90071

Re:     Lowlife Corporation Ltd. v. RLP *et al*
        Our File No.: 1163.07001

Dear Mr. Treska:

This law firm represents Lowlife Corporation, Ltd. concerning the above-referenced matter. As you are aware, on or before April 16, 2007, Lowlife notified Really Likeable People, Inc. ("RLP") that it wanted to proceed with the acquisition of certain assets from RLP. As you are also aware, the parties' Heads of Agreement dated March 28, 2007 required the parties to try to finalize a definitive purchase agreement for the sale of those assets on or before April 30, 2007. To date, the parties have been unable to agree upon the terms of the formal purchase agreement. The Heads of Agreement, a copy of which is attached, provides in part:

> Provided that Lowlife has, by April 16, 2007 indicated its intent to complete the purchase of the Assets, then if the parties cannot acting reasonably and in good faith finalize the definitive purchase agreement on or before April 30, 2007, the parties shall utilize an arbitrator to decide the final definitive terms of the agreement, and the parties shall execute the definitive agreement on May 10, 2007 or such other dates as the arbitrator shall set. The arbitration shall be conducted in accordance with Section 29 hereof.

Therefore, pursuant to paragraphs 3 and 29 of the Heads of Agreement, demand is hereby made upon RLP to arbitrate the final provisions and conditions of the purchase agreement contemplated by paragraph 3 of the Heads of Agreement.

Paragraph 29 of the Heads of Agreement calls for this matter to be arbitrated before three arbitrators, one to be elected by Lowlife, one to be elected by RLP and a third to be elected by the other two arbitrators. Lowlife hereby designates the Hon. J. Richard Haden (ret.) as its elected arbitrator.

EXHIBIT __3__ PAGE __4__ OF __18__

Michael A. Treska, Esq.
May 3, 2007
Page 2


Please take further notice that should RLP refuse to select an arbitrator pursuant to paragraph 29 of the Heads of Agreement, or should RLP otherwise refuse to arbitrate the matter in accordance with the Heads of Agreement, the undersigned will take further steps to proceed with the arbitration according to law.

Very truly yours,

Michael H. Riney
VANTAGE LAW GROUP, A.P.C.

MHR:ld

cc:    Amy Arroyo
       David J. Dorne, Esq.

EXHIBIT _3_ PAGE _5_ OF _18_

1  Michael H. Riney, Esq. (116137)
   VANTAGE LAW GROUP A.P.C.
2  600 West Broadway, Suite 950
   San Diego, CA 92101
3  Telephone: (619) 330-3000
   Facsimile:  (619) 330-3010 .
4
   Attorneys for Plaintiff Lowlife Corporation
5  Ltd

6

7              SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                   FOR THE COUNTY OF SAN DIEGO

9

10  LOWLIFE CORPORATION LTD., a limited  )   Case No. GIC881995
    company organized under the laws of the )
11  United Kingdom,                          )
                                             )   PROOF OF SERVICE
12              Plaintiff,                    )
                                             )
13      v.                                    )   Complaint Filed: March 19, 2007
                                             )   Dept. 73
14  REALLY LIKEABLE PEOPLE, L.P., a          )   Judge: Hon. Steven R. Denton
    California limited partnership, ATTICUS  )
15  CLOTHING, INC., a California corporation, )
    MACBETH, INC., a California corporation, )
16  LOSERKIDS COM, INC., a California        )
    corporation, JONATHAN W. HUMPHREY,       )
17  an individual, THOMAS MATTHEW            )
    DELONGE, an individual, THOMAS           )
18  HELLEBERG, an individual, and DOES 1     )
    through 75,                              )
19                                           )
20              Defendants.

21

22      I am employed in the County of San Diego, State of California. I am over the age of 18

23  and not a party to the within action; my business address is 600 W. Broadway, Suite 950, San

24  Diego, California 92101.

25      On May 3, 2007, I served the following document:

26      1. Arbitration Demand dated May 3, 2007.

27  on the interested parties in this action as set forth below in the following manner:

28

                                                              CASE NO. GIC881995
                                PROOF OF SERVICE

                        EXHIBIT __3__ PAGE __6__ OF __18__

1  Michael A. Treska, Esq
   Latham & Watkins
2  633 West 5th St #4000
   Los Angeles, CA 90071
3  (213) 485-1234
   (213) 891-8763 Fax
4

5

6  (x)  **BY MAIL.**  I am familiar with this firm's practice of collection and processing
        correspondence for mailing with the United States Postal Service, and that the sealed
7       correspondence was deposited with the United States Postal Service on the same day in
        the ordinary course of business pursuant to Code of Civil Procedure §1013a.

8  (x)  **BY FACSIMILE.**  In addition to service by mail as set forth above, a copy of said
        document(s) was also delivered by facsimile transmission to the addressee(s) pursuant to
9       Code of Civil Procedure §1013(e).

10

11 ( )  **BY PERSONAL SERVICE.**  I caused a true copy of said document(s) to be hand-
        delivered to the addressee(s).

12 ( )  **BY EXPRESS MAIL.**  I caused said document(s) to be deposited in a box or other
        facility regularly maintained by the express service carrier providing overnight delivery
13      pursuant to Code of Civil Procedure §1013(c).

14

15     I declare under penalty of perjury under the laws of the State of California that the

16     foregoing is true and correct and that this Declaration was executed on May 3, 2007, at

17     San Diego, California.

18                                        _Kesha Newcomb-Pugh_ (signature)

19                                        Kesha Newcomb-Pugh

20

21

22

23

24

25

26

27

28

CASE NO  GIC 875457

2

PROOF OF SERVICE

EXHIBIT __3__ PAGE __7__ OF __18__

Heads of Agreement

BETWEEN Lowlife Corporation Ltd ("Lowlife"), and Really Likeable People Inc, Atticus Clothing Inc., Macbeth, Inc and LoserKids, Inc. (collectively, "RLP"), for valuable consideration the receipt and sufficiency of which is hereby acknowledged:

Introduction

1.  The parties hereto, intending to be legally bound, agree that these Heads of Agreement are binding on all parties hereto except to the extent that they are replaced by binding written agreements executed by the parties in the future.

2.  These Heads of Agreement shall govern so far as applicable the terms of the acquisition agreement for the Atticus "Assets" (defined below) and the extension/wind down agreements in relation to the brands commonly known as:

    2.1   "Atticus";

    2.2   "Macbeth"; and

    2.3   LoserKids UK website/business ("LoserKids")

Offer to Purchase.  RLP hereby offers to sell to Lowlife the "Assets" described on Schedule 1 attached hereto and incorporated herein by this reference for the agreed sale price of USD$4,200,000no on the following essential terms:

3.  Essential Terms:

    3.1   Lowlife shall pay RLP USD $450,000 no later than 3 business days following execution of these Heads of Agreement in connection with the payment of certain account payables described below in Section 4;

    3.2   Lowlife shall pay RLP USD $550,000 no later than April 7, 2007, which funds will be treated as a deposit towards the purchase of the Assets or alternatively as an on-account payment of royalties, as more particularly described in Section 5.

    3.3   Lowlife shall notify RLP whether it wants to proceed with the acquisition of the Assets no later than April 16, 2007;

    3.4   The parties shall use their best efforts to draft, finalize and execute the definitive purchase agreement for the Assets no later than 5pm Californian time April 30 2007; and

EXHIBIT  3  PAGE  8  OF  18

3.5    Provided that Lowlife has paid the deposit of USD$550,000 to RLP as provided herein, the closing of the acquisition of the Assets shall occur on or before June 30, 2007, when Lowlife has paid the remaining sum due of USD $3,650,000 to RLP in full and cleared funds.

This offer shall remain open until 5pm Californian time May 10, 2007 (or such later time as may be necessary due to an arbitration between the parties as to the provisions and conditions of the purchase agreement), only if Lowlife has confirmed to RLP in writing by April 16, 2007 at the latest that it intends to proceed with the acquisition of the Assets, and may not be amended or revoked by RLP before that time. Should Lowlife confirm its intention not to proceed with the acquisition of the Assets this offer may be revoked by RLP advising Lowlife in writing of its revocation. The agreed purchase price assumes that the Assets will be sold on a debt-free and lien-free basis and are not subject to any third-party claims known to RLP at the time of entering into these Heads of Agreement. The purchase price will be subject to a reasonable adjustment for any deviation from the foregoing assumptions. RLP acknowledges and agrees that it will give reasonable representations, warranties and indemnities to Lowlife in the definitive purchase agreement for the Assets.

Provided that Lowlife has, by April 16, 2007 indicated its intent to complete the purchase of the Assets, then if the parties cannot acting reasonably and in good faith finalize the definitive purchase agreement on or before April 30, 2007, the parties shall utilize an arbitrator to decide the final definitive terms of the agreement, and the parties shall execute the definitive agreement on May 10, 2007 or such other dates as the arbitrator shall set. The arbitration shall be conducted in accordance with Section 29 hereof.

If and when the Assets are transferred to Lowlife, RLP shall immediately provide Lowlife all books, records, agreements, correspondence, designs, samples, customer and supplier lists and all other information and documents in RLP's possession or control related to the Assets only.

Payments in Advance

4.    The payment of USD $450,000 referenced in Section 3 represents an on account payment in relation to:

4.1    Sums due in respect of Atticus and Macbeth royalties for the fourth quarter of 2006;

4.2    Sums due for the 2006 full calendar year royalty for LoserKids;

4.3    All other amounts due and payable in relation to Atticus, Macbeth and LoserKids in the ordinary course of business.

EXHIBIT 3 PAGE 9 OF 18

4.4    Any excess payment to be applied to payment for royalties for first quarter of 2007.

5      The payment of USD $550,000 referenced in Section 3 shall, in the first instance, be treated as a deposit on the agreed purchase price of USD $4,200,000. However, should:

5.1    Lowlife notify RLP that it does not intend to proceed with the acquisition of the Assets by April 16, 2007; or

5.2    The Parties not execute the acquisition agreement by May 10, 2007; or

5.3    Lowlife not pay sums when due pursuant to the acquisition agreement;

then such payment shall be treated as an on account payment of royalties due for the 2007 calendar year in relation to Atticus, Macbeth and LoserKids with a full accounting of the sums required between the parties by no later than January 31 2008. Lowlife (without offset) shall pay RLP any outstanding amount within 14 days (ie by no later than 14 February 2008) and RLP (without offset) shall refund any overpayment within 14 days (ie by no later than 14 February 2008).

Royalties for Q107 ,Q207, Q307 and Q407

6.     In addition to the payments provided for above, Lowlife shall make payment to RLP and shall provide a detailed accounting of all royalties for:

6.1    Q107 by no later than April 15, 2007;

6.2    Q207, upon the earlier of July 15, 2007 or upon the actual transfer of the Assets pursuant to these Heads of Agreement.

6.3    Q307 by no later than October 15, 2007; and

6.4    Q407 by no later than January 15, 2008.

Royalty rates and calculations will be consistent with those used during the 2006 calendar year. For the avoidance of doubt, Sections 6.3 and 6.4 above shall have no application to the Atticus Brand in the event Lowlife acquires the Assets as provided herein.

EXHIBIT _3_ PAGE _10_ OF _18_

Due Diligence and Confidentiality

7.  The commercial and legal due diligence for the Assets shall be completed by April 16, 2007. The commercial due diligence is limited to only include non-European dealings. Such due diligence is to relate to a reasonable and proportionate list of due diligence items.

8.  Lowlife shall exercise reasonable proportionality in any requests made and RLP shall use its best efforts to comply with such requests as soon as is practicable.

9.  The parties agree that they shall keep confidential and not release to any third parties, unless obliged by Court Order so to do, any and all information which either of them provide to the other in connection with these Heads of Agreement.

Fall 07 Orders

10. Upon the execution of these Heads of Agreement by the parties, Lowlife shall immediately provide to RLP all of the Fall 07 Orders for UK and Europe that it is currently in possession of for: Atticus, Macbeth and LoserKids.

11. Lowlife shall also immediately instruct its Agents, Officers, Distributors and Employees to turn over to RLP any Fall 07 Orders that have not yet been provided to Lowlife.

12. RLP shall be entitled to undertake any reasonable audit to verify the Fall 07 Orders provided.

13. Atticus and Macbeth Fall 07 Orders shall be manufactured by current suppliers or by mutually agreed suppliers at prices previously advised. Lowlife to have full access to the Fall 07 manufacturers for the Atticus Brand only for quality control purposes.

Exclusive Dealing

14. Subject to Clause 15, upon execution of these Heads of Agreement and until June 30, 2007 or, until receipt of notification in writing from Lowlife that it will not proceed with the acquisition of the Assets, whichever occurs earlier, RLP agrees that it will deal exclusively with Lowlife in relation to the purchase of the Assets.

15. Should Lowlife fail to notify RLP of its decision as to whether it intends to proceed with the acquisition by April 16, 2007 or fail to pay any monies when due under these Heads of Agreement, the anticipated

EXHIBIT _3_ PAGE _11_ OF _18_

acquisition/purchase agreement or the extension/wind down agreements to be negotiated in respect of Atticus, Macbeth and LoserKids, any agreement regarding exclusive dealings shall cease to have any effect.

<u>Extension/Wind Down Agreements</u>

16.    RLP and Lowlife shall negotiate in good faith with the intention to enter into mutually agreeable extension/wind down agreements in relation to LoserKids and Macbeth (and Atticus should Lowlife not proceed to the acquisition of the Assets) by no later than April 30 2007, the essential terms of which are set forth on <u>Schedule 2</u> attached hereto and incorporated herein by this reference. From the date of these Heads of Agreement until the execution of new extension/wind down agreements, the provisions and conditions of the parties' most recent written agreements for the brands at issue shall govern and control the conduct of the parties, save for any amendments by implication expressly agreed herein.

17.    Provided that Lowlife has not breached any of its obligations under this Agreement, RLP expressly consents to Lowlife's assignment in respect of the acquisition of the Assets, to an affiliate or assignee of Lowlife, which may include a new entity formed by either Lowlife or Dale Masters for the purpose of acquiring the Assets.

18.    For all other proposed assignments by Lowlife, Lowlife shall first obtain the express written consent of RLP, which consent shall not be unreasonably conditioned, delayed or withheld.

19.    Lowlife accepts that any assignment of its rights as provided for in Clause 18 shall be to an assignee of reasonably satisfactory financial standing and capacity. Evidence of the financial standing and capacity of the proposed assignee to be provided by Lowlife before any written consent is required to be given. Such written consent will not be unreasonably conditioned, delayed or withheld by RLP.

20.    If there is an assignment as provided for in Clause 18 Lowlife accepts that any assignment of its rights under any extension/wind down agreement of Macbeth and/or LoserKids (and/or Atticus should Lowlife not proceed to the acquisition of the Assets) to an affiliate or assignee of Lowlife will result in more detailed reporting and auditing controls on the affiliate or assignee as provided for in Schedule 2.

21.    RLP will maintain global control of sales for the Spring 08 season with regards to the Macbeth brand, and, in the event Lowlife does not proceed with the purchase of the Atticus Brand, RLP will assume global control of sales for the Atticus Brand beginning with the Spring 08 selling season.

EXHIBIT 3 PAGE 12 OF 18

Lowlife will only be entitled to operate the LoserKids website until December 31, 2007 and on January 1, 2008 this shall revert to RLP's full control and ownership.

<u>General Obligations</u>

22.    Lowlife shall provide an accounting (and if requested disclosure) to RLP in respect of LoserKids for the 2006 calendar year by no later than April 10, 2007.

23.    RLP and Lowlife agree to a mutual release in relation to all past and present claims whether filed or not (and any claims that have been filed by either party against the other shall be dismissed with prejudice), including those intimated against the agents and/or employees of the other. For the avoidance of doubt, Lowlife's release shall extend to Tom Helleberg only in the event that, within 21 business days after the execution hereof, Tom Helleberg and Lowlife execute a mutual release and non-disparagement agreement in favor of each other, including a release of any and all monies that are or may be payable by Lowlife to Tom Helleberg.

24.    The parties shall be entitled to specific performance of these Heads of Agreement. Time is of the essence for the obligations to be performed hereunder.

25.    After the signing of these Heads of Agreement, each of the Parties, and their respective affiliates, parents, subsidiaries, and each of their respective officers, directors, employees and agents, successors and assigns shall not make any statement to any person likely to result in disparagement or adverse publicity for the other party or any of such party's affiliates, parents, subsidiaries or any their respective officers, directors, employees or agents, successors or assigns.

26.    After the signing of these Heads of Agreement, Lowlife and RLP, and their respective affiliates, parents, subsidiaries, and each of their respective officers, directors, employees and agents, successors and assigns shall not interfere with the on-going business activities of each other.

27.    Each of the parties will be responsible for and bear all of their own costs and expenses (including any legal fees and expenses) incurred at any time in connection with pursuing or consummating this Heads of Agreement.

28.    The parties shall negotiate in good faith and shall use their best efforts to finalize and execute the extension/wind down agreements contemplated hereby and the acquisition agreement for the Assets. The parties covenant and agree that neither of them will seek to avoid the obligations created by

EXHIBIT _3_ PAGE _13_ OF _18_

these Heads of Agreement on the theory that the parties have failed to state the essential terms of their agreement.

29. Any dispute, claim or controversy arising out of or relating to these Heads of Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this letter of intent to arbitrate, shall be determined by arbitration in San Diego, California before three arbitrators, one of which shall be elected by each of Lowlife and RLP; and the third of which shall be elected by the other two arbitrators. The arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures. Judgment on the award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

30. These Heads of Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument.

31. These Heads of Agreement shall be governed and construed under the laws of the State of California, without taking into account conflict of laws provisions.

Duly executed 27th March 2007:

LOWLIFE CORPORATION LTD.,
a _____

By: _____
      Dale Masters, Chief Operating Officer

REALLY LIKEABLE PEOPLE, INC.,
a Delaware corporation

By: _____
      Jon W. Humphrey, President

ATTICUS CLOTHING, INC.,
a California corporation

By: _____
      Jon W. Humphrey, President

EXHIBIT 3   PAGE 17 OF 18

MACBETH, INC,
a California corporation

By: _____
         Jon W. Humphrey, President


LOSERKIDS, INC.,
a California corporation

By: _____
         Jon W. Humphrey, President

EXHIBIT 3 PAGE 15 OF 18

SCHEDULE 1

ASSETS:

All of the right, title and interest in, to and under the registered and unregistered domestic and foreign servicemarks, trademarks, trademark applications, trade names and copyrights associated with the "Atticus" brand of clothing and related products, which are owned by RLP or to which RLP otherwise has rights as of the date of this Agreement (all of the foregoing referred to herein as the "Atticus Marks"), together with the goodwill of the business associated with the Atticus Marks only and which is symbolized thereby; all rights to sue for infringement of any Atticus Marks, whether arising prior to or subsequent to the date of the final acquisition agreement and any and all renewals and extensions thereof that may hereafter be secured under the laws now or hereafter in effect in the United States, Australia, Canada, the United Kingdom, the European Union, and in any other jurisdiction, the same to be held and enjoyed by the RLP, their parents, subsidiaries, affiliates, successors and assigns from and after the date hereof as fully and entirely as the same would have been held and enjoyed by the RLP had the final acquisition agreements not been made; all distribution or sales agency agreements for products sold under the Atticus Marks (provided, however, to the extent the foregoing cannot be assigned without obtaining a third-party's consent, RLP will use its reasonable efforts to obtain such consent but will not be obligated to assign such agreements to Lowlife in the absence of such consent) lien-free ownership of the URL www.atticusclothing.com and all Atticus "myspace" (the Atticus Marks, together with the foregoing rights, the "Assets")

EXHIBIT 3 PAGE 16 OF 18

SCHEDULE 2

ESSENTIAL TERMS:

| | |
|---|---|
| Term: | The license term of all extension/wind down agreements shall be extended through December 31, 2007 (except as otherwise provided below). |
| Accounts Payable: | Future amounts payable to RLP for "Macbeth" brand purchases (e.g., samples) shall be paid no later than 15 days after Lowlife's receipt of an invoice from RLP. |
| | Royalty payments due for "LoserKids.com.uk" shall be made on a quarterly basis (in arrears) by the 30th calendar day following each calendar quarter beginning with the 2007 first quarter. The royalty payment for the first calendar quarter of 2007 will be due and payable on April 30, 2007. |
| | Lowlife shall make payment to RLP for "Atticus" and "Macbeth and shall provide a detailed accounting of all royalties for: |
| | Q107 by no later than April 15, 2007; |
| | Q207, upon the earlier of July 15, 2007 or upon the actual transfer of the Assets pursuant to these Heads of Agreement. |
| | Q307 by no later than October 15, 2007; and |
| | Q407 by no later than January 15, 2008. |
| Restrictions: | RLP, as applicable, will retain all responsibility for the manufacture of the "Macbeth" brand products (and Atticus should Lowlife not proceed to the acquisition of the Assets). |
| | Lowlife will retain the right to sell and ship "Macbeth" brand (and Atticus should Lowlife not proceed to the acquisition of the Assets) products through December 31, 2007, but the Spring 2008 sales for the "Macbeth" brand (and Atticus should Lowlife not proceed to the acquisition of the Assets) of products will pass to RLP effective July 1, 2007. The LoserKids.com.uk website will function normally and will be subject to RLP's approval of content, newsletters, brands, and other matters in accordance with the parties' customary practice and procedures. Lowlife will only be entitled to operate the LoserKids website until December 31, 2007 and on January 1, 2008 this shall revert to RLP's full control and ownership. |
| Audit/Inspection: | Lowlife accepts that the extension/wind down agreements in respect of Atticus and Macbeth will contain further restrictions as to reporting and supervision than are contained in the Macbeth and Atticus agreements |

EXHIBIT 3 PAGE 17 OF 19

which expired on December 31 2007. The further restrictions shall be;

1. Regular and complete monthly reporting by Lowlife in relation to financial and other performance of Atticus/Macbeth brands.
2. RLP to have to right to regularly audit/inspect Lowlife with 5 days notice to Lowlife of such an audit/inspection occurring

In the event the parties cannot agree on the other non-essential terms of the extension/wind down agreements, then such extension/wind down agreements shall contain the same provisions and conditions of the parties' most recent written agreements for the brands in question, except that in the event of a conflict between the terms of this Schedule 2 and the terms in the previous agreements, the terms of this Schedule 2 shall govern and control.

EXHIBIT 3 PAGE 19 OF 19

EXHIBIT 4

Michael H. Riney, Esq. (116137)
VANTAGE LAW GROUP A.P.C
600 West Broadway, Suite 950
San Diego, CA 92101
Telephone: (619) 330-3000
Facsimile: (619) 330-3010

Attorneys for Claimant Lowlife Corporation
Ltd.

IN THE MATTER OF ARBITRATION BETWEEN

| | |
|---|---|
| LOWLIFE CORPORATION LTD., | STIPULATION RE: STATEMENT AND SCOPE OF CLAIM FOR ARBITRATION |
| Claimant, | |
| v. | Date: May 29, 2007<br>Time: 9:00 a.m.<br>Location: JAMS San Diego, 401 B Street<br>                   Suite 2100, San Diego, CA  92101 |
| REALLY LIKEABLE PEOPLE, L.P.,<br>ATTICUS CLOTHING, INC., MACBETH,<br>INC., and LOSERKIDS, INC., | |
| Respondents. | Arbitrators: John Seitman, Esq.<br>                   Hon. Richard Haden (Ret.)<br>                   Hon. William Howatt (Ret.) |

        Claimant Lowlife Corporation, Ltd. and respondents Real Likeable People, Inc., Atticus

Clothing, Inc., Macbeth, Inc., and Loserkids, Inc., by and through their respective attorneys of

record, hereby enter into the following stipulation regarding the scope of the arbitration hearing

scheduled to commence in the above-captioned matter on May 29, 2007:

1.   Whereas the Heads of Agreement requires arbitration of: "Any dispute, claim or controversy

      arising out of or relating to these Heads of Agreement or the breach, termination,

      enforcement, interpretation or validity thereof, including the determination of the scope or

      applicability of this letter of intent to arbitrate":

STIPULATION RE: STATEMENT AND SCOPE OF CLAIM FOR ARBITRATION

EXHIBIT _4_ PAGE _1_ OF _3_

2  Whereas the parties to the Heads of Agreement have or claim to have multiple disputes, claims or controversies arising out of or relating to the Heads of Agreement;

3. Whereas the parties desire at this time to focus the arbitration process exclusively on the issue of finalizing the terms of the definitive purchase agreement (and, to the extent ruled arbitrable pursuant to para 4 b below, the extension/wind down agreements) through arbitration as anticipated by paragraph 3 of the Heads of Agreement without prejudicing any other known disputes, claims or controversies arising out of the Heads of Agreement in the event the arbitration does not result in the prompt execution of a definitive purchase agreement through arbitration as anticipated by paragraph 3 of the Heads of Agreement;

4  The parties hereby stipulate and agree:

a.  The scope of the arbitration hearing scheduled for May 29, 2007, shall be limited to the issue(s) of: (1) finalizing the terms of the definitive purchase agreement through arbitration as anticipated by paragraph 3 of the Heads of Agreement, (2) whether the arbitration agreement provides the arbitrators with jurisdiction to finalize the terms of the extension/wind down agreements through arbitration, and (3) if and only to the extent the arbitrators determine over Lowlife's objection that the arbitration agreement provides the arbitrators with jurisdiction to finalize the terms of the extension/wind down agreements through arbitration, finalizing the terms of such documents;

b  The arbitration panel shall use its best efforts to issue its Final Arbitration Award on or before close of business on May 30, 2007;

c  If and only if all parties to the arbitration hearing execute a definitive purchase agreement and all related documents, including the extension/wind down agreements to the extent ruled arbitrable, in accordance with the arbitrators' ruling within 24

2
STIPULATION RE: STATEMENT AND SCOPE OF CLAIM FOR ARBITRATION

EXHIBIT _4_ PAGE _2_ OF _3_

1  hours of the issuance of the Final Arbitration Award, all known claims existing as of

2  May 29, 2007, between Lowlife, on the one hand, and RLP, Atticus, Macbeth and

3  Loserkids, or any of them, on the other hand, shall be deemed to be subsumed into the

4  arbitration award and forever barred

5     d  If the parties do not execute a definitive purchase agreement and all related

6  documents in accordance with the arbitrators' ruling within 24 hours of the issuance

7  of the Final Arbitration Award, or if there is a termination of the definitive purchase

8  agreement, the parties shall arbitrate any claims arising out of the Heads of

9  Agreement in accordance with the terms thereof, and they shall remain free to pursue

10  any and all other claims not released in the Heads of Agreement

11

12

13  Dated: May 23, 2007          VANTAGE LAW GROUP, A P C

14

15  By:

16                     Michael H  Riney
                   Attorneys for Claimant LowLife Corporation,
                   LTD

17  Dated: May __, 2007          LATHAM & WATKINS LLP

18

19  By:

20                     Kenneth M  Fitzgerald
                   Attorneys for Respondents Really Likeable

21                     People, L P , Atticus Clothing, Inc , MacBeth,
                   Inc  and Loserkids com, Inc

22

23

24

25

26

27

28

---

3

STIPULATION RE: STATEMENT AND SCOPE OF CLAIM FOR ARBITRATION

EXHIBIT _4_ PAGE _3_ OF _3_

EXHIBIT 5

EXECUTION COPY

## ASSET PURCHASE AND SALE AGREEMENT

This ASSET PURCHASE AND SALE AGREEMENT (this "**Agreement**") is entered into as of May 29, 2007 (the "**Execution Date**"), by and among LOWLIFE CORPORATION LTD, an English limited company ("**Buyer**"), ATTICUS CLOTHING INC., a California corporation ("**Seller**"), and REALLY LIKEABLE PEOPLE, INC., a Delaware corporation ("**RLP**"). Seller and RLP are collectively referred to herein as the "**Seller Parties**." Buyer and the Seller Parties are individually referred to herein as a "**Party**," and collectively as the "**Parties**."

### RECITALS

A.     This Agreement is the "definitive purchase agreement" referenced in that certain Heads of Agreement, dated March 28, 2007, by and among Buyer, the Seller Parties and certain other parties identified on the signature page thereto (the "**Heads of Agreement**").

B.     Reference is hereby made to the following agreements dated as of the date hereof by and among Buyer and certain of the Seller Parties or Seller's Affiliates: that certain Extension Agreement concerning the "Macbeth" brand, the Atticus Inventory, Sales Order and Wind-Down Agreement and the www.LoserKids.uk.com Wind-Down Agreement (such three agreements, collectively, the "**Wind-Down Agreements**").

C.     By this Agreement, the Parties contemplate a transaction in which, on the terms and subject to the conditions set forth herein, Seller Parties will sell, and Buyer will acquire, the Purchased Assets, as defined herein.

NOW, THEREFORE, with reference to the foregoing recitals, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

### ARTICLE I

### DEFINITIONS

As used herein, the following terms shall have the following respective meanings:

"**Affiliate**" of a Person means any other Person controlling, controlled by or under common control with such first Person.   As used in this definition and the definition of Associated Persons and Entities, "**controlling**," "**controlled by**" and "**under common control with**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of another Person whether through the ownership of voting securities, by contract or otherwise.

"**Associated Persons and Entities**" of a Party shall include, to the broadest extent allowed by law, such party's past, present and future members, managers, limited partners, general partners, partners, officers, directors, shareholders, employees, agents, representatives, assigns, accountants, attorneys, insurance carriers, beneficiaries, spouses, children, executors,

- 1 -

EXHIBIT 5 PAGE 1 OF 56

EXECUTION COPY

administrators, heirs, predecessors-in-interest and successors-in-interest, Affiliates, related entities, parents, subsidiaries, predecessors, and divisions, including without limitation, all partnerships, limited liability companies, and joint ventures as well as all other companies controlling, controlled by, or under common control with such Party; provided, however, that Buyer and any Affiliates of Buyer shall not be deemed to be "Associated Persons and Entities" of any Seller Party or any Seller Affiliate, notwithstanding any prior, existing or future business relationship or course of dealing.

"Atticus Agreements" means all agreements to which Seller Parties or any Seller Affiliates are parties related to distribution, licensing, design, manufacturing, marketing, sales agency, retail sales, and other forms of agreement, whether written or oral, relating to the Atticus Products or by which the Purchased Assets may be bound or affected.

"Atticus Copyrights" means all worldwide registered and unregistered copyrights that have been used exclusively by the Seller Parties and/or Seller Affiliates in connection with the Atticus Products, including but not limited to those items set forth on the Schedule of Atticus Copyrights attached as Schedule 1 1(c) hereto.

"Atticus Information" means all of the following that have been used in connection with manufacturing and/or marketing the Atticus Products and in relation to the Atticus Marks, to the extent in the possession or control of Seller Parties or any Seller Affiliate: (a) current and historic customer and supplier, pricing and cost information; (b) current and historic designs, graphic designs in a useable format for any Atticus Products that have been developed prior to the Closing associated with Atticus Copyrights and/or Atticus Marks; (c) all material records, correspondence and samples of use that are related to the Purchased Assets (other than the Atticus Other Rights) and are reasonably necessary for Buyer to protect and defend its rights to those Intellectual Property rights that are included in the Purchased Assets; and (d) an archive (zip or RAR of a top level folder) containing all the atticusclothing.com files from Seller's web server, include all .php and .swf files and a backup of the most recent database for the site to the extent the same are owned by Seller Parties and legally can be conveyed to Buyer and solely to the extent relating exclusively to the Web sites operated by the Seller Parties under the Atticus Net Names, but not, for the avoidance of doubt, any images that constitute Promotional Material or as to which Seller Parties have any legal or contractual prohibition on transferring to Buyer

"Atticus IP Assets" means, individually and collectively, the Atticus Marks, the Atticus Copyrights and the Atticus Net Names.

"Atticus Marks" means:

(a)    the worldwide right, title, and interest in, to and under the registered, unregistered and common law domestic and foreign service marks, trademarks, service mark applications, trademark applications, names, words, designs, logos, slogans, symbols and trade names associated with the Atticus Products or arising from the Seller Parties' promotion, endorsement or sponsorship activities and services relating to the Atticus Products, including but not limited to those marks set forth on the Schedule of Marks attached as Schedule 1.1(b), together with the goodwill associated therewith;

- 2 -

EXHIBIT 5 PAGE 2 OF 56

EXECUTION COPY

(b)    all rights to sue for infringement of any of the rights specified in subparagraph (a) above, whether arising prior to or subsequent to the Closing Date; and

(c)    any and all renewals and extensions of the rights specified in subparagraph (a) above that may hereafter be secured under applicable Law.

"**Atticus Net Names**" means all domain names set forth on the Schedule of Atticus Net Names attached as Schedule 1.1(e) hereto, to the extent the same may be validly transferred to Buyer as part of the Purchased Assets (whether with or without consent).

"**Atticus Other Rights**" means (a) all worldwide registered and unregistered copyrights relating to the Atticus Products or arising from the Seller Parties' promotion, endorsement or sponsorship activities and services relating to the Atticus Products (including any registered and unregistered copyrights relating to products sold under the "Atticus Black" name and marks) and (b) all worldwide right, title, and interest in, to and under the registered, unregistered and common law domestic and foreign service marks, trademarks, service mark applications, trademark applications, names, words, designs, logos, slogans, symbols and trade names associated with the Atticus Products or arising from the Seller Parties' promotion, endorsement or sponsorship activities and services relating to the Atticus Products, in each case (i) to the extent created, arising or resulting from actions or activities of Buyer, Buyer Affiliates or Associated Persons and Entities of Buyer and (ii) in which Seller Parties may have any rights, title or interest as a result of the contractual relationship between Buyer and Seller under the Manufacturing Agreement between Buyer and Seller made on February 25, 2003 as subsequently amended and/or extended.

"**Atticus Products**" means clothing, footwear and related products sold and marketed by Seller Parties under the "Atticus" name and/or Atticus Marks.

"**Claims**" means any demands, Liens, causes of action, Losses, and Liabilities of any nature whatsoever.

"**Deposit**" means the Five Hundred and Fifty Thousand and No/100 Dollars (USD $550,000.00) previously delivered by Buyer to Seller Parties pursuant to the Heads of Agreement as a deposit to be credited towards the Purchase Price at Closing.

"**Government Entity**" means any: (a) nation, state, county, city, town, borough, village, district or other jurisdiction; (b) federal, state, local, municipal, foreign or other government, governmental or quasi-governmental body or authority (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers); (d) multinational organization or body; (e) body exercising, or entitled to or with the legal authority to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power; or (f) any official representative of any of the foregoing acting in his or her authorized capacity.

"**Intellectual Property**" means the following in any jurisdiction throughout the world: (a) inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with

- 3 -

EXHIBIT _5_ PAGE _3_ OF _56_

all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (b) trade marks, service marks, trade dress, logos, slogans, trade names, corporate names, internet domain names, together with translations, adaptations, derivations, and combinations thereof and including any goodwill associated therewith, and applications, registrations, and renewals in connection therewith, (c) copyrightable works, copyrights, and applications, registrations, and renewals in connection therewith, and (d) trade secrets and confidential business information (including ideas, research and development, compositions, technical data, designs, drawings, specifications, customer and supplier lists, and pricing and cost information).

"Knowledge": The Seller Parties shall be deemed to have knowledge of a particular fact or other matter if: Jon Humphrey, Diana Crawford or Amy Arroyo has actual knowledge with respect to the fact or matter in question, or the foregoing individuals reasonably would be expected to discover or otherwise become aware of that fact or matter in the course of conducting a reasonable inquiry with respect to the fact or matter in question. The Buyer shall be deemed to have knowledge of a particular fact or matter if: Dale Masters, Matt Ash or Tom Ash has actual knowledge with respect to the fact or matter in question, or the foregoing individuals reasonably would be expected to discover or otherwise become aware of that fact or matter in the course of conducting a reasonable inquiry with respect to the fact or matter in question.

"Law" or "Laws" means any federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty enacted, adopted, promulgated or applied by a Government Entity.

"Liability" or "Liabilities" shall mean and include any direct or indirect indebtedness, guaranty, endorsement, adverse claim, loss, damage, deficiency, cost, expense, obligation or responsibility, fixed or unfixed, direct or indirect, known or unknown, asserted or unasserted, liquidated or unliquidated, and secured or unsecured.

"Lien" or "Liens" means with respect to any property or assets, any mortgages, liens (statutory or otherwise), security interests, claims, pledges, licenses, options, conditional sales contracts, assessments, charges, title defects or encumbrances of any nature whatsoever, whether perfected or unperfected.

"Losses" means all losses, damages, judgments, awards, claims, costs, liabilities and expenses (including, without limitation court costs and reasonable attorneys' fees and expenses, costs of suit and costs of appeal).

"Litigation" means any action, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard (or threatened to be commenced, brought, conducted or heard) by or before, or otherwise involving, any Government Entity or arbitrator.

"Order" means any legally binding order, injunction, judgment, decree, ruling, assessment or arbitration award of any Government Entity or arbitrator

- 4 -

C:\N:Portbl\ACTIVEFIL\PPA72021064_10 DOC

EXHIBIT 5 PAGE 4 OF 56

EXECUTION COPY

"**Person**" means an individual, corporation, partnership, limited liability company, UK limited company, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"**Purchased Assets**" means, solely and exclusively: (a) the Atticus IP Assets; (b) the Atticus Other Rights (but solely to the extent of Seller Parties' transferable rights, title and interest therein, if any); and (c) the Atticus Information.

"**Seller Affiliate**" means any entity controlling, controlled by or under common control with any Seller Party.

"**Tax**" or "**Taxes**" means all taxes levied or imposed by any Government Entity, including income, gross receipts, windfall profits, value added, severance, production, sales, use, license, excise, franchise, employment, environmental, real property, personal property, transfer, alternative minimum, estimated, withholding or other taxes, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties, whether or not disputed or contested.

## ARTICLE II

### PURCHASE AND SALE OF PURCHASED ASSETS

2.1    <u>Purchased Assets.</u>  Subject to the provisions and conditions of this Agreement, on the Closing Date (as defined in <u>Section 2.7</u>), each of the Seller Parties shall sell, assign, transfer, convey and deliver to Buyer against delivery of the Purchase Price (as defined in <u>Section 2.5</u>), and Buyer shall purchase and accept, all of Seller Parties' worldwide right, title and interest in and to the Purchased Assets, together with the goodwill associated therewith, free and clear of any Liens (other than any Liens resulting from the actions or omissions of Buyer).  To the extent any Seller Party acquires any additional Purchased Assets between the Execution Date and the Closing Date, or if any Seller Affiliate directly or indirectly owns any assets that otherwise would constitute "Purchased Assets" hereunder if owned by the Seller Parties on the Closing Date, the Seller Parties shall convey (or cause the applicable Seller Affiliate to convey) the same to Buyer at the Closing for no consideration other than the payment of the Purchase Price to Seller as provided in <u>Section 2.5</u>.

2.2    <u>Excluded Assets.</u>  Notwithstanding the foregoing or anything to the contrary herein, Buyer is not purchasing, and no Seller Party, Seller Affiliate or Associated Persons and Entities of Seller shall be obligated to sell to Buyer or any Associated Persons and Entities of Buyer, any assets, properties, claims or rights other than the Purchased Assets (all such other items that do not expressly constitute Purchased Assets, the "**Excluded Assets**").  All Excluded Assets are expressly excluded from the transactions contemplated hereby, and the Seller Parties' rights, title and interests in and to such Excluded Assets shall remain intact, unaffected and unimpaired notwithstanding the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.  For avoidance of doubt, and without limiting the generality of the foregoing, (a) all rights, title and interest in and to the Class 9 trademark registration for the "dragging the lake" trademark and the Class 35 trademark for "Loserkids" in Indonesia that currently are held in the name of Seller are Excluded Assets and (b) all rights title

- 5 -

EXHIBIT _5_ PAGE _5_ OF _56_

EXECUTION COPY

and interest in and to any and all licenses, authorizations and permits from any Government Entity held by Seller or any Seller's Affiliate are Excluded Assets

2.3     Retained Liabilities. For avoidance of doubt, the Parties expressly acknowledge and agree that: (a) Buyer is not assuming any Liabilities of or owed by any Seller Party or Seller Affiliate whatsoever by virtue of the transactions contemplated hereby and (b) no Seller Party, Seller Affiliate or Associated Persons and Entities of Seller is assuming any Liabilities of or owed by Buyer or any Associated Persons and Entities of Buyer whatsoever by virtue of the transactions contemplated hereby. For avoidance of doubt, any and all Liabilities of Seller Parties arising under any Atticus Agreement(s) and any Liabilities of Seller Parties that relate to or arise out of Seller Parties' use of Promotional Material (as defined in Section 4.4) are not being assumed by Buyer hereunder.

2.4     Post-Closing Competition. For avoidance of doubt, subject to Section 4.1.3, neither the purchase and sale of the Purchased Assets nor any provision of this Agreement shall in any way preclude the Seller Parties, the Seller Affiliates or any Associated Persons and Entities of Seller from engaging in any business or other activities similar to or in competition with the business or other activities that from time to time are or may be conducted by Buyer.

2.5     Purchase Price. The Purchase Price for the Purchased Assets shall be Four Million Two Hundred Thousand and No/100 Dollars (USD $4,200,000) in lawful money of the United States of America (the "Purchase Price"). The Parties acknowledge that Buyer has previously delivered the Deposit to Seller, which shall be credited by Seller against the Purchase Price at Closing. On the Closing Date, Buyer shall deliver the Purchase Price, less the Deposit, to Seller by wire transfer of immediately available funds to an account designated by Seller.

2.6     Allocation of Purchase Price. The aggregate Purchase Price shall be allocated among the Purchased Assets for tax purposes in accordance with the provisions of Section 1060 of the Internal Revenue Code of 1986, as amended, and the regulations thereunder. To the extent that Section 1060 permits any discretion as to the allocation of the Purchase Price such that Seller Parties would be materially affected by the specific allocation of the Purchase Price to the Purchased Assets, the applicable allocations shall be subject to the prior written consent of Seller Parties, not to be unreasonably withheld. Seller Parties, Seller Affiliates and Buyer will follow and use such allocation in all tax returns, filings or other related reports made by them to any Government Entity. To the extent that disclosures of this allocation are required to be made by the parties to the Internal Revenue Service ("IRS"), Buyer, Seller Parties and Seller Affiliates will disclose such reports to the other reasonably in advance of filing with the IRS.

2.7     Closing. The closing of the purchase and sale of the Purchased Assets (the "Closing") will commence at 10:00 a.m. (Pacific Standard Time) on July 9, 2007 (the "Closing Date"), unless the Buyer and Seller otherwise agree. The Closing shall be conducted telephonically and at the offices of Seltzer Caplan McMahon Vitek at 750 B Street, Suite 2100, in San Diego, California, unless Buyer and Seller otherwise agree. Subject to the termination rights set forth in Article VII, failure to consummate the purchase and sale provided for in this Agreement on the date and at the time specified above will not alone result in the termination of this Agreement and will not without more relieve any party of any obligation under this

- 6 -

EXHIBIT __5__ PAGE __6__ OF __56__

Agreement. In such a situation, the Closing will occur as promptly as reasonably practicable, subject to the rights of the Parties to terminate this Agreement pursuant to the terms and conditions in Article VII.

2.8    Further Assurances. From time to time after the Closing, each Party shall execute and deliver such other documents and instruments, and shall take such other actions, as any other Party may reasonably request in order to effectuate or evidence the transactions contemplated by this Agreement; provided, however, that any such request that will require the incurrence of material fees, costs or expenses by any Party may be conditioned upon the requesting Party agreeing to pay or reimburse the other Party for the actual amount of such fees, costs or expenses.

2.9    Proration. Any Taxes relating to the Purchased Assets shall be prorated as of the Closing Date, such that Seller Parties shall be responsible for any Taxes relating to Seller Parties' ownership of the Purchased Assets prior to the Closing and Buyer shall be responsible for any Taxes relating to Buyer's ownership of the Purchased Assets after the Closing.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

3.1    Representations and Warranties of Seller Parties. Each Seller Party, as applicable, hereby represents and warrants to Buyer as follows, except as set forth in the disclosure schedules attached to or accompanying this Agreement (the "Disclosure Schedules"):

3.1.1    General.

(a)    Organization and Qualification. Each of the Seller Parties is duly organized, validly existing and in good standing under the laws of its state of incorporation or organization, and each of the Seller Parties is duly licensed or qualified to do business as a domestic or foreign entity, as applicable, and is in good standing, in each jurisdiction wherein the character of the properties owned or leased by it, or the nature of its business, makes such licensing or qualifications necessary, except in each case where the failure to be so licensed or qualified or to be in good standing would not materially impair or delay the performance of the obligations of the Seller Parties hereunder.

(b)    Power. Each of the Seller Parties has all requisite power and authority to own, operate, lease and license its assets, and to carry on its businesses as and where such are now being conducted, except as would not materially impair or delay the performance of the obligations of the Seller Parties hereunder.

(c)    Binding Obligation. Each of the Seller Parties has all requisite corporate power and authority to enter into and perform its obligations under this Agreement and to perform its respective obligations hereunder. The execution and delivery of this Agreement and any other documents and instruments required to be executed and delivered by the Seller Parties pursuant hereto (the "Ancillary Documents"), and the performance of the Seller Parties' obligations hereunder and thereunder, have been duly authorized by all necessary corporate

- 7 -

EXHIBIT 5 PAGE 7 OF 56

EXECUTION COPY

action on the part of the respective Seller Parties. No other act or proceeding on the part of any of the Seller Parties is necessary to authorize (i) the execution and delivery by the Seller Parties of this Agreement or any Ancillary Documents or (ii) the performance of the obligations of the Seller Parties contemplated hereby and thereby. This Agreement and each Ancillary Document has been (or upon delivery will be) duly executed and delivered by the applicable Seller Parties signatory thereto and, assuming the valid execution and delivery of this Agreement and such Ancillary Documents by the other parties thereto, constitutes (or upon execution and delivery will constitute) a valid and binding obligation of such Seller Party enforceable against such Seller Party in accordance with their respective terms, except that enforceability may be limited by bankruptcy, insolvency, reorganization or other laws affecting creditors' rights generally, and the availability of equitable remedies may be limited by general equitable principles.

(d)    No Conflict.    To the Seller Parties' Knowledge, neither the execution and delivery of this Agreement or the Ancillary Agreements, nor the consummation by Seller Parties of the transactions contemplated hereby and thereby: (i) will violate any applicable Law or Order, (ii) will require the Seller Parties to obtain any authorization, consent, approval, exemption or take other action or give notice to any Government Entity, or (iii) will violate or conflict with, or constitute a default or breach (or an event which, with notice or lapse of time, or both, would constitute a default or breach) under, or will result in the termination of, or accelerate the performance required by, or result in the creation of any Lien upon any of the Purchased Assets under any term or provision of the organizational documents of any of the Seller Parties or of any contract, commitment, understanding, arrangement, agreement or restriction of any kind or character to which any of the Seller Parties is a party or by which such Seller Party or any of the Purchased Assets may be bound or affected, except in each case as would not materially impair or delay the performance of the obligations of the Seller Parties hereunder.

3.1.2    Ownership of Purchased Assets

(a)    Ownership.    Except as set forth on Schedule 3.1.2(a), Seller Parties have not granted or assigned to any Person other than Buyer and any applicable Associated Persons and Entities of Buyer any franchise, right or license of any kind, written or oral, to use any part of the Atticus IP Assets in any manner. Other than agreements with Buyer and Associated Persons and Entities of Buyer, there is no oral or written agreement, contract, commitment, understanding or obligation by which the Seller Parties have agreed to restrict Seller Parties' rights to develop, own and operate the Atticus IP Assets in any manner.

(b)    Title to Atticus IP Assets.    Except as set forth on Schedule 3.1.2(b), the Seller Parties collectively own all right, title and interest in and to the Atticus IP Assets appearing in Schedules 1 1(b), 1.1(c) and 1.1(e) hereto (the "**Scheduled Atticus IP Assets**"), free and clear of all Liens (other than those resulting from the actions or omissions of Buyer). Except as set forth on Schedule 3.1.2(b), to the Knowledge of the Seller Parties, the Seller Parties collectively own all right, title and interest in and to the Atticus IP Assets other than the Scheduled Atticus IP Assets, free and clear of all Liens (other than those resulting from the actions or omissions of Buyer).

- 8 -

EXHIBIT _5_ PAGE _8_ OF _56_

EXECUTION COPY

(c)  <u>Restrictions on Atticus Business</u>.  Except for the Heads of Agreement, this Agreement, the existing Manufacturing and Distribution Agreement with Buyer (as amended from time to time, including pursuant to the Wind-Down Agreements) and the agreements listed on Schedule 3.1.2(c), no Seller Party is a party to or bound by any agreement (i) requiring it to assign any interest in any of the Atticus IP Assets, or (ii) prohibiting or restricting it from commercially exploiting the Atticus IP Assets or soliciting customers to purchase products marketed under the Atticus Marks.

(d)  <u>Employee Design Work</u>.  Except as set forth on Schedule 3.1.2(d), all Atticus Copyrights created by employees of Seller Parties were created within the scope of such employees' employment with the Seller Parties.

(e)  <u>Atticus Other Rights</u>.  THE ATTICUS OTHER RIGHTS ARE BEING TRANSFERRED TO BUYER AS PART OF THE PURCHASED ASSETS HEREUNDER ON AN "AS IS" "WHERE IS" BASIS.  NONE OF THE SELLER PARTIES MAKES ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ATTICUS OTHER RIGHTS, EITHER EXPRESS OR IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF TITLE, NON-INFRINGEMENT, OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, QUIET ENJOYMENT, QUIET POSSESSION, OR ANY WARRANTIES IMPLIED FROM ANY COURSE OF DEALING OR USAGE OF TRADE, AND EACH OF THE SELLER PARTIES HEREBY EXPRESSLY DISCLAIMS THE SAME.  FOR THE AVOIDANCE OF DOUBT, NONE OF THE SELLER PARTIES' REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO THE REPRESENTATIONS AND WARRANTIES OF BUYER CONTAINED IN THIS SECTION 3.1.2, OR IN SECTIONS 3.1.4 AND 3.1.6, SHALL APPLY TO THE ATTICUS OTHER RIGHTS.

3.1.3  <u>Absence of Liabilities</u>.  Except as set forth on Schedule 3.1.3, to the Knowledge of the Seller Parties, the Seller Parties do not have any Liabilities that relate to or that may affect the Purchased Assets (other than the Atticus Other Rights, as to which Seller Parties make no representations or warranties) or that are reasonably likely to prevent or materially delay the performance of the Seller Parties' obligations hereunder or that have resulted in or would result in any Lien on any of the Atticus IP Assets (other than as a result of any action or omission of Buyer).  The Seller Parties have no Knowledge of any basis as of the date hereof for the assertion against any of the Seller Parties of any Liability related to the Purchased Assets (other than the Atticus Other Rights, as to which Seller Parties make no representations or warranties) for which Buyer could become liable as a result of the purchase and sale of the Purchased Assets contemplated hereby.

3.1.4  <u>Sufficiency of Assets</u>.  In order to design, manufacture, market, and sell and offer the Atticus Products as such are currently being designed, manufactured, marketed, sold and offered by Seller Parties, Seller Parties do not require the rights to any Intellectual Property other than the Intellectual Property included within the Atticus IP Assets.  After the Closing Date, if the Parties discover that any of the Seller Parties' Intellectual Property that constitutes Atticus IP Assets was not properly assigned and conveyed to Buyer at the Closing,

- 9 -

EXHIBIT __5__ PAGE __9__ OF __56__

EXECUTION COPY

the Parties shall appropriately update the applicable Purchased Asset schedules and Seller Parties shall promptly assign such Atticus IP Assets to Buyer at no additional cost to Buyer, and any such Atticus IP Assets shall be deemed to be a Purchased Asset for all purposes of this Agreement.  After the Closing, if the Parties discover that any information that constitutes Atticus Information was not properly assigned and conveyed to Buyer at the Closing, the Seller Parties shall promptly assign and deliver such Atticus Information to Buyer at no additional cost to Buyer and any such Atticus Information shall be deemed to be a Purchased Asset for all purposes of this Agreement.

      3.1.5    Absence of Changes or Events.  Except as set forth on Schedule 3.1.5, to the Knowledge of the Seller Parties, since January 1, 2007, the business of the Seller Parties related to or that affects the Purchased Assets (other than the Atticus Other Rights, as to which Seller Parties make no representations or warranties) has been operated in all material respects in the ordinary course of business consistent with past practice and there has been no material adverse change in the value or condition of the Purchased Assets (other than the Atticus Other Rights, as to which the Seller Parties make no representations or warranties).  Notwithstanding the foregoing, the Seller Parties make no representation or warranty with respect to any consequences or events impacting the business of the Seller Parties related to or that affect the Purchased Assets, to the extent attributable to or resulting from any actions or omissions of Buyer, Buyer's Affiliates or Associated Persons or Entities of Buyer.

      3.1.6    Intellectual Property.  Except as set forth on Schedule 3 1.6:

          (a)    Good Standing.  To the Knowledge of the Seller Parties, all Atticus IP Assets that have been registered with the United States Patent and Trademark Office or equivalent foreign Governmental Entity are valid, enforceable and in good standing with the applicable Government Entity, are currently in compliance (and will be in compliance as of the Closing) with all Laws and, except as specified in Schedule 3.1.6(a), are not subject to any renewal fees or taxes or actions falling due within 45 days after the Closing Date.

          (b)    Atticus IP Assets.  To the Seller Parties' Knowledge, none of the Atticus IP Assets have been infringed or been challenged by any Person, and Seller Parties have not received any written notice alleging such infringement or otherwise challenging the validity or ownership of the Atticus IP Assets.  To the Knowledge of the Seller Parties, none of the Atticus IP Assets used by the Seller Parties or the Seller Affiliates infringe or are alleged to infringe the Intellectual Property rights of any other Person.

          (c)    Atticus Net Names.  The Atticus Net Names have been registered in the name of the Seller as identified on Schedule 3.16(c).

          (d)    No Licenses or Royalties.  Except for the oral and/or written agreements with Buyer or Associated Persons and Entities of Buyer or as disclosed on Schedule 3.1.6(d), the Seller Parties have not granted any license or made any assignment of rights in any Atticus IP Assets  The Seller Parties do not pay any royalties or other consideration (other than ordinary course payments for design services and similar costs of doing business, and except for other ordinary costs and expenses of conducting business that are not material in amounts) to any

- 10 -

EXHIBIT  5  PAGE  10  OF  56

EXECUTION COPY

other Person for the right to use any of the Purchased Assets (other than the Atticus Other Rights, as to which Seller Parties make no representations or warranties).

(e)    Atticus Agreements.  Except as set forth on Schedule 3.1.6(e) and other than purchase orders entered into in the ordinary course of business or any agreements with Buyer or Buyer's Affiliates, there are no written Atticus Agreements.  There are no oral Atticus Agreements that (a) contain any material rights which are enforceable by Seller Parties and may be assigned to Buyer, (b) that contain obligations or could result in Liabilities for which Buyer would have any responsibility after the Closing, (c) that require payments to or from any Seller Party of any material value, (d) that are necessary for Buyer to own or exploit the Atticus IP Assets or (e) that reasonably could restrict or adversely affect Buyer's title to or rights to use the Atticus IP Assets after the Closing.

3.1.7    No Default.  To the Knowledge of the Seller Parties, (a) no Seller Party is in default under any Atticus Agreement and (b) no  event or omission has occurred which through the passage of time or the giving of notice, or both, would constitute a default thereunder or cause the acceleration of any of its obligations under any Atticus Agreements, except in each case as would not materially impair or delay the performance of the obligations of the Seller Parties hereunder.

3.1.8    Litigation.  Except as set forth on Schedule 3.1.8, and except for pending or threatened Litigation between or among the Parties or their respective Affiliates, there is no Litigation pending or, to the Knowledge of Seller Parties, threatened against any of the Seller Parties that relates to or that affects the Purchased Assets (other than the Atticus Other Rights, as to which Seller Parties make no representations or warranties)

3.1.9    No Broker's or Finder's Fees.  No agent, broker, investment banker, or other Person acting on behalf of the Seller Parties is or will be entitled to any broker's or finder's fee or any other commission or similar fee in connection with any of the transactions contemplated herein.

3.1.10  Compliance with Laws.  To the Knowledge of the Seller Parties, Seller Parties are not in violation of any Law applicable to the Seller Parties' ownership or use and commercial exploitation of the Purchased Assets (other than the Atticus Other Rights, as to which Seller Parties make no representations or warranties).

3.1.11  Disclosure.  To the Seller Parties' Knowledge, no representation or warranty by the Seller Parties in this Agreement, nor any statement, certificate, schedule, document or exhibit hereto required to be furnished by or on behalf of the Seller Parties in connection with the transactions contemplated hereby, contains or shall contain (when considered in light of the entirety of all information provided by the Seller Parties) any misstatement of any material fact or omits to state any material fact necessary to make the statements contained therein not misleading.

- 11 -

EXHIBIT _5_ PAGE _11_ OF _56_

EXECUTION COPY

    3.2    <u>Representations and Warranties of Buyer.</u>  Buyer hereby represents and warrants to Seller as follows:

        3.2.1    <u>General</u>.

            (a)    <u>Organization</u>.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the United Kingdom with the authority to enter into this Agreement.

            (b)    <u>Power</u>.  To Buyer's Knowledge, Buyer has all requisite power and authority to own, operate, lease and license its assets, and to carry on its businesses as and where such are now being conducted, except as would not materially impair or delay the performance of the obligations of Buyer hereunder.

            (c)    <u>Binding Obligation</u>.  Buyer has all requisite corporate power and authority to enter into and perform its obligations under this Agreement and to perform its obligations hereunder.  The execution and delivery of this Agreement and the other documents and instruments to be executed and delivered by or on behalf of Buyer pursuant hereto, and the performance of Buyer's obligations hereunder and thereunder, have been duly authorized by all necessary board of director, member or manager action on the part of Buyer.  No other act or proceeding on the part of Buyer or its shareholders is necessary to authorize (i) the execution and delivery of this Agreement or the other documents and instruments to be executed and delivered by or on behalf of Buyer pursuant hereto or (ii) the performance of the obligations of Buyer contemplated hereby and thereby.  This Agreement each other document or instrument required to be executed and delivered by or on behalf of Buyer pursuant hereto has been (or upon execution and delivery will be) duly executed and delivered by Buyer and constitutes (or upon execution and delivery will constitute) a valid and binding obligation of Buyer enforceable against Buyer in accordance with their respective terms, except that enforceability may be limited by bankruptcy, insolvency, reorganization or other laws affecting creditors' rights generally, and the availability of equitable remedies may be limited by general equitable principles.

            (d)    <u>No Conflict</u>.  To Buyer's Knowledge, neither the execution and delivery of this Agreement or the other documents and instruments to be executed and delivered by or on behalf of Buyer pursuant hereto, nor the consummation by Buyer of the transactions contemplated hereby or thereby: (i) will violate any applicable Law or Order, (ii) will require any authorization, consent, approval, exemption or other action by or notice to any Government Entity, or (iii) will violate or conflict with, or constitute a default or breach (or an event which, with notice or lapse of time, or both, would constitute a default or breach) under, or will result in the termination of, or accelerate the performance required by, or result in the creation of any Lien upon any of the Purchased Assets under any term or provision of the organizational documents of Buyer or of any contract, commitment, understanding, arrangement, agreement or restriction of any kind or character to which Buyer is a party, except in each case where the failure to be so licensed or qualified or to be in good standing would not materially impair or delay the performance of the obligations of the Buyer hereunder.

- 12 -

EXHIBIT _5_ PAGE _12_ OF _56_

EXECUTION COPY

3.2.2  Financing and Solvency.  Buyer presently has or will have at Closing Date, sufficient funds available to it to pay the Purchase Price in full. Immediately after the Closing Date, after giving effect to the payment of the Purchase Price, Buyer shall have sufficient funds to pay its debts in full as they become due and otherwise shall be solvent.

3.2.3  Litigation.  Except for pending or threatened Litigation between or among the Parties or their respective Affiliates, there is no Litigation pending or, to the Knowledge of Buyer, threatened against Buyer that relates to or that affects the Purchased Assets (this representation and warranty, the "**Buyer Litigation Representation**").

3.2.4  No Broker's or Finder's Fees.  No agent, broker, investment banker, or any other Person acting on behalf of Buyer is or will be entitled to any broker's or finder's fee or any other commission or similar fee in connection with any of the transactions contemplated herein.

## ARTICLE IV

## COVENANTS OF THE PARTIES

4.1    Covenants of Seller Parties.  Until the earlier of (a) the Closing Date and (b) the date this Agreement is terminated in accordance with its terms (except as expressly permitted or contemplated by this Agreement or to the extent that Buyer shall otherwise consent in writing, which consent shall not be unreasonably withheld):

4.1.1  Ordinary Course.  Except as otherwise agreed by the Parties in writing, each of the Seller Parties shall use its commercially reasonable efforts to carry on its business (to the extent such business is related to or affects the Atticus Marks or Atticus Products) in all material respects in the usual, regular and ordinary course consistent with past practices. Notwithstanding the foregoing, the Parties expressly acknowledge and agree that the Seller Parties and Seller Affiliates shall have no obligation to market the Atticus Products or Atticus Marks at the 2007 "Warped Tour."

4.1.2  Exclusive Dealings.  Until the Closing or the termination of this Agreement pursuant to Article VII hereof, or a material breach by Buyer of its obligations under the Heads of Agreement, the Seller Parties shall not, nor shall any of them authorize any officer, director or employee of the Seller Parties or any investment banker, attorney, accountant or other representative retained by any of them to, engage in any discussions or negotiations with any Person other than Buyer or its Affiliates regarding the acquisition of all or any portion of the Purchase Assets (including any acquisition structured as a merger, consolidation, or share exchange); provided, however, that the foregoing covenant shall not apply to any other transaction involving the Seller Parties the primary purpose of which is not a sale of the Purchased Assets, provided that the terms of any such other transaction would not reasonably prevent or materially delay the performance of the Seller Parties' obligations hereunder.

4.1.3  Name Change.  Following the Closing, none of the Seller Parties shall conduct any business under the name "Atticus" or in connection with any trade mark, service mark, trade dress, logo, slogan, corporate name, trade name, fictitious name, domain name that

- 13 -

EXHIBIT __5__ PAGE __13__ OF __56__

EXECUTION COPY

reasonably could be deemed to be confusingly similar to any of the Atticus Marks; provided, however, that notwithstanding the foregoing, Seller shall not be deemed to be in breach or violation of this provision; (a) by virtue of its corporate name, provided that Seller shall change its corporate name to a name that does not include the word "Atticus" or any word that reasonably could be deemed to be confusingly similar to "Atticus" as promptly as reasonably practicable after the Closing (taking into account Seller's need to collect accounts receivable, cash checks, maintain bank accounts and otherwise complete business relating to Seller Parties' sale and marketing of Atticus Products, but in each case only to the extent that such activities cannot otherwise reasonably be conducted if Seller did change its corporate name as contemplated by this subclause (a)), but in no event later than 120 days after the Closing Date, nor (b) for utilizing the phrase "formerly, Atticus Clothing Inc." (i) in legal documents, (ii) in private correspondence in the ordinary course of business for purposes of identifying the corporate history of Seller, (iii) in incidental references to identify the connection between the former corporate name and Seller's successor name(s), (iv) in connection with invoicing and collection efforts relating to royalties or payments relating to sales of Atticus Products by Seller Parties that do not violate the terms hereof (which may include depositing check in bank accounts under Seller's current name), or (v) as otherwise may be legally required, it being expressly understood that Seller Parties will not use the phrase "formerly, Atticus Clothing Inc." on any clothing items or other products sold or offered for sale by the Seller Parties without the prior written consent of Buyer, which consent may be withheld in Buyer's reasonable and good faith discretion.

4.1.4    Certain Expenses and Costs.  The Seller Parties shall pay up to the first Three Thousand Dollars ($3,000.00) of any transfer expenses and Taxes payable to effectuate the purchase and sale of the Purchased Assets (including without limitation recording fees necessary to evidence the transfer of the items of Intellectual Property included in the Purchased Assets to the extent such recording is required by applicable Law to validly transfer such Purchased Assets to Buyer).  Any expenses and Taxes in excess of such amount shall be paid by the Party incurring such expense or liable for such Taxes.  Except as set forth above or expressly provided elsewhere in this Agreement, each Party shall be responsible for any and all expenses incurred by such Party in connection with the negotiation, execution and delivery of this Agreement and the performance of its obligations under this Agreement.

4.1.5    Trademark Registrations   On or prior to the Closing Date, Seller shall correct the registrant name associated with Costa Rica Trademark Registration No. 163878 to reflect that of Seller so that transfer of such registration to Buyer as a Purchased Asset in accordance with this Agreement can be legally affected on the Closing Date.

4.1.6    MySpace Account.  The parties shall use their respective commercially reasonable good faith efforts to promptly transfer ownership of the MySpace account (the "MySpace Account") located at WWW.MYSPACE.COM/ATTICUSCLOTHING to Buyer after the Closing for no additional consideration to the extent that such transfer may be accomplished under the conditions of use of MySpace.com. From and after the Closing, Seller Parties shall not, and shall use commercially reasonable efforts to cause their respective officers, directors, employees and Affiliates not to access, modify, or otherwise use the MySpace Account for any purpose without the prior written consent of Buyer which may be withheld at Buyer's

- 14 -

EXHIBIT 5 PAGE 14 OF 56

EXECUTION COPY

sole and absolute discretion. From and after the Closing, Seller Parties hereby expressly authorize Buyer to change any and all access passwords related to the MySpace Account and (subject only to any prohibitions and limitations imposed by MySpace.com's terms and conditions of use) hereby grant Buyer a world-wide, irrevocable, perpetual, royalty-free, right and license to access, modify and use the MySpace Account without restriction on manner or use. Buyer hereby agrees to indemnify, defend and hold harmless Seller Indemnitees against, and in respect of, any Losses incurred by or asserted against Seller's Indemnitees as a result of such transfer and/or access or Buyer's subsequent use and operation of the MySpace Account. The foregoing Buyer indemnification obligation shall be subject to the procedures set forth in Article VI hereof but shall not be subject to the limitations on amount of indemnified Losses or any purported limitation on the amount of time such indemnification obligation may continue that may be set forth in such Article. For avoidance of doubt, Seller Parties shall not be deemed to be in breach or violation of this provision if performing its obligations provided above would violate MySpace.com's terms of use or any applicable law.

       4.1.7  Customer E-Mails. Seller shall Provide the contact information described in clause (e) of the Closing deliveries specified in section 5.2.3 on the Closing Date as part of the items delivered (or to which access is provided) at Closing. Buyer hereby agrees to indemnify, defend and hold harmless Seller Indemnitees against, and in respect of, any Losses incurred by or asserted against Seller's Indemnitees as a result of any use of such information by Buyer in violation of applicable law (not including any alleged violation based on a breach of Seller's privacy policy), or any use of such information by Buyer that is not reasonably related to the sale and promotion of Atticus Products. The foregoing Buyer indemnification obligation shall be subject to the procedures set forth in Article VI hereof but shall not be subject to the limitations on amount of indemnified Losses or any purported limitation on the amount of time such indemnification obligation may continue that may be set forth in such Article. For avoidance of doubt, Seller Parties shall not be deemed to be in breach or violation of this provision if performing its obligations provided above would violate any applicable law.

      4.2  Covenants of Buyer.

       4.2.1  Ordinary Course. Until the consummation of the purchase and sale of the Purchased Assets contemplated hereby, except as otherwise agreed by the Parties in writing, the Buyer shall use its commercially reasonable efforts to carry on its business (to the extent such business is related to or affects the Atticus Marks or any of the Purchased Assets) in all material respects in the usual, regular and ordinary course consistent with past practices.

       4.2.2  Contact With Customers and Suppliers. From the Execution Date until the Closing, Buyer shall refrain from stating or implying that it has acquired or will acquire the Purchased Assets in all communications and interactions with any Persons who to the Knowledge of Buyer are current or prospective customers or suppliers of the Seller Parties without the prior written consent of Seller, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that any Party may make any public disclosure it believes in good faith is required by applicable law (in which case the disclosing Party will use its reasonable best efforts to advise the other Party a reasonable period of time prior to making the disclosure).

- 15 -

EXHIBIT 5 PAGE 15 OF 56

4.3    <u>Non-Disparagement</u>. From and after the Execution Date, no Party shall, and each Party shall use commercially reasonable efforts to cause its respective officers, directors, employees and Affiliates not to, make any public statements that are intended or reasonably calculated to disparage or impugn the Purchased Assets or any of the Seller Parties brands or products or the character, integrity or business reputation of any other Party or its officers, directors, employees, agents, successors, assigns or Affiliates. For avoidance of doubt, nothing in this provision or <u>Section 4.4</u> is intended to restrict or prohibit any Party or its Affiliates or representatives from engaging in discussions with musicians or celebrities regarding promotional matters or endorsement arrangements, provided that such discussions do not include statements that are intended or reasonably calculated to disparage or impugn the character, integrity or business reputation of any other Party or its officers, directors, employees, agents, successors, assigns or Affiliates.

4.4    <u>Band Promotion and Publicity</u>. The Parties acknowledge and agree that Seller Parties have entered into informal arrangements with certain musicians and musical groups from time to time in the ordinary course of marketing and promotional efforts associated with the business of the Seller Parties (collectively, the **"Third-Party Promotional Activities"**). The Parties acknowledge and agree that none of the arrangements or agreements relating to any past, current or proposed Third-Party Promotional Activities constitute a part of the Purchased Assets. For the avoidance of doubt, the Parties acknowledge and agree that, notwithstanding the execution and delivery of this Agreement, the Parties and their respective Affiliates are entitled to freely pursue and engage in any promotional activities of any kind, provided such activities do not otherwise violate the terms of this Agreement or applicable law. The Parties further expressly acknowledge and agree that any rights of any Seller Party or Seller Affiliate, if any, resulting from or relating to any such Third-Party Promotional Activities (except for any rights in the Atticus Marks resulting from the Seller Parties' promotion, endorsement or sponsorship activities and services relating to the Atticus Products), but otherwise including marketing materials, campaigns, photographs and other tangible items from time to time used or produced by the Seller Parties or Seller Affiliates in connection with the Third-Party Promotional Activities (collectively, **"Promotional Material"**) are expressly excluded from the Purchased Assets for all purposes. Without limiting the generality of the foregoing, the Purchased Assets do not include, and expressly exclude for all purposes, any use or right to use or reference the name or likeness of Tom DeLonge or Mark Hoppus or the bands or musical groups commonly known as "Blink 182," "Box Car Racer," "+44," "Angels and Airwaves" and any other band or musical group with which Tom DeLonge and/or Mark Hoppus may in the future be associated. From and after the date hereof Buyer shall not use and shall discontinue use of the Promotional Materials for any promotion purpose and shall only use Promotional Materials after the Closing to the extent reasonably necessary to establish and/or preserve Buyer's rights in the Atticus Marks resulting from the Seller Parties' promotion, endorsement or sponsorship activities and services relating to the Atticus Products (it being understood that such purpose shall not in any way entail the public use or display of such Promotional Materials in any marketing or sales context).

- 16 -

EXHIBIT _5_ PAGE _16_ OF _56_

EXECUTION COPY

## ARTICLE V

### CONDITIONS PRECEDENT

5.1    Mutual Conditions. The respective obligation of each Party hereunder shall be subject to the satisfaction on or prior to the Closing Date of the following conditions: (a) all authorizations, consents, orders or approvals of, or declarations or filings with, or expiration of waiting periods imposed by, any Government Entity necessary for the consummation of the transactions contemplated by this Agreement shall have been filed, occurred or been obtained; and (b) no Litigation shall have been instituted or threatened by any Person that is not an Associated Person or Entity of any Party seeking to challenge or restrain the transactions contemplated hereby.

5.2    Conditions to Obligations of Buyer. The obligations of Buyer to effect the transactions contemplated hereby are subject to the satisfaction of the following conditions unless waived by Buyer:

5.2.1    Representations and Warranties. The representations and warranties of the Seller Parties set forth in this Agreement shall be true and correct in all material respects (and all representations and warranties that are qualified by materiality shall be true and correct in accordance with their terms) as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specified date, which shall be true and correct as of such specified date), and Buyer shall have received a certificate signed by the chief executive officers (or equivalent management positions) of the Seller Parties attesting to such fact.

5.2.2    Performance of Obligations of Seller Parties. The Seller Parties shall have performed in all material respects the obligations required to be performed by each of them under this Agreement and under the Heads of Agreement on or prior to the Closing Date, and Buyer shall have received a certificate signed by the chief executive officers (or equivalent management positions) of the Seller Parties attesting to such fact.

5.2.3    Closing Deliveries. Seller Parties shall deliver to Buyer (or in the case of Atticus Information that it is not reasonably practicable to physically deliver, Seller Parties shall provide Buyer immediate access to) the following items on the Closing Date: (a) all documents which are necessary to be executed and/or delivered by the Seller Parties to convey and record all of the Seller Parties' right, title and interest in and to the Purchased Assets to Buyer, including, without limitation, multiple executed originals (to the extent required by applicable law) of (i) the trademark and service mark assignments and related powers of attorney attached as Exhibit A hereto, (ii) the Design Specific Copyright Assignment attached as Exhibit B hereto, (iii) the Net Name Assignment attached as Exhibit C hereto, (iv) the Design Specific Copyright Assignments attached as Exhibits D-1 (from Dylan Anderson to Seller) and D-2 (from Loserkids.com to Seller) hereto and (v) any other assignments, powers of attorney and other documentation prepared by Buyer necessary in any jurisdiction in which Seller Parties have rights in Atticus IP Assets (specifically including common law rights generated through use of one or more Atticus Marks in such jurisdiction) for purposes of establishing and recording

- 17 -

EXHIBIT _5_ PAGE _17_ OF _56_

EXECUTION COPY

Buyer's ownership of the Atticus IP Assets as reasonably requested by Buyer reasonably in advance of the Closing; (b) all Atticus Information susceptible to physical delivery (provided that the obligation to deliver Atticus Information specified in clause (d) of the definition of Atticus Information shall be limited to posting such information to an ftp site specified by Buyer at least 2 business days prior to the Closing, and any Atticus Information); (c) copies of all trademark and service mark application, registration and related files for trademarks and service marks constituting Atticus IP Assets within the possession of the Seller Parties or legal counsel to the Seller Parties; (d) a summary of unaudited fiscal year 2006 and 2007 year-to date total gross sales for Atticus Products based on wholesale United States dollars for the territories of the United States, Canada, Australia and Indonesia and (e) all e-mail addresses in the possession or control of Seller Parties for past and current Atticus Products customers (or Persons who have expressed an interest in obtaining information regarding Atticus Products) and all mailing address contact information in the possession or control of Seller Parties for past and current distributors of Atticus Products. For the avoidance of doubt, the Seller Parties agree to continue to provide to Buyer at Buyer's reasonable request and expense any documentation within the possession of the Seller Parties or legal counsel necessary in any jurisdiction for purposes of establishing and recording Buyer's ownership of the Atticus IP Assets from and after Closing.

    5.2.4 <u>Other Documents</u>. Buyer shall have received such other documents, instruments or certificates that are necessary to effect the transactions contemplated by this Agreement as shall be reasonably requested by Buyer or its counsel no later than three business days prior to the anticipated Closing Date.

    5.3 <u>Conditions to Obligation of Seller Parties</u>. The obligations of the Seller Parties to effect the transactions contemplated hereby are subject to the satisfaction of the following conditions unless waived by Seller:

    5.3.1 <u>Representations and Warranties</u>. The representations and warranties of Buyer set forth in this Agreement (except for the Buyer Litigation Representation, the existence of which shall be read-out of this Agreement and ignored for all purposes of this Section 5.3.1), shall be true and correct in all material respects (and all representations and warranties that are qualified by materiality shall be true and correct in accordance with their terms) as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specified date, which shall be true and correct as of such specified date), and Seller shall have received a certificate signed by the chief executive officer of Buyer attesting to such fact. For the avoidance of doubt, in the event that the Buyer Litigation Representation is not true and correct in all material respects, or if Buyer otherwise breaches the Buyer Litigation Representation, the same shall not in any way affect Seller Parties' obligation to close if all other conditions to <u>Seller Parties' obligations are satisfied or waived by Seller Parties</u>.

    5.3.2 <u>Performance of Obligations of Buyer.</u> Buyer shall have performed in all material respects all obligations required to be performed by it under this Agreement and under the Heads of Agreement on or prior to the Closing Date, and Seller shall have received a certificate signed by the chief executive officer of Buyer attesting to such fact.

- 18 -

EXHIBIT _5_ PAGE _18_ OF _56_

5.3.3 <u>Other Documents.</u>  Seller shall have received such other documents, instruments or certificates that are necessary to effect the transactions contemplated by this Agreement as shall be reasonably requested by Seller or its counsel no later than three business days prior to the anticipated Closing Date.

5.3.4 <u>Wind-Down Agreements</u>.  Buyer and any applicable Buyer Affiliates shall have executed and delivered each of the Wind-Down Agreements.

<div align="center">ARTICLE VI</div>

<div align="center"><u>INDEMNIFICATION</u></div>

6.1     <u>By Seller Parties.</u>  Except as hereinafter set forth, from and after the Closing, Seller Parties, jointly and severally, shall indemnify, defend and hold harmless Buyer and its successors and assigns and their respective officers, directors, shareholders, employees and agents (collectively, the "Buyer's Indemnitees"), against, and in respect of, any Losses that Buyer's Indemnitees may suffer, sustain or become subject to, as a result of, in connection with, relating or incidental to or by virtue of: (a) the inaccuracy or breach of any representation or warranty of the Seller Parties contained in or made by or on behalf of the Seller Parties pursuant to this Agreement; or (b) the breach of any covenant of the Seller Parties contained herein; <u>provided, however,</u> that notwithstanding the foregoing or anything to the contrary contained herein, the Seller Parties shall have no liability to indemnify Buyer's Indemnitees for any Losses pursuant to <u>Section 6.1(a)</u> until the aggregate amount of such Losses exceeds Twenty-Five Thousand Dollars ($25,000.00) (the "Basket"), in which event the Purchaser Indemnitees shall be entitled to claim indemnity for the full amount of such Losses; <u>provided, further,</u> that in no event shall the total amount of Losses jointly and/or severally payable by the Seller Parties pursuant to this **Article VI** exceed Four Million Two Hundred Thousand Dollars ($4,200,000.00); <u>provided, further,</u> that the Seller Parties shall have no obligation to indemnify Buyer for any Losses to the extent the same results from or is attributable to any matter for which the Seller's Indemnitees are entitled to indemnification pursuant to <u>Section 6.2</u> or which are directly caused by actions or omissions of Buyer, Buyer's Affiliates or Associated Persons or Entities of Buyer.

6.2     <u>By Buyer.</u>  Except as hereinafter set forth, from and after the Closing, Buyer shall indemnify, defend and hold harmless the Seller Parties, and their respective successors and assigns and their respective officers, directors, shareholders, employees and agents (collectively, the "Seller's Indemnitees"), against, and in respect of, any Losses that Seller's Indemnitees may suffer, sustain or become subject to, as a result of, in connection with, relating or incidental to or by virtue of: (a) the inaccuracy or breach of any representation or warranty of Buyer contained in or made by or on behalf of Buyer pursuant to this Agreement; or (b) the breach of any covenant of Buyer contained herein; <u>provided, however,</u> that notwithstanding the foregoing or anything to the contrary contained herein, Buyer shall have no liability to indemnify the Seller's Indemnitees for any Losses pursuant to this <u>Section 6.2</u> until the aggregate amount of such Losses exceeds the Basket, in which event the Seller's Indemnitees shall be entitled to claim indemnity for the full amount of such Losses; <u>provided, further,</u> that Buyer shall have no obligation to indemnify the Seller's Indemnitees for any Losses to the extent the same results from or is attributable to any

<div align="center">- 19 -</div>

EXHIBIT 5 PAGE 19 OF 56

EXECUTION COPY

matter for which Buyer's Indemnitees are entitled to indemnification pursuant to Section 6.1, or which are directly caused by actions or omissions of Seller, Seller's Affiliates or Associated Persons or Entities of Seller.

6.3    Survival of Indemnification. The indemnification obligations of the Parties contained in this Article VI shall survive the Closing Date for (14) months from the Closing Date and at such time automatically shall terminate; provided, however, the representations and warranties of the Seller Parties: (a) in Section 3.1.2 shall survive indefinitely; and (b) in Section 3.1.6(b) shall survive for a period of three (3) years after the Closing; provided, further, that any representation, warranty, covenant or agreement that would otherwise terminate will continue to survive with respect to any claim for Losses timely asserted by a Party prior to the applicable termination date, in which case the indemnification obligations of the Indemnifying Party shall continue solely with respect to the Losses in question until the related indemnification claim is finally resolved as provided below.

6.4    Notice of Claim. Any Party seeking to be indemnified for Losses pursuant to this Article VI (the "Indemnified Party") shall provide the Party from whom such indemnification is sought (the "Indemnifying Party") written notice of the nature and (if known to the Indemnified Party) the amount of such alleged Losses promptly upon becoming aware of such Losses (such written notice being hereinafter referred to as a "Notice of Claim"); provided, however, that any failure or delay in giving any Notice of Claim shall not absolve the Indemnifying Party of its obligations under this Article VI except to the extent the Indemnifying Party shall be materially prejudiced by such failure or delay.

6.5    Defense of Third Party Claims. With respect to any Losses described in a Notice of Claim relating to a claim or Litigation commenced by a third party (a "Third Party Claim"), the Indemnifying Party may elect to defend any such Third Party Claim at its expense, subject to confirming in writing its indemnification obligations under this Article VI with respect to such Losses. In addition, the Indemnified Party shall have the right, at its expense, to participate in the defense of any such Third Party Claim so defended by the Indemnifying Party. So long as the Indemnifying Party is defending in good faith any such Third Party Claim, the Indemnified Party shall not settle or compromise such Third Party Claim, and in any event no Third Party Claim may be settled by the Indemnified Party or the Indemnifying Party without the prior consent of the other unless such settlement (a) includes an unconditional release of any claims giving rise to any Losses, (b) does not subject any Buyer's Indemnitee or Seller's Indemnitee, as the case may be, to any Liabilities or Losses without its consent and (c) does not include any admission of fault or liability of any Buyer's Indemnitee or Seller's Indemnitee, as the case may be, without its consent. If the Indemnifying Party does not so elect to defend any such Third Party Claim, the Indemnified Party shall have no obligation to do so.

6.6    Mitigation; Determination of Losses. Each Indemnified Party shall use its commercially reasonable efforts to mitigate any Losses at the reasonable request, and expense, of the Indemnifying Party. In determining the amount of Losses for which an Indemnifying Party is liable under this Article VI appropriate adjustment shall be made for the proceeds from any insurance policies covering such Losses that are paid to or on behalf of the Indemnified Party with respect to the Losses in question and for any indemnification or contribution rights of the

- 20 -

EXHIBIT 5 PAGE 20 OF 56

EXECUTION COPY

Indemnified Party which result in any payments to or on behalf of the Indemnified Party with respect to the Losses in question. An Indemnifying Party shall not be liable to an Indemnified Party for any special, consequential or similar damages with respect to any Claim subject to indemnification under this **Article VI**; provided, however, that this sentence shall not limit the amount payable by an Indemnifying Party to an Indemnified Party for reimbursement of amounts paid or payable with respect to Losses associated with a Third Party Claim.

6.7    Payment.    The Indemnifying Party shall promptly pay or reimburse the Indemnified Party for any Losses for which the Indemnified Party is entitled to be indemnified pursuant to this Article VI, unless the Indemnifying Party reasonably and in good faith disputes the amount, nature or its liability to indemnify the Indemnified Party for such claim (provided that such Indemnifying Party shall promptly pay or reimburse Indemnified Party as to any amount(s) not in dispute), or if the claim for indemnification relates to Losses anticipated from a Third Party Claim which has not yet been definitively determined or adjudicated. If the Indemnifying Party disputes its liability, the Indemnified Party and Indemnifying Party shall promptly meet and endeavor to resolve such dispute through good faith negotiations. If the dispute is not resolve within ten business days after initiating such good faith discussions, either may initiate Litigation to resolve such matter. Upon judgment, determination, settlement or compromise of any Third Party Claim, the Indemnifying Party shall promptly pay to or on behalf of the Indemnified Party the amount of Losses for which the Indemnifying Party is obligated to indemnify the Indemnified Party, unless the Indemnifying Party desires to and there are reasonable grounds to appeal the judgment. If the Indemnifying Party desires to appeal from an adverse judgment, then the Indemnifying Party shall post and pay the cost of the security or bond to stay execution of the judgment pending appeal. The Indemnifying Party shall promptly pay any amounts for which it is obligated to indemnify the Indemnified Party promptly upon the matter being determined through a judgment not subject to appeal. Upon the payment in full by the Indemnifying Party of the amount of any Losses under this Article VI, the Indemnifying Party shall succeed to the rights of the applicable Indemnified Party, to the extent not waived in settlement, against the Person who asserted such Third Party Claim. No payment of any Losses for which an Indemnifying Party is liable under this Article VI may be paid by the Indemnifying Party setting off any amount owed to the Indemnifying Party by the Indemnified Party.

6.8    Sole Remedy.    Except for any equitable relief to which any Party may be entitled, including injunctive relief and specific performance (which remedies shall be cumulative and in addition to, and not exclusive of, any other rights or remedies available at law or in equity), and except for claims for Losses based on fraud or intentional misrepresentation, from and after the Closing, the indemnification provided in this **Article VI** shall be the sole and exclusive remedy of the Parties hereto and Buyer's Indemnitees and Seller's Indemnitees, as the case may be, with respect to any Losses resulting from or attributable to the breach of a representation, warranty or covenant in this Agreement. No right to indemnification hereunder shall be limited by reason of any investigation or audit conducted before or after the Closing or the decision of any Party to consummate the Closing.

- 21 -

EXHIBIT __5__ PAGE __21__ OF __56__

EXECUTION COPY

ARTICLE VII

TERMINATION, AMENDMENT AND WAIVER

7.1    Termination.  This Agreement may be terminated at any time prior to the Closing:

7.1.1   By mutual consent of Buyer and Seller;

7.1.2   By Buyer if the Seller Parties are in material breach of any representation, warranty, covenant or agreement of the Seller Parties contained in this Agreement which (a) would give rise to the failure of the condition to closing set forth in Section 5.2.1, (b) cannot be or has not been cured within 10 days after the earlier of (i) the date Buyer gives written notice to the Seller Parties of such breach, and (ii) the Seller Parties first have Knowledge that such default exists or has occurred, and (c) is not waived by Buyer; provided, however, that Buyer may not terminate this Agreement pursuant to this Section 7.1.2 if the Seller Parties are then entitled to terminate this Agreement pursuant to Section 7.1.3;

7.1.3   By Seller if Buyer is in material breach of any representation, warranty, covenant or agreement of Buyer contained in this Agreement which (a) would give rise to the failure of the condition to closing set forth in Section 5.3.1, (b) cannot be or has not been cured within 10 days after the earlier of (i) the date Seller gives written notice to Buyer of such breach, and (ii) the date the Seller Parties first have Knowledge that such default exists or has occurred, and (c) is not waived by Seller; provided, however, that Seller may not terminate this Agreement pursuant to this Section 7.1.3 if Buyer are then entitled to terminate this Agreement pursuant to Section 7.1.2;

7.1.4   By Buyer if any of the conditions set forth in Section 5.2 have not been satisfied on or before July 9, 2007 or such later date as Buyer and Seller shall mutually agree in writing; provided, however, that Buyer may not terminate this Agreement pursuant to this Section 7.1.4 if the reason such conditions are not satisfied is materially attributable to the actions or omissions of Buyer; and

7.1.5   By Seller if any of the conditions set forth in Section 5.3 have not been satisfied on or before July 9, 2007 or such later date as Buyer and Seller shall mutually agree in writing; provided, however, that Seller may not terminate this Agreement pursuant to this Section 7.1.5 if the reason such conditions are not satisfied is materially attributable to the actions or omissions of Seller.

7.2    Effect of Termination; Amendment; Waiver.  If this Agreement is terminated pursuant to Section 7.1, the Agreement shall be null and void and of no further force and effect and no Party shall have any further liability or obligation to any other Party; provided, however, that Sections 3.1.9, 3.2.4, 4.2.2, 4.4, and Article IX as well as the defined terms used in such Sections shall survive such termination; provided, further, that such termination shall not relieve any Party from any liability resulting from any willful and material breach of any covenant or agreement in this Agreement prior to termination.  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.  All waivers of any provisions hereof must be in writing, signed by the Party entitled to waive such provision, and no

- 22 -

EXHIBIT _5_ PAGE _22_ OF _56_

EXECUTION COPY

waiver of any provision of this Agreement by a Party on one occasions shall be deemed to be a blanket or continuing waiver of any other provision of this Agreement or of the same provision on any other occasion or in any other context, unless expressly specified in writing.

### ARTICLE VIII

### MUTUAL GENERAL RELEASE

8.1    Mutual General Release.

8.1.1    By Buyer.  Effective as of the Closing, Buyer, for itself and on behalf of its Associated Persons and Entities, hereby fully and forever releases, acquits, and discharges the Seller Parties, and each of their Associated Persons and Entities from all Claims arising or based on facts existing as of the Closing Date, except as otherwise provided in Section 8.2 below.

8.1.2    By Seller Parties.  Effective as of the Closing, Seller Parties, each for itself and on behalf of its Associated Persons and Entities, hereby fully and forever releases, acquits, and discharges Buyer and its Associated Persons and Entities from all Claims arising or based on facts existing as of the Closing Date, except as otherwise provided in Section 8.2 below.

8.1.3    Waiver of Civil Code Section 1542.  The Parties, for themselves and on behalf of each of their respective affiliates, successors and assigns and each of their respective Associated Persons and Entities, acknowledge and agree that their releases in Section 8.1.1 and 8.1.2 include Claims which they do not know or suspect to exist and for which the severity of any related Losses may not be known or may have been underestimated, and the Parties explicitly took into account those facts and possibilities in determining the consideration to be given for the mutual general releases in this Article VIII and in agreeing to hereby waive all rights which may exist under California Civil Code Section 1542, which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

8.2    Continuing Liabilities and Obligations.  Notwithstanding the mutual general releases contained in Section 8.1 or any other provision in this Agreement, the Heads of Agreement or in any of the Wind-Down Agreements to the contrary, the foregoing mutual general releases are not intended to and do not release any of the Parties or their respective Associated Persons and Entities from (a) any provisions, conditions or obligations arising pursuant to this Agreement, the Heads of Agreement, any of the Wind-Down Agreements (or the respective agreements extended and amended pursuant to the Wind-Down Agreements, after giving effect to such extensions and amendments) or hereafter arising outside of the context of such agreements, (b) any ordinary course payment obligations accrued and owing as of the Closing Date by or in favor of any Party arising from the ordinary course ongoing commercial relationships between or among such Parties, or (c) from any Claims based on fraud.

- 23 -

EXHIBIT  5  PAGE  23  OF  56

EXECUTION COPY

## ARTICLE IX

### GENERAL PROVISIONS

9.1    Notices.  Any notice or other communication required or permitted to be given hereunder shall be in writing (including facsimile or similar transmission) and mailed (by U.S. certified mail, return receipt requested, postage prepaid), sent or delivered (including by way of overnight courier service):

| | |
|---|---|
| If to Buyer: | With a copy (which shall not constitute notice) to: |
| Lowlife Corporation Ltd<br>172 Queenstown Road<br>London, SW8 3NR<br>United Kingdom<br>Attn: Dale Masters<br>Telephone: 011-44-20-7622-9326<br>Facsimile: 011-44-20-7622-9327<br>E-Mail: dale@24-7trading.com | Seltzer, Caplan, McMahon Vitek<br>2100 Symphony Towers<br>750 B Street<br>San Diego, California 92101<br>Attn: David Dorne, Esq.<br>Telephone: 619-685-3027<br>Facsimile: 619-702-6806<br>E-Mail: dorne@scmv.com |
| If to Seller Parties: | With a copy (which shall not constitute notice) to: |
| Really Likeable People, Inc.<br>2251 Las Palmas Drive<br>Carlsbad, CA 92011<br>Attn: Amy Arroyo<br>Telephone: 760-431-8055 ext. 110<br>Facsimile: 760-431-9551<br>E-Mail: amy@rlpdistribution.com | Bingham McCutchen LLP<br>355 South Grand Ave, Suite 4400<br>Los Angeles, California 90071-3106<br>Attention: John L. Filippone<br>Facsimile: (213) 830-8626<br>E-Mail: john.filippone@bingham.com |

or to such other address(es) as the Parties shall give notice to the other by like means. All such notices, demands, and communications, if mailed, shall be effective upon the earlier of: (a) actual receipt by the addressee, (b) the date shown on the return receipt of such mailing, or (c) three days after deposit in the mail. All such notices, demands, and communications, if not mailed, shall be effective upon the earlier of: (i) actual receipt by the addressee, (ii) with respect to facsimile and similar electronic transmission, the earlier of (A) the time that electronic confirmation of a successful transmission is received, or (B) the date of transmission, if a confirming copy of the transmission is also mailed as described above on the date of transmission, and (iii) with respect to delivery by overnight courier service, the day after deposit with the courier service, if delivery on such day by such courier is confirmed with the courier or the recipient orally or in writing.

9.2    Entire Agreement; Conflicting Provisions; Reformation.  This Agreement represents the complete and entire agreement of the Parties with respect to the specific subject

- 24 -

C:\NrPortbl\ACTIVE\FIL\PP\V72021064_10 DOC

EXHIBIT 5 PAGE 24 OF 56

matter set forth herein, and supersedes any prior or contemporaneous oral or written negotiations, discussions, agreements and understandings with respect to such specific subject matter. In the event of any conflict, inconsistency, or incongruity between any provision of this Agreement and any provision of the Heads of Agreement, the provisions of this Agreement shall govern and control. If this Agreement is terminated prior to the Closing, the terms of the Heads of Agreement that were superseded by this Agreement (other than those that expressly contemplated or provided for the purchase and sale of the Purchased Assets) shall be deemed to be reformed and binding upon the parties thereto, notwithstanding the preceding two sentences of this Section 9.2.

9.3    Equitable Relief.  The Parties agree that in the event of a breach or threatened breach of any provision of this Agreement, the non-breaching Party may be without an adequate remedy at law.  In such event, the non-breaching Party shall be entitled to obtain in any court of competent jurisdiction a decree of specific performance or an injunction to prevent the initial or continuing breach of such provision, in each case without being required to post a bond without having to prove actual damages.  Seeking or obtaining such equitable relief will not preclude the non-breaching Party from seeking or obtaining any other relief to which it may otherwise be entitled at law or in equity.

9.4    Costs of Litigation.  The prevailing Party in any action brought with respect to or to enforce any right or remedy under this Agreement shall be entitled to recover from the non-prevailing Party or Parties all reasonable costs and expenses incurred by the prevailing Party in connection with such action, including without limitation reasonable attorneys' fees and prejudgment interest.

9.5    Severability.  The provisions of this Agreement are severable and in the event any term or provision of this Agreement is found by a Government Entity of competent jurisdiction to be invalid or unenforceable, such finding shall not affect the validity or enforceability of the remaining terms and provisions hereof.

9.6    Headings; Drafting; Construction.   The headings in this Agreement are for convenience of reference only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.  The Parties acknowledge and agree that each has been represented by independent legal counsel and advisors and has been substantially involved in the negotiation and drafting of this Agreement.  Consequently, in the event of any inconsistency or ambiguity in this Agreement, this Agreement shall be deemed to have been jointly drafted by the Parties and no principle of construction or interpretation shall be applied such that any inconsistency or ambiguity is construed as against any particular Party.

9.7    Assignment.  Buyer's rights under this Agreement may be assigned only to: (a) an affiliate of Buyer; or (b) any party who acquires ownership or control of Buyer or, after the Closing, the Purchased Assets through a merger, consolidation, sale of assets or similar business combination; provided, however, that any such assignee shall receive such assigned rights subject to all the provisions and conditions of this Agreement and shall agree to be bound by all of the provisions and conditions hereof to the same extent as Buyer was prior to such Assignment, and no such assignment shall relieve Buyer of any Liability hereunder to the extent

- 25 -

EXHIBIT 5 PAGE 25 OF 56

EXECUTION COPY

its assignee does not timely and fully perform its obligations as Buyer's assignee hereunder. This Agreement shall inure to the benefit of, and be binding upon, the successors and permitted assigns of the respective Parties, provided such assignment was in compliance with the terms hereof.

9.8    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement and all of which when taken together shall constitute one and the same instrument. A signature of a Party delivered by telecopy or other electronic communication shall constitute an original signature of such party for all purposes.

9.9    Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of California without regard to its conflicts or choice of law principles.

[signature page follows]

*    *    *    *    *

- 26 -

C:\N:Portbl\ACTIVE\FIL1PPA\72021064_10 DOC

EXHIBIT __5__ PAGE _26_ OF _56_

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

BUYER:

LOWLIFE CORPORATION LTD,
an English limited company

By:    _Magfny_____
       Dale Masters, Chairman

SELLER PARTIES:

ATTICUS CLOTHING, INC.,
a California corporation

By:    _____
       Jon W. Humphrey, President

REALLY LIKEABLE PEOPLE, INC.,
a Delaware corporation

By:    _____
       Jon W. Humphrey, President

EXHIBIT _5_ PAGE _27_ OF _56_

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

BUYER:

LOWLIFE CORPORATION LTD,
an English limited company

By: _____
       Dale Masters, Chairman

SELLER PARTIES:

ATTICUS CLOTHING, INC.,
a California corporation

By: _____
       Jon W. Humphrey, President

REALLY LIKEABLE PEOPLE, INC.,
a Delaware corporation

By: _____
       Jon W. Humphrey, President

EXHIBIT _5_ PAGE _28_ OF _56_

EXHIBIT A

FORM OF PURCHASE ORDER

Atticus Clothing Company
2251 Las Palmas
Carlsbad, CA 92011

Order

Purchase #:  00002959

Ship To:

Bluechip Directions
Room 19A, 19th Floor
Huamin Empire Plaza
726 West Yan'an Rd
Shanghai 200050, China

Atticus Clothing
2350 Camino Vida Roble
Carlsbad CA 92011
USA

| SALESPERSON | YOUR NO | SHIP VIA | COL | PPD | SHIP DATE | TERMS | | DATE | PG. |
|---|---|---|---|---|---|---|---|---|---|
| | Fall07 USA | Sea Freight | | X | 6/23/2007 | Prepaid | | 4/25/2007 | 1 |

| QTY | ITEM NO. | DESCRIPTION | PRICE | UNIT | DISC % | EXTENDED | TX. |
|---|---|---|---|---|---|---|---|
| 10 | | Amos Black Knit L/S Tee Shirt Men's Size Extra Small | $4.00 | Each | | $40.00 | |
| 43 | | Amos Black Knit L/S Tee Shirt Men's Size Small | $4.00 | Each | | $172.00 | |
| 55 | | Amos Black Knit L/S Tee Shirt Men's Size Medium | $4.00 | Each | | $220.00 | |
| 31 | | Amos Black Knit L/S Tee Shirt Men's Size Large | $4.00 | Each | | $124.00 | |
| 14 | | Amos Black Knit L/S Tee Shirt Men's Size XL | $4.00 | Each | | $56.00 | |
| 6 | | Amos White Knit L/S Tee Shirt Men's Size Extra Small | $4.00 | Each | | $24.00 | |
| 9 | | Amos White Knit L/S Tee Shirt Men's Size Small | $4.00 | Each | | $36.00 | |
| 10 | | Amos White Knit L/S Tee Shirt Men's Size Medium | $4.00 | Each | | $40.00 | |
| 8 | | Amos White Knit L/S Tee Shirt Men's Size Large | $4.00 | Each | | $32.00 | |
| 2 | | Amos White Knit L/S Tee Shirt Men's Size XL | $4.00 | Each | | $8.00 | |
| 7 | | Amos Rifle Green Knit L/S Tee Shirt Men's Size Extra Small | $4.00 | Each | | $28.00 | |
| 6 | | Amos Rifle Green Knit L/S Tee Shirt Men's Size Small | $4.00 | Each | | $24.00 | |
| 6 | | Amos Rifle Green Knit L/S Tee Shirt Men's Size Medium | $4.00 | Each | | $24.00 | |
| 4 | | Amos Rifle Green Knit L/S Tee Shirt Men's Size Large | $4.00 | Each | | $16.00 | |
| | | Amos Rifle Green Knit L/S Tee Shirt Men's Size XL | $4.00 | Each | | | |

| | | |
|---|---|---|
| PP sample and Shipment sample require approval prior to Production/Shipment Special Shipping/Packing Instructions Attached | SALE AMT. | $844.00 |
| | FREIGHT | $0.00 |
| | SALES TAX | $0.00 |
| | TOTAL AMT. | $844.00 |
| | PAID TODAY | $0.00 |
| | BALANCE DUE | $844.00 |

EXHIBIT  5  PAGE  27  OF  56

EXHIBIT A

Final

## TRADEMARK AND SERVICE MARK ASSIGNMENT

WHEREAS, ATTICUS CLOTHING, INC., a California corporation ("Assignor"), is the owner of the trademarks, service marks, trademark registrations, service mark registrations, trademark applications and service mark applications in the form more fully described in **Exhibit A** and **Exhibit B** hereto (the "Marks");

WHEREAS, Assignor and LOWLIFE CORPORATION LTD, an English limited company ("Assignee") have executed that certain Asset Purchase And Sale Agreement dated June __, 2007 (the "Purchase Agreement"); and

WHEREAS, pursuant to the terms of the Purchase Agreement, Assignor desires to assign and Assignee desires to receive all of Assignor's right, title and interest in and to the Marks, together with the goodwill associated therewith

NOW THEREFORE, for the consideration set forth in the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor hereby sells, transfers, assigns and sets over unto Assignee, its successors and assigns, all of Assignor's entire worldwide right, title and interest in and to the Marks, together with the goodwill associated therewith, all common law rights related to the Marks, all rights of registration, renewal and extension, and the right to recover for damages and profits for past, present and future infringements thereof

Assignor agrees to execute and deliver at the request of Assignee all papers, instruments, assignments and powers of attorney, and to perform any other reasonable acts Assignee may request in order to vest all of Assignor's right, title, and interest in and to the Marks in Assignee and/or to provide evidence to support any of the foregoing in the event such evidence is deemed necessary by Assignee, to the extent such evidence is in the possession or control of Assignor

THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

EXHIBIT _5_ PAGE _30_ OF _56_

IN TESTIMONY WHEREOF, the undersigned Assignor and Assignee have executed this Assignment effective as of the _____ day of June, 2007.


ASSIGNOR                            ASSIGNEE
ATTICUS CLOTHING, INC.              LOWLIFE CORPORATION LTD


By: _____           By: _____
Name:                              Name:
Date:                              Date:


| Subscribed and sworn to before me this ____ day of _____, 2007<br><br><br>_____<br>　　　Notary Public<br><br> | Subscribed and sworn to before me this ____ day of _____, 2007<br><br><br>_____<br>　　　Notary Public<br><br> |
| --- | --- |

2

EXHIBIT _5_ PAGE _31_ OF _56_

EXHIBIT A

## U.S. Trademarks

| MARK | COUNTRY | CLASS | APP./REG. NO. |
|------|---------|-------|---------------|
| ATTICUS | U.S. Federal | 25 | Reg. 3,002,249 |
| ATTICUS | U.S. Federal | 25 | Reg. 2,700,340 |
| ATTICUS | U.S. Federal | 18 | Reg. 2,949,967 |
|  | U.S. Federal | 25 | Reg. 2,706,759 |
| ATTICUS SCOUT | U.S. Federal | 25 | App No. 76/454448 (Abandoned) |

3

EXHIBIT 5 PAGE 32 OF 56

EXHIBIT B

### Foreign Trademarks and Service Marks

| MARK | COUNTRY | CLASS | APP./REG. NO. |
|---|---|---|---|
| ATTICUS | Argentina | 25 | App. 2598319 |
| ATTICUS | Australia | 25 | Reg. 678620 (Cancelled) |
| ATTICUS | Australia | 25 | Reg. 915025 |
| ATTICUS | Brazil | 25 | App. 825622468 |
| ATTICUS | Canada | 9, 18, 25, 41 | Reg. TMA 662588 |
| ATTICUS | Chile | 25 | Reg. 686144 |
| ATTICUS | China (People's) | 25 | Reg. 3595873 |
|  | Community Trademarks | 9, 18, 25 | Reg. 2823680 |
| ATTICUS | Community Trademarks | 18, 25 | Reg. 4519229 |
| ATTICUS BLACK | Community Trademarks | 9, 18, 25 | Reg. 2810737 |
| ATTICUS SCOUT | Community Trademarks | 9, 18, 25 | App. 02693638 (Abandoned) |
| ATTICUS | Costa Rica | 25 | Reg. 163878 |
| ATTICUS | Czech Republic | 25 | Reg. 253680 |
| ATTICUS | Hong Kong | 25 | Reg. 300030626 |
| ATTICUS | Hungary | 25 | Reg. 177604 |
| ATTICUS | India | 25 | Reg. 1230948 |
| ATTICUS | Indonesia | 25 | Reg. IDM000034805 |
| ATTICUS | Indonesia | 35 | App. 200 2006 012049 |
| ATTICUS | International Registration (KR, RU) | 25 | Reg. 844158 |

4

EXHIBIT _5_ PAGE 33? OF _56_

| MARK | COUNTRY | CLASS | APP/REG NO. |
|------|---------|-------|-------------|
| ATTICUS | International Registration (KR, RU) | 25 | Reg. 845286 |
| ATTICUS | Japan | 18, 25 | Reg. 4656511 |
| ATTICUS | Mexico | 25 | Reg. 937146 |
| ATTICUS | Norway | 25 | Reg. 219074 |
| ATTICUS | Pakistan | 25 | App. 204994 |
| ATTICUS | Panama | 25 | Reg. 127738-01 |
| ATTICUS | Peru | 25 | App. 247224 |
| ATTICUS | Philippines | 18, 25 | App. 4-2003-0005048[1] |
| ATTICUS | Poland | 18, 25 | App. Z-272021 (Abandoned) |
| ATTICUS | Singapore | 25 | Reg T03/08733J |
| ATTICUS | Slovak Republic | 18, 25 | Reg. 208407 |
| ATTICUS | Slovenia | 25 | Reg. 200271193 |
| ATTICUS | South Africa | 25 | App. 2003110695 |
| ATTICUS | Switzerland | 25 | Reg. 504246 |
| ATTICUS | Taiwan | 25 | Reg. 01087521 |
| ATTICUS | Thailand | 25 | Reg. 198145 |
| ATTICUS | Turkey | 25 | Reg. 2002 19864 |
| ATTICUS | United Kingdom | 25 | Reg. 1532945B |
| ATTICUS | United Kingdom | 18 | Reg. 1532944 |
| ATTICUS | Venezuela | 25 | Reg. P-248750 |
| ATTICUS | Vietnam | 25 | Reg. 57550 |

---

[1] Seller has requested further information from its IP counsel to answer Buyer's question regarding the proof of use in the Philippines

EXHIBIT _5_ PAGE _34_ OF _56_

EXHIBIT B

Final

### DESIGN SPECIFIC COPYRIGHT ASSIGNMENT

WHEREAS, ATTICUS CLOTHING, INC. a California corporation ("Assignor") and LOWLIFE CORPORATION LTD, an English limited company, ("Assignee") have executed that certain Asset Purchase And Sale Agreement dated June __, 2007 (the "Purchase Agreement"); and

WHEREAS, pursuant to the terms of the Purchase Agreement, Assignor desires to assign and Assignee desires to receive all of Assignor's right, title and interest in and to the registered copyright identified in Exhibit A hereto (the "Atticus Copyright").

NOW THEREFORE, for the consideration set forth in the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and subject to the terms of the Purchase Agreement, Assignor does hereby irrevocably sell, grant, convey, assign and set over unto Assignee, its successors and assigns all of its worldwide right, title and interest in and to the Atticus Copyright  Without limiting the generality of the foregoing, Assignor hereby assigns to Assignee Assignor's exclusive right to make derivative works based upon the Atticus Copyright; and the right to recover for damages and profits for past, present and future infringements of the Atticus Copyright

Assignor waives any and all ownership and proprietary interest in the Atticus Copyright and all extensions and renewals thereof, including all rights of droit moral (moral rights) including, without limitation, rights equivalent thereto such as rights of attribution, assignment and integrity  Assignor agrees to sign all documents from time-to-time that may be reasonably necessary for Assignee to record and register its exclusive ownership rights in and to the Atticus Copyright, and agrees that Assignee may register the Atticus Copyright in its own name.

THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

EXHIBIT 5 PAGE 35 OF 56

IN TESTIMONY WHEREOF, the undersigned Assignor and Assignee have executed this Assignment effective as of the _____ day of June, 2007.


ASSIGNOR                                    ASSIGNEE
ATTICUS CLOTHING, INC.                      LOWLIFE CORPORATION LTD


By: _____               By: _____
Name:                                      Name:
Date:                                      Date:


| Subscribed and sworn to before me this ___ day of _____, 2007.  _____ Notary Public | Subscribed and sworn to before me this ___ day of _____, 2007.  _____ Notary Public |
|---|---|

2

EXHIBIT __5__ PAGE 36 OF 56

EXHIBIT A

| | Work Title | Work Reproduction | COUNTRY | REGISTRATION NO. |
|---|---|---|---|---|
| 1. | Dead Bird |  | United States | VA 1-219-709 |

3

EXHIBIT 5 PAGE 37 OF 56

EXHIBIT C

Final

NET NAMES ASSIGNMENT

WHEREAS, ATTICUS CLOTHING, INC., a California corporation ("Assignor"), has obtained the domain name registrations identified in Exhibit A hereto (the "Net Names");

WHEREAS, Assignor and LOWLIFE CORPORATION LTD, an English limited company ("Assignee"), have executed that certain Asset Purchase And Sale Agreement dated June __, 2007 (the "Purchase Agreement"); and

WHEREAS, pursuant to the terms of the Purchase Agreement, Assignor desires to transfer and assign and Assignee desires to receive all of Assignor's right, title and interest in and to the Net Names.

NOW THEREFORE, for the consideration set forth in the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor hereby sells, transfers, assigns and sets over unto Assignee, its successors and assigns, all of Assignor's entire worldwide right, title and interest it has and as may exist in the Net Names

Assignor agrees to provide all further information and execute any further documents in print or electronic form that may reasonably be necessary to complete the transfer of the Net Names and to give effect to this Agreement  Without limiting the generality of the foregoing, Assignor agrees to make best efforts to confirm or authorize the transfer of the Net Names from Assignor to the Assignee with the respective registrar or registry or both, as the case may be, as soon as practicable but in any event no later than five (5) business days, following Assignor's receipt of any request from Assignee's registrar or registry to confirm or authorize the transfer of any Net Name

THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

EXHIBIT 5 PAGE 39 OF 56

IN TESTIMONY WHEREOF, the undersigned Assignor and Assignee have executed this Assignment effective as of the _____ day of June, 2007.

ASSIGNOR                          ASSIGNEE
ATTICUS CLOTHING, INC.            LOWLIFE CORPORATION LTD


By: _____          By: _____
Name:                            Name:
Date:                            Date:

2

EXHIBIT _5_ PAGE _39_ OF _56_

EXHIBIT A

ATTICUS NET NAMES

| DOMAIN NAME | EXPIRATION DATE |
|---|---|
| ATTICUSCLOTHING.COM | 2/6/08 |
| ATTICUS-CLOTHING.COM | 2/19/08 |
| ATTICUS-CLOTHING.NET | 2/19/08 |
| ATTICUS.JP | 3/31/09 |
| ATTICUSBLACK.CO.UK | 3/18/09 |
| ATTICUSBLACK.COM | 12/22/07 |
| ATTICUSCLOTHING.BIZ | 3/2/09 |
| ATTICUSCLOTHING.BZ | 3/2/09 |
| ATTICUSCLOTHING.CA | 3/22/08 |
| ATTICUSCLOTHING.CC | 3/2/09 |
| ATTICUSCLOTHING.CN | 3/12/09 |
| ATTICUSCLOTHING.COM.AU | 8/6/08 |
| ATTICUSCLOTHING.COM.CN | 3/2/09 |
| ATTICUSCLOTHING.COM.MX | 4/11/09 |
| ATTICUSCLOTHING.DE | 10/21/07 |
| ATTICUSCLOTHING.INFO | 3/2/09 |
| ATTICUSCLOTHING.IT | 12/16/07 |
| ATTICUSCLOTHING.JP | 3/13/08 |
| ATTICUSCLOTHING.KIDS.US | 2/6/08 |
| ATTICUSCLOTHING.NET | 3/2/09 |
| ATTICUSCLOTHING.NET.CN | 3/2/08 |
| ATTICUSCLOTHING.ORG | 3/2/09 |
| ATTICUSCLOTHING.ORG.CN | 3/3/09 |
| ATTICUSCLOTHING.ORG.UK | 1/21/08 |
| ATTICUSCLOTHING.US | 3/2/09 |

3

EXHIBIT 5 PAGE 40 OF 56

EXHIBIT D-1

Final

## ANDERSON COPYRIGHT ASSIGNMENT

WHEREAS, Sven-Dylan Anderson ("Assignor"), during the course of his employment with Loserkids.com a California corporation ("Loserkids") and/or Atticus Clothing, Inc , a California corporation ("Assignee"), originated registered and unregistered copyrights, including but not limited to those designs and logos identified on **Exhibit A** hereto, used exclusively in connection with clothing, footwear and related products sold and marketed under the "Atticus" name and marks, (the "Copyrights") by Assignee, Really Likeable People, Inc., a Delaware Corporation ("RLP") and(or) affiliates of Assignee and(or) RLP. Assignee and RLP are collectively referred to herein as the "Assignee Parties";

WHEREAS, the Assignee Parties and Lowlife Corporation Limited, an English limited company ("Lowlife"), have executed that certain Asset Purchase and Sale Agreement dated June __, 2007 (the "Purchase Agreement") in which the Assignee Parties have agreed to assign to Lowlife all of Assignee Parties' right, title and interest in and to the Copyrights; and

WHEREAS, since Assignor originated each of the Copyrights in the course of his employment with Loserkids and/or Assignee or otherwise created each of the Copyrights as a "work made for hire" at the request of Loserkids and/or Assignee; and Assignor, Assignee and Loserkids believe that Loserkids and/or Assignee already possess all right, title and interest to the Copyrights and merely desire Assignor to assign and confirm transfer of all right, title and interest in and to the Copyrights to Assignee by virtue of this written agreement.

NOW THEREFORE, for one dollar and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby irrevocably sell, grant, convey, assign and set over unto Assignee, its successors and assigns, all worldwide right, title and interest in and to the Copyrights. Without limiting the generality of the foregoing, Assignor hereby assigns to Assignee the exclusive right to make derivative works based upon the Copyrights and the right to recover for damages and profits for past, present and future infringements the Copyrights.

Assignor waives any and all ownership and proprietary interest in the Copyrights and all extensions and renewals thereof, including all rights of droit moral (moral rights) including, without limitation, rights equivalent thereto such as rights of attribution, assignment and integrity. Assignor agrees to sign all documents from time-to-time that may be necessary for Assignee to protect and preserve its ownership rights in and to the Copyrights.

THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

EXHIBIT _5_ PAGE _41_ OF _56_

IN TESTIMONY WHEREOF, the undersigned Assignor and Assignee have executed this Assignment effective as of the _____ day of June, 2007.

ASSIGNOR                                ASSIGNEE


By: _____        By: _____
Name:  Sven-Dylan Anderson          Name:  Atticus Clothing, Inc.
Date:                               Date:

| Subscribed and sworn to before me this ___ day of _____, 2007.<br><br>_____<br>Notary Public | Subscribed and sworn to before me this ___ day of _____, 2007.<br><br>_____<br>Notary Public |
|---|---|

2

EXHIBIT  5  PAGE  42  OF  56

Exhibit A

| Season | Name | Author | Date of Creation | Date of Publication |
|---|---|---|---|---|
| Unknown (DTL 1) | Angel | Dylan Anderson | 2001 | 2001 |
| Summer 2003 | Angel | Dylan Anderson | 2001 | 2001 |
| Summer 2003 | ATCS | Dylan Anderson | 2001 | Sept. 2002 |
| Unknown (DTL 1) | Broken Heart | Dylan Anderson | 2001 | 2001 |
| Summer 2003 | Broken Heart | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Crop Circles | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Czar | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Dead Bird | Dylan Anderson | 2001 | 2001 |
| Summer 2003 | Dead Bird | Dylan Anderson | 2001 | 2001 |
| Spring 2004 | Dead Bird | Dylan Anderson | 2001 | 2001 |
| Fall/Holiday 2004 | Dead Bird | Dylan Anderson | 2001 | 2001 |
| Spring/Summer 2005 | Dead Bird | Dylan Anderson | 2001 | 2001 |
| Spring/Summer 2006 | Dead Bird | Dylan Anderson | 2001 | 2001 |
| Fall/Holiday 2006 | Dead Bird | Dylan Anderson | 2001 | 2001 |
| Spring 2007 | Dead Bird | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Double Cross | Dylan Anderson | 2001 | 2001 |
| Summer 2003 | Double Cross | Dylan Anderson | 2001 | 2001 |
| Spring 2004 | Double Cross | Dylan Anderson | 2001 | 2001 |
| Fall/Holiday 2004 | Double Cross | Dylan Anderson | 2001 | 2001 |
| Spring/Summer 2005 | Double Cross | Dylan Anderson | 2001 | 2001 |
| Spring/Summer 2006 | Double Cross | Dylan Anderson | 2001 | 2001 |
| Fall/Holiday 2006 | Double Cross | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Double Down | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Drowning | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Graveyard | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | H.R. | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Logo | Dylan Anderson | 2001 | 2001 |
| Summer 2003 | Logo | Dylan Anderson | 2001 | 2001 |
| Spring 2004 | Logo | Dylan Anderson | 2001 | 2001 |
| Fall/Holiday 2004 | Logo | Dylan Anderson | 2001 | 2001 |
| Spring/Summer 2005 | Logo | Dylan Anderson | 2001 | 2001 |
| Spring/Summer 2006 | Logo | Dylan Anderson | 2001 | 2001 |
| Fall/Holiday 2006 | Logo | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Outtaline | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Phantom | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Slacked | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | X-ray | Dylan Anderson | 2001 | 2001 |
| Summer 2003 | Cursive | Dylan Anderson | 2002 | Sept. 2002 |
| Spring 2004 | Cursive | Dylan Anderson | 2002 | Sept. 2002 |
| Fall/Holiday 2004 | Cursive | Dylan Anderson | 2002 | Sept. 2002 |
| Spring/Summer 2005 | Cursive | Dylan Anderson | 2002 | Sept. 2002 |
| Summer 2003 | Fist | Dylan Anderson | 2002 | Sept. 2002 |
| Summer 2003 | Hard A | Dylan Anderson | 2002 | Sept. 2002 |
| Summer 2003 | Mash | Dylan Anderson | 2002 | Sept. 2002 |

3

EXHIBIT 5 PAGE 43 OF 56

| | | | | | |
|---|---|---|---|---|---|
| Summer 2003 | Mayhem | Dylan Anderson | | 2002 | Sept. 2002 |
| Summer 2003 | Negative | Dylan Anderson | | 2002 | Sept. 2002 |
| Summer 2003 | Saloon | Dylan Anderson | | 2002 | Sept. 2002 |
| Summer 2003 | Spider | Dylan Anderson | | 2002 | Sept. 2002 |
| Spring 2007 | Comix | Dylan Anderson | | 2005 | Sept. 2005 |
| Spring 2007 | Silhouette | Dylan Anderson | | 2005 | Jan. 2006 |
| Spring 2007 | Dead Bird 2 | Dylan Anderson | | 2006 | Sept. 2006 |
| Fall/Holiday 2004 | Blueprint | Dylan Anderson | Oct. 2003 | | Jan. 2004 |
| Fall/Holiday 2004 | Clean | Dylan Anderson | Oct. 2003 | | Jan. 2004 |
| Fall/Holiday 2004 | Flash | Dylan Anderson | Oct. 2003 | | Jan. 2004 |
| Fall/Holiday 2004 | Letter | Dylan Anderson | Oct. 2003 | | Jan. 2004 |
| Fall/Holiday 2004 | Lines | Dylan Anderson | Oct. 2003 | | Jan. 2004 |
| Fall/Holiday 2004 | Logan | Dylan Anderson | Oct. 2003 | | Jan. 2004 |
| Fall/Holiday 2004 | Pattern | Dylan Anderson | Oct. 2003 | | Jan. 2004 |
| Fall/Holiday 2004 | Plain | Dylan Anderson | Oct. 2003 | | Jan. 2004 |
| Fall/Holiday 2004 | Quick Spray | Dylan Anderson | Oct. 2003 | | Jan. 2004 |
| Fall/Holiday 2004 | Shadow | Dylan Anderson | Oct. 2003 | | Jan. 2004 |
| Fall/Holiday 2004 | Streets | Dylan Anderson | Oct. 2003 | | Jan. 2004 |
| Fall/Holiday 2004 | Swirl | Dylan Anderson | Oct. 2003 | | Jan. 2004 |
| Fall/Holiday 2004 | Triangle | Dylan Anderson | Oct. 2003 | | Jan. 2004 |
| Fall 2005 | Alfred | Dylan Anderson | 2004-Aug | | Jan. 2005 |
| Fall 2005 | Apart | Dylan Anderson | 2004-Aug | | Jan. 2005 |
| Fall 2005 | Brush | Dylan Anderson | 2004-Aug | | Jan. 2005 |
| Fall 2005 | NXNW | Dylan Anderson | 2004-Aug | | Jan. 2005 |
| Spring/Summer 2006 | Brush | Dylan Anderson | 2005-April | | Sept. 2005 |
| Spring/Summer 2006 | Comix | Dylan Anderson | 2005-April | | Sept. 2005 |
| Fall/Holiday 2006 | Barely | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | Birdy | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | Bleach | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | Boxcutter | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | Class | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | Cobra Kai | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | Comix | Dylan Anderson | 2005-Sept | | Sept. 2005 |
| Fall/Holiday 2006 | Confused | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | Cut Up | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | Diego | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | Graf 2 | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | Kisses | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | KTL | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | Monster | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | Notes | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | OG Logo | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | Old Bird | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | Outdoor | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | Paste | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | Pattern | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | Plate | Dylan Anderson | 2005-Sept | | Jan. 2006 |
| Fall/Holiday 2006 | Quake | Dylan Anderson | 2005-Sept | | Jan. 2006 |

4

EXHIBIT 5 PAGE 44 OF 56

| | | | | |
|---|---|---|---|---|
| Fall/Holiday 2006 | RAADDII | Dylan Anderson | 2005-Sept | Jan. 2006 |
| Fall/Holiday 2006 | Rail Bird | Dylan Anderson | 2005-Sept | Jan. 2006 |
| Fall/Holiday 2006 | Sabbath | Dylan Anderson | 2005-Sept | Jan. 2006 |
| Fall/Holiday 2006 | San Diego | Dylan Anderson | 2005-Sept | Jan. 2006 |
| Fall/Holiday 2006 | Silhouette | Dylan Anderson | 2005-Sept | Jan. 2006 |
| Fall/Holiday 2006 | Sweet | Dylan Anderson | 2005-Sept | Jan. 2006 |
| Fall/Holiday 2006 | Thomas | Dylan Anderson | 2005-Sept | Jan. 2006 |
| Fall/Holiday 2006 | We're #1 | Dylan Anderson | 2005-Sept | Jan. 2006 |
| Summer 2007 | 2 Metal | Dylan Anderson | 2006-Aug | March. 2007 |
| Fall 2007 | 2 Metal | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | A Game | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Adams | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Amos | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Apoco | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Apoco (hat) | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Arc | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Archway | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Summer 2007 | Bad Screen | Dylan Anderson | 2006-Aug | March. 2007 |
| Fall 2007 | Bad Screen | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Barbwire | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Boombox | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Caged | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Cover | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Crush | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Summer 2007 | Dead Bird 2 | Dylan Anderson | 2006-Aug | March. 2007 |
| Fall 2007 | Dead Bird 2 | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Summer 2007 | Dead Bird 3 | Dylan Anderson | 2006-Aug | March. 2007 |
| Fall 2007 | Dead Bird 3 | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Decay | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Summer 2007 | DFA | Dylan Anderson | 2006-Aug | March. 2007 |
| Fall 2007 | DFA | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Summer 2007 | Ferry | Dylan Anderson | 2006-Aug | March. 2007 |
| Fall 2007 | Ferry | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Firm | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Front | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Impact | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Leftover | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Levac | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Lupus | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Magnum | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Option | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Red Dot | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Summer 2007 | Rising | Dylan Anderson | 2006-Aug | March. 2007 |
| Fall 2007 | Rising | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Summer 2007 | Secret Handshake | Dylan Anderson | 2006-Aug | March. 2007 |
| Fall 2007 | Sheet Music | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Summer 2007 | Sketch bird | Dylan Anderson | 2006-Aug | March. 2007 |

5

EXHIBIT _5_ PAGE _45_ OF _56_

| | | | | |
|---|---|---|---|---|
| Fall 2007 | Skullsette | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Fall 2007 | Solidarity | Dylan Anderson | 2006-Aug | Jan. 2007 |
| Spring 2007 | Blitz | Dylan Anderson | 2006-Feb | Sept. 2006 |
| Spring 2007 | Bombs Away | Dylan Anderson | 2006-Feb | Sept. 2006 |
| Spring 2007 | Decay | Dylan Anderson | 2006-Feb | Sept. 2006 |
| Spring 2007 | Double Cross 2 | Dylan Anderson | 2006-Feb | Sept. 2006 |
| Spring 2007 | Front | Dylan Anderson | 2006-Feb | Sept. 2006 |
| Spring 2007 | Full Metal | Dylan Anderson | 2006-Feb | Sept. 2006 |
| Spring 2007 | Impact | Dylan Anderson | 2006-Feb | Sept. 2006 |
| Spring 2007 | Logo 2 | Dylan Anderson | 2006-Feb | Sept. 2006 |
| Spring 2007 | Olde E | Dylan Anderson | 2006-Feb | Sept. 2006 |
| Spring 2007 | Quake | Dylan Anderson | 2006-Feb | Sept. 2006 |
| Spring 2007 | Rips | Dylan Anderson | 2006-Feb | Sept. 2006 |
| Spring 2007 | Rise | Dylan Anderson | 2006-Feb | Sept. 2006 |
| Spring 2007 | Rising | Dylan Anderson | 2006-Feb | Sept. 2006 |
| Spring 2007 | Slant | Dylan Anderson | 2006-Feb | Sept. 2006 |
| Spring 2008 | Apmpersand | Dylan Anderson | 2007-March | N/A |
| Spring 2008 | Beathoven | Dylan Anderson | 2007-March | N/A |
| Spring 2008 | Dego | Dylan Anderson | 2007-March | N/A |
| Spring 2008 | Formula | Dylan Anderson | 2007-March | N/A |
| Spring 2008 | Gibson | Dylan Anderson | 2007-March | N/A |
| Spring 2008 | Girley | Dylan Anderson | 2007-March | N/A |
| Spring 2008 | Hash | Dylan Anderson | 2007-March | N/A |
| Spring 2008 | Havoc | Dylan Anderson | 2007-March | N/A |
| Spring 2008 | Necks | Dylan Anderson | 2007-March | N/A |
| Spring 2008 | Ona Wire | Dylan Anderson | 2007-March | N/A |
| Spring 2008 | Oval | Dylan Anderson | 2007-March | N/A |
| Spring 2008 | Roll | Dylan Anderson | 2007-March | N/A |
| Spring 2008 | Thread count | Dylan Anderson | 2007-March | N/A |
| Spring 2004 | Blueprint | Dylan Anderson | June. 2003 | Sept. 2003 |
| Spring 2004 | Dots | Dylan Anderson | June. 2003 | Sept. 2003 |

6

EXHIBIT _5_ PAGE _46_ OF _56_

EXHIBIT D-2

Final

## LOSERKIDS.COM COPYRIGHT ASSIGNMENT

WHEREAS, LOSERKIDS.COM a California corporation ("Assignor"), may have rights in and to registered and unregistered copyrights, including but not limited to those identified in **Exhibit A** hereto, used exclusively in connection with clothing, footwear, and related products sold and marketed under the "Atticus" name and marks (the "Copyrights") by Atticus Clothing, Inc., a California corporation ("Assignee"), Really Likeable People, Inc., a Delaware Corporation ("RLP") and(or) affiliates of Assignee and(or) RLP. Assignee and RLP are collectively referred to herein as the "Assignee Parties";

WHEREAS, the Assignee Parties and Lowlife Corporation Limited, an English limited company ("Lowlife"), have executed that certain Asset Purchase and Sale Agreement dated June ___, 2007 (the "Purchase Agreement") in which the Assignee Parties have agreed to assign to Lowlife all of Assignee Parties' right, title and interest in and to the Copyrights; and

WHEREAS, Assignor and Assignee desire to assign and confirm transfer of all of Assignor's right, title and interest in and to the Copyrights to Assignee by virtue of this written agreement.

NOW THEREFORE, for one dollar and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby irrevocably sell, grant, convey, assign and set over unto Assignee, its successors and assigns, all of its worldwide right, title and interest in and to the Copyrights. Without limiting the generality of the foregoing, Assignor hereby assigns to Assignee, its exclusive right to make derivative works based upon the Copyrights and the right to recover for damages and profits for past, present and future infringements the Copyrights.

Assignor waives any and all ownership and proprietary interest in the Copyrights and all extensions and renewals thereof, including all rights of droit moral (moral rights) including, without limitation, rights equivalent thereto such as rights of attribution, assignment and integrity. Assignor agrees to sign all documents from time-to-time that may be necessary for Assignee to protect and preserve its ownership rights in and to the Copyrights.

THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

EXHIBIT 5 PAGE 47 OF 56

IN TESTIMONY WHEREOF, the undersigned Assignor and Assignee have executed
this Assignment effective as of the _____ day of June, 2007.


ASSIGNOR                           ASSIGNEE
LOSERKIDS.COM                      ATTICUS CLOTHING INC.


By: _____   By: _____
Name:                             Name:
Date:                             Date:

| Subscribed and sworn to before me this ___ day of _____, 2007. | Subscribed and sworn to before me this ___ day of _____, 2007. |
|---|---|
| _____<br>Notary Public | _____<br>Notary Public |

2

EXHIBIT _5_ PAGE _48_ OF _56_

EXHIBIT A

| Season | Name | Author | Date of Creation | Date of Publication |
|---|---|---|---|---|
| Unknown (DTL 1) | Angel | Dylan Anderson | 2001 | 2001 |
| Summer 2003 | Angel | Dylan Anderson | 2001 | 2001 |
| Summer 2003 | ATCS | Dylan Anderson | 2001 | Sept. 2002 |
| Unknown (DTL 1) | Broken Heart | Dylan Anderson | 2001 | 2001 |
| Summer 2003 | Broken Heart | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Crop Circles | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Czar | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Dead Bird | Dylan Anderson | 2001 | 2001 |
| Summer 2003 | Dead Bird | Dylan Anderson | 2001 | 2001 |
| Spring 2004 | Dead Bird | Dylan Anderson | 2001 | 2001 |
| Fall/Holiday 2004 | Dead Bird | Dylan Anderson | 2001 | 2001 |
| Spring/Summer 2005 | Dead Bird | Dylan Anderson | 2001 | 2001 |
| Spring/Summer 2006 | Dead Bird | Dylan Anderson | 2001 | 2001 |
| Fall/Holiday 2006 | Dead Bird | Dylan Anderson | 2001 | 2001 |
| Spring 2007 | Dead Bird | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Double Cross | Dylan Anderson | 2001 | 2001 |
| Summer 2003 | Double Cross | Dylan Anderson | 2001 | 2001 |
| Spring 2004 | Double Cross | Dylan Anderson | 2001 | 2001 |
| Fall/Holiday 2004 | Double Cross | Dylan Anderson | 2001 | 2001 |
| Spring/Summer 2005 | Double Cross | Dylan Anderson | 2001 | 2001 |
| Spring/Summer 2006 | Double Cross | Dylan Anderson | 2001 | 2001 |
| Fall/Holiday 2006 | Double Cross | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Double Down | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Drowning | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Graveyard | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | H.R. | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Logo | Dylan Anderson | 2001 | 2001 |
| Summer 2003 | Logo | Dylan Anderson | 2001 | 2001 |
| Spring 2004 | Logo | Dylan Anderson | 2001 | 2001 |
| Fall/Holiday 2004 | Logo | Dylan Anderson | 2001 | 2001 |
| Spring/Summer 2005 | Logo | Dylan Anderson | 2001 | 2001 |
| Spring/Summer 2006 | Logo | Dylan Anderson | 2001 | 2001 |
| Fall/Holiday 2006 | Logo | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Outtaline | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Phantom | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | Stacked | Dylan Anderson | 2001 | 2001 |
| Unknown (DTL 1) | X-ray | Dylan Anderson | 2001 | 2001 |

3

EXHIBIT 5 PAGE 49 OF 56

EXHIBIT D-3

Final

### DELONGE COPYRIGHT ASSIGNMENT

WHEREAS, Kari DeLonge ("Assignor"), during the course of her employment with Atticus Clothing, Inc., a California corporation ("Assignee"), originated the unregistered copyrights identified on Exhibit A hereto, used exclusively in connection with clothing, footwear and related products sold and marketed under the "Atticus" name and marks; (the "Copyrights") by Assignee, Really Likeable People, Inc., a Delaware Corporation ("RLP") and(or) affiliates of Assignee and(or) RLP.  Assignee and RLP are collectively referred to herein as the "Assignee Parties";

WHEREAS, the Assignee Parties and Lowlife Corporation Limited, an English limited company ("Lowlife"), have executed that certain Asset Purchase and Sale Agreement dated June __, 2007 (the "Purchase Agreement") in which the Assignee Parties have agreed to assign to Lowlife all of Assignee Parties' right, title and interest in and to the Copyrights; and

WHEREAS, since Assignor originated each of the Copyrights in the course of her employment with Assignee or otherwise created each of the Copyrights as a "work made for hire" at the request of Assignee; and Assignor and Assignee believe that Assignee already possess all right, title and interest in the Copyrights and merely desire Assignor to assign and confirm transfer of all right, title and interest in and to the Copyrights to Assignee by virtue of this written agreement.

NOW THEREFORE, for one dollar and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby irrevocably sell, grant, convey, assign and set over unto Assignee, its successors and assigns, all worldwide right, title and interest in and to the Copyrights.  Without limiting the generality of the foregoing, Assignor hereby assigns to Assignee the exclusive right to make derivative works based upon the Copyrights and the right to recover for damages and profits for past, present and future infringements the Copyrights

Assignor waives any and all ownership and proprietary interest in the Copyrights and all extensions and renewals thereof, including all rights of droit moral (moral rights) including, without limitation, rights equivalent thereto such as rights of attribution, assignment and integrity. Assignor agrees to sign all documents from time-to-time that may be necessary for Assignee to protect and preserve its ownership rights in and to the Copyrights

THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

EXHIBIT _5_ PAGE _50_ OF _56_

IN TESTIMONY WHEREOF, the undersigned Assignor and Assignee have executed this Assignment effective as of the _____ day of June, 2007

ASSIGNOR                              ASSIGNEE


By: _____        By: _____
Name:   Karl DeLonge                 Name:   Atticus Clothing, Inc.
Date:                                Date:

| Subscribed and sworn to before me this ___ day of _____, 2007. | Subscribed and sworn to before me this ___ day of _____, 2007 |
|---|---|
| _____<br>Notary Public | _____<br>Notary Public |

2

EXHIBIT 5 PAGE 51 OF 56

Exhibit A

| Ref. | Season | Name | Creation | Publication |
|---|---|---|---|---|
| 1 | Fall/Holiday 2004 | Trio | October 2003 | January 2004 |
| 2 | Spring/Summer 2005 | Classical | March 2004 | September 2004 |
| 3 | Spring/Summer 2005 | Mosaic | March 2004 | September 2004 |
| 4 | Fall 2005 | Star Rays | August 2004 | January 2005 |

The Copyright Images appear on the attached four (4) pages to this Exhibit A.

3

EXHIBIT 5 PAGE 52 OF 56



TRIO DESIGN #1

BACK HIT
3.63"W X 4"H

WHITE TEE

FRONT

BACK

CHEST HIT
4"W X 1"H

SLEEVE HIT
1.75"W X .88"H

PANTONES:
A) RED 201 C
B) HEX CYAN C
C) ORANGE 021 C
D) PINK 204 C
E) PURPLE 2405 C
F) YELLOW 012 C
G) BLACK
H) RED 187 C
I) HEX MAGENTA C
J) REFLEX BLUE C
K) HEX GREEN C
L) HEX GREEN C
M) HEX MAGENTA C
N) HEX MAGENTA

EXHIBIT  5  PAGE  53  OF  56



*atticas*

EXHIBIT 5 PAGE 54 OF 56

## CLASSICAL SWEATSHIRT



powder pink

EMBRIODERED
front size

A) WHITE
B) PANTONE RUBINE RED C
D) PANTONE RUBINE RED C

A

B

C

A) GREEN PANTONE 355 C
B) PINK PANTONE 707 C
D) PINK PANTONE 707 C

FOLD OVER TAG ON HOOD
.5"W X.5"H (SHOWING)
.5"W X 1"H (COMPLETE TAG)
pink pantone 1915 c
ON WHITE TAG FOR ALL COLORS

D

back arm embroidery
size

A) WHITE
B) PINK PANTONE 707 C
D) PINK PANTONE 707 C

EXHIBIT 5 PAGE 55 OF 56



front gafic size:



# THRICE TEE




SLEEVE HIT:
size:



A) PINK PANTONE 225 C
B) PANTONE YELLOW C
C) BROWN PANTONE 168 C
D) RED PANTONE 187 C
E) GREEN PANTONE 354 C
F) BLUE PANTONE 293 C
G) BLUE PANTONE 312 C
H) PINK PANTONE 204 C

K                    L




WHITE

K) PINK PANTONE 204 C
L) BLACK



BLACK

K) BLUE PANTONE 293 C
L) PINK PANTONE 204 C



HEATHER

K) BLUE PANTONE 204 C
L) PINK PANTONE 204 C

EXHIBIT _5_ PAGE _56_OF_56