1  BINGHAM McCUTCHEN LLP
   J. Warren Rissier (No. 197939)
2  warren.rissier@bingham.com
   Aron P. Rofer (No. 240021)
3  aron.rofer@bingham.com
   355 S. Grand Avenue, 44th Floor
4  Los Angeles, CA 90071
   Telephone: (213) 680-6400
5  Facsimile: (213) 680-6499

6  Attorneys for Plaintiffs Really Likeable People, Inc.,
   Loserkids, Inc., Macbeth, Inc., Macbeth Optics, LP, and
7  Really Likeable People II, Inc. (formerly Atticus
   Clothing, Inc.)

8

9           UNITED STATES DISTRICT COURT

10          SOUTHERN DISTRICT OF CALIFORNIA

11

12 REALLY LIKEABLE PEOPLE, INC., a         CASE NO. 07 CV 2405 L CAB
   Delaware corporation, LOSERKIDS, INC., a
13 California Corporation, MACBETH, INC., a   **PLAINTIFFS' OPPOSITION TO**
   California corporation, MACBETH OPTICS, LP, **DEFENDANT EBTM'S MOTION TO**
14 a California limited partnership, and REALLY **DISMISS PURSUANT TO RULE**
   LIKEABLE PEOPLE II, INC. (formerly        **12(b)(2)**
15 ATTICUS CLOTHING INC.), a California
   corporation                              Judge:    Hon. M. James Lorenz
16                                           Date:     March 3, 2008
              Plaintiffs,                    Time:     10:30 a.m.
17                                           Room:     14
         vs.
18
   LOWLIFE CORPORATION, LTD, an English
19 limited company, EVERYTHING BUT THE
   MUSIC, plc, an English corporation, DALE
20 MASTERS, an individual, and DOES 1 through
   25, inclusive,
21
              Defendants.
22

23

24

25

26

27

28

A/72419472.4

---

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ......................................................................................... 1

II.  STATEMENT OF FACTS ............................................................................ 2

   A.   Background Regarding Competing Companies Really Likeable People And EBTM ............................................................................................. 2

   B.   Lowlife Enters Into Contracts With Really Likeable People, And EBTM Immediately Acquires Lowlife .............................................................. 4

   C.   EBTM Commits Numerous Intentional Acts Aimed At Harming RLP By Stealing Its Business And Trade Secrets ............................................... 6

III. RLP NEED ONLY MAKE A "PRIMA FACIE" SHOWING OF PERSONAL JURISDICTION, AND THE COURT IS REQUIRED TO ACCEPT ITS UNCONTROVERTED ALLEGATIONS AS TRUE ...................................... 11

IV.  THIS COURT HAS GENERAL JURISDICTION OVER EBTM ................. 12

   A.   EBTM Is Subject To General Personal Jurisdiction In California Because Of Its Extensive Business Activities In This State ............................... 13

   B.   Lowlife's Extensive Contacts With California Are Imputed To EBTM Since Lowlife Acts As EBTM's General Agent .................................... 15

V.   THIS COURT HAS SPECIFIC JURISDICTION OVER EBTM BECAUSE IT INTENTIONALLY CAUSED INJURY TO A CALIFORNIA-BASED CORPORATION ......................................................................................... 16

   A.   EBTM's Actions Were Purposeful ....................................................... 16

   B.   This Lawsuit Arises From EBTM's Unlawful And Intentional Acts ................. 18

   C.   Personal Jurisdiction Over EBTM Is Reasonable ................................ 18

        1.   Purposeful Interjection ................................................................ 19

        2.   Burden On EBTM In Defending In The Forum ......................... 20

        3.   Extent Of The Conflict With Sovereignty Of United Kingdom ............. 20

        4.   California's Interest In The Dispute ........................................... 21

        5.   The Most Efficient Judicial Resolution Of The Controversy .................. 21

        6.   The Importance Of The Forum To The Plaintiffs' Interest In Convenient And Effective Relief ................................................ 22

        7.   The Existence Of An Alternative Forum .................................... 22

VI.  IN THE EVENT THE COURT DOES NOT DENY EBTM'S MOTION OUT OF HAND, IT SHOULD PERMIT RLP TO CONDUCT JURISDICTIONAL DISCOVERY. ............................................................................................. 22

VII. CONCLUSION ............................................................................................ 23

A/72419472.4                                            i

1

# TABLE OF AUTHORITIES

2

Page

3      Cases

4      Ballard v. Savage
         65 F.3d 1495 (9th Cir. 1995) ................................................ 10, 15, 16, 19
5

6      Bancroft, supra
         223 F.3d at 1087 ........................................................... 15, 16, 17

7      Burger King, supra
         471 U.S. at 478 ............................................................ 14, 15, 16, 17
8

9      Calder v. Jones
         465 U.S. 783 (1984) ........................................................... 15, 16

10     CFA N. Cal., Inc. v. CRT Partners LLP
         378 F. Supp. 2d 1177 (N.D. Cal. 2005) ........................................... 18, 20
11

12     Chan v. Society Expeditions
         39 F.3d 1398 (9th Cir. 1994) ..................................................... 13

13     Coremetrics, Inc. v. AtomicPark.com, LLC
         370 F. Supp. 2d 1013 (N.D. Cal. 2005) ............................................. 12
14

15     Credit Lyonnais Securities (USA), Inc. v. Alcantara
         183 F.3d 151 (2nd Cir. 1999) ...................................................... 10

16     Data Disc, Inc. v. Sys. Tech. Ass'n, Inc.
         557 F.2d 1280 (9th Cir. 1977) ................................................ 10, 11, 20
17

18     Doe v. Unocal Corp.
         248 F.3d 915 (9th Cir. 2001) ...................................................... 13

19     Dole Food Co. v. Watts
         303 F.3d 1104 (9th Cir. 2002) ..................................................... 15, 16
20

21     Dorsey v. American Golf Corp.
         98 F.Supp.2d 812 (E.D. Mich. 2000) ............................................... 12

22     Farmers Ins. Exchange v. Portage La Prairie Mut. Ins. Co.
         907 F.2d 911 (9th Cir. 1990) ...................................................... 11
23

24     Gordy v. Daily News, L.P.
         95 F.3d 829 (9th Cir. 1996) ....................................................... 16

25     Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.
         328 F.3d 1122 (9th Cir. 2003) ................................................ 10, 13, 20
26

27     Insurance Co. of N. Am. v. Marina Salina Cruz
         649 F.2d 1266 (9th Cir. 1981) ..................................................... 18

28

TABLE OF AUTHORITIES
(continued)

Page

Lewis v. Fresne
  252 F.3d 352 (5th Cir. 2001) ................................................................. 16

Ochoa v. J.B. Martin & Sons Farms, Inc.
  287 F.3d 1182 (9th Cir. 2002) ........................................................ 12, 17

Panavision Intern., L.P. v. Toeppen
  141 F.3d 1316 (9th Cir. 1998) .............................................................. 18

Schwarzenegger v. Fred Martin Motor Co.
  374 F.3d 797 (9th Cir. 2004) ............................................................... 10

Sher v. Johnson
  911 F.2d 1357 (9th Cir. 1990) .............................................................. 18

Sibley v. Superior Court
  16 Cal. 3d 442 (1976) ......................................................................... 14

Sinatra v. Nat'l Enquirer, Inc.
  854 F.2d 1191 (9th Cir. 1988) .............................................................. 18

Ziegler v. Indian River County
  64 F.3d 470 (9th Cir. 1995) .................................................................. 17


Statutes

California Business and Professions Code §17200 ................................ 2, 19

Other Authorities

Schwarzer et al., Cal. Practice Guide: Federal Civil Procedure Before Trial (The
  Rutter Group 2008) § 9:114 at p. 9 ...................................................... 10

Schwarzer et al., Cal. Practice Guide: Federal Civil Procedure Before Trial at §
  3:105.2 at p. 3 .................................................................................... 12

Schwarzer et al., Cal. Practice Guide: Federal Civil Procedure Before Trial at §
  3:168 at 3 .......................................................................................... 14

I.    **INTRODUCTION**

This court has personal jurisdiction over defendant EBTM plc ("EBTM") and its motion to dismiss should be denied. The allegations of the complaint and the additional evidence submitted herewith sufficiently establish a "prima facie" if not a conclusive showing of personal jurisdiction over EBTM. EBTM's motion is nothing more than a spurious attempt to evade responsibility for its wrongful actions. EBTM is subject to both general and specific personal jurisdiction.

EBTM is subject to general jurisdiction due to its continuous and systematic contacts with California, which include extensive product sales to California residents. EBTM is also subject to general jurisdiction because of its subsidiary, Lowlife Corporation Limited's ("Lowlife") extensive contacts with California, which are imputed to EBTM because Lowlife acts as EBTM's general agent.

EBTM is subject to specific jurisdiction because a defendant that intentionally causes injury to a California-based company is subject to jurisdiction in California. Here, EBTM has intentionally caused injury to Plaintiffs in numerous ways, none of which EBTM disputes in its Motion. For example, EBTM caused the closure of Plaintiffs' website at www.loserkids.uk.com, secretly plotted to take over fulfillment services for Plaintiffs' website through a fraudulent scheme relating to such closure, stole Plaintiffs' customer data, failed and refused to ship product for sale on Plaintiffs' websites (because it was selling the same products on its own competing website), and unlawfully used the name, likeness and celebrity of Plaintiffs' founder and his former band in advertising EBTM's website and products in an improper attempt to divert sales from Plaintiffs' websites.

EBTM's arguments in its motion to dismiss are entirely focused on general jurisdiction, including a conclusory argument that this Court's jurisdiction over its subsidiary Lowlife does not automatically confer jurisdiction over EBTM. EBTM, however, makes no attempt to refute the allegations of harm intentionally caused to Plaintiffs by EBTM that are the basis for the Court's specific jurisdiction over EBTM.

Accordingly, EBTM's motion to dismiss for lack of personal jurisdiction should be

A/72419472.4                                      - 1 -

1    denied. In the event the Court does not deny EBTM's motion out of hand, Plaintiffs respectfully

2    request the opportunity to conduct jurisdictional discovery to determine the full extent of

3    EBTM's contacts with California.

4    **II.    STATEMENT OF FACTS**

5        Plaintiffs Really Likeable People, Inc., Loserkids, Inc., Macbeth, Inc., Macbeth Optics,

6    LP, and Really Likeable People II, Inc. (formerly Atticus Clothing, Inc.) (collectively referred to

7    as "Really Likeable People" or "RLP") filed this action against defendants EBTM, Lowlife and

8    EBTM's director and largest individual shareholder, Dale Masters ("Masters"). Really Likeable

9    People asserts causes of action against EBTM for misappropriation of trade secrets, aiding and

10   abetting breach of fiduciary duty, intentional interference with contract, unfair competition, and

11   violation of California Business and Professions Code §17200.

12   **A.    Background Regarding Competing Companies Really Likeable
             People And EBTM**

13

14       Really Likeable People is a California company founded in 1999 that owns and licenses

15   rights to distribute music-inspired clothing brands and accessories under the Macbeth and

16   Loserkids trademarks and brand names. (Complaint ("Compl.") ¶¶ 1-4, 13.) RLP also owned

17   and licensed the rights to distribute music-inspired clothing and accessories under the Atticus

18   trademark and brand name, until July 2007 when RLP sold the Atticus trademarks and brand

19   name to Lowlife. (Id.) EBTM subsequently acquired Lowlife and Atticus. (Declaration of Aron

20   Rofer ("Rofer Decl.") ¶ 4 and Ex. B.) RLP markets its products, which include clothing, shoes

21   and accessories, to consumers with music interests. (Compl. ¶ 13.)

22       RLP was founded by Jon Humphrey and two members of the San Diego-based band

23   Blink-182, including current RLP owner Tom DeLonge. (Compl. ¶ 14.) Blink 182 achieved

24   huge commercial success, including selling over 12 million copies of its album titled *Enema of

25   the State.* (Id.) In 2005, Blink-182 disbanded and Tom DeLonge formed a new band, Angels &

26   Airwaves. Angels & Airwaves released their debut album *We Don't Need to Whisper* in May

27   2006, where it debuted at number 4 on the Billboard Top 200 chart. (Id.) In November 2007,

28   Angels & Airwaves released their album *I-Empire* where it debuted at number 1 for iTunes

A/72419472.4                                  - 2 -

1    album downloads. (Id.) Tom DeLonge, Blink-182 and Angels & Airwaves have been a

2    promotional vehicle for RLP's brands. (Id. ¶ 15.)

3        EBTM describes itself as "the leading online retailer of music inspired fashion." (Rofer

4    Decl. ¶ 2 and Ex. A.)[1] Since EBTM opened its doors in 2005, it has continuously done business

5    in California, including shipping up to 200 orders to California residents between 2005 and 2007.

6    (Declaration of Richard Breeden ("Breeden Decl.") ¶¶ 2, 10.) EBTM advertises to United States

7    customers, providing for conversions for prices in the U.S. dollar. (Compl. ¶ 6.) More than

8    twenty brands of products advertised and sold on EBTM's website are from California-based

9    companies, including RLP's own Macbeth brand. (Rofer Decl. ¶ 3.)

10        In summer 2007, as described below, EBTM "acquired [the] Atticus brand clothing

11    range." (Rofer Decl. ¶ 4 and Ex. B.) Thereafter, EBTM continued to systematically conduct

12    business in the United States and California. For example, on September 5, 2007, EBTM

13    announced that it had entered into wholesale and online agreements with Adeline, based in

14    California. (Rofer Decl. ¶¶ 10-11, Exs. I-J.) Also, for example, in November 2007, EBTM

15    announced "the launch of its US webstore for Atticus Clothing" in partnership with Music

16    Today, part of the Live Nation Group of companies. Live Nation is headquartered in California.[2]

17    (Rofer Decl. ¶ 6 and Ex. E.) EBTM further touted that "the launch of the US webstore is in line

18    with our strategy for future growth." (Id.)

19        Masters—EBTM's director and largest single shareholder—systematically

20    communicated with California-based RLP regarding the Atticus, Macbeth and Loserkids brands

21    and other matters. (See, e.g., Compl. ¶¶ 25, 26, 120; Declaration of Diana Crawford ("Crawford

22    Decl.") ¶¶ 2-4 and Exs. A-D.) Moreover, in August 2007, when RLP complained about

23    _____

24    [1] As described in more detail below, EBTM has unlawfully advertised and sought to improperly
     divert sales from RLP's websites by referencing Tom DeLonge and Blink 182 in the meta data
25    on its website in an unlawful attempt to associate their business and brands with Mr. DeLonge
     and his bands. The meta data, while not visible to the naked eye when viewing the website
26    pages, was known by EBTM to be referenced by search engines, like Google.

27    [2] Live Nation is headquartered in Los Angeles, California, and its subsidiary, Music Today, lists
     an address in Virginia. (See Rofer Decl. ¶ 5 and Exs. C-D.)

28

1   Lowlife's performance under the relevant agreements, Masters directed RLP to communicate

2   with EBTM director Simon Hargreaves. (Crawford Decl. ¶ 4 and Ex. D; Rofer Decl. ¶ 9, 13 and

3   Exs. H, M.)

4       Not surprisingly, given all of the above, EBTM is apparently frequently in California on

5   business. Indeed, when RLP initially attempted to serve the complaint in this action upon

6   Breeden in the United Kingdom, he was traveling in California. (Declaration of Malcolm

7   Satchell "Satchell Decl." ¶¶ 3-4.) He stayed at the W Hotel located at 421 West B. Street in San

8   Diego, California. (Declaration of Amy Arroyo ("Arroyo Decl.") ¶ 3.) Moreover, at a recent

9   industry convention in San Diego, EBTM rented a booth to advertise and take orders for their

10  Atticus brand. (Id. ¶ 4.)

11          **B.      Lowlife Enters Into Contracts With Really Likeable People, And**
12                    **EBTM Immediately Acquires Lowlife**

13      In February 2003, Lowlife (now a subsidiary and agent of EBTM) contracted with RLP

14  to be the exclusive distributor of Atticus and Macbeth products in the United Kingdom. (Compl.

15  ¶¶ 18-19.) In 2005, RLP and Lowlife entered into an agreement to jointly operate a website at

16  www.Loserkids.uk.com ("Loserkids.uk.com"), which was intended to be a UK version of the

17  website owned and operated by RLP at www.loserkids.com in the United States. (Id. ¶ 21.) The

18  model for Loserkids.uk.com was developed by RLP in connection with the Loserkids.com site,

19  based on RLP's successful website promotion and fulfillment arrangements and other experience

20  in creating and operating Loserkids.com since 1999. (Id. ¶¶ 15, 21.)

21      On May 29, 2007, Lowlife and RLP entered into the agreements at issue in this litigation.

22  (Compl. ¶ 23.) Pursuant to the Atticus Asset Purchase Agreement, RLP agreed to sell Atticus

23  brand assets to Lowlife in exchange for payment of $4.2 million. (Id.) The parties also entered

24  into "wind-down" agreements, providing for, among other things, the transition of the Atticus

25  brand assets and accompanying obligations from RLP to Lowlife, for wind-down of the

26  distribution relationships between RLP and Lowlife originally established pursuant to Atticus

27  and Macbeth Manufacturing and Distribution Agreements, and for the wind-down and transition

28  of the operation of the Loserkids.uk.com website from Lowlife to RLP. (Id.)

A/72419472.4                                    - 4 -

1    Among other things, the parties agreed that during the seven month wind-down period,

2    from May 29, 2007 through December 31, 2007, Lowlife would continue operating and

3    promoting the Loserkids.uk.com website and paying royalties to RLP for sales of product on the

4    site, and Lowlife would be given a license to continue to distribute Macbeth products in the UK,

5    Republic of Ireland, the Channel Islands, the European Union, Norway, Switzerland, Turkey,

6    and Russia (the "Territory") and would pay royalties to RLP for sales of Macbeth product in the

7    Territory. (Compl. ¶ 24.)  Consistent with past practices and the established course of dealing

8    for Loserkids.uk.com site, Atticus product was approved by RLP for sale on the

9    Loserkids.uk.com site and Lowlife acquired RLP's obligations under an outstanding purchase

10   order that provided for shipment of Fall 2007 Atticus product to be sold on Loserkids.com.  (Id.)

11   At the conclusion of the wind-down period, RLP was to take over operation of the

12   Loserkids.uk.com site and Lowlife would have no further rights to distribute Macbeth product in

13   the Territory. (Id.)

14   Each of the aforementioned agreements provided that California law governed the

15   contracts. (See Compl. ¶¶ 34, 52 and 82, Atticus Wind-Down Agreement § 8.6 (providing that

16   the Agreement "shall be governed by and construed in accordance with the laws of the State of

17   California ...); Loserkids.uk.com Wind-Down Agreement § 10(f) (same); Macbeth Wind-Down

18   Agreement § 27 (providing that the parties "irrevocably submit to the jurisdiction of the state

19   and/or federal courts in San Diego County, California for any action or proceeding regarding this

20   Agreement.").)  Upon information and belief, EBTM reviewed and approved of the terms of

21   each of these agreements, including their provisions that California law applied.  More

22   specifically, during negotiation of the Atticus Asset Purchase Agreement and accompanying

23   Wind-Down Agreements, Lowlife's agents stated that their "financing source"—now known not

24   to have been a "financing source" but instead competitor EBTM—needed to review certain

25   documents or contract terms before they could be agreed upon. (Crawford Decl. ¶ 5; Compl.

26   ¶¶ 23-29.)

27   On May 31, 2007, two days after the execution of the definitive agreements to sell the

28   Atticus brand to Lowlife and the related Wind-Down Agreements, Masters (Lowlife's sole

A/72419472.4                                                    - 5 -

1  owner) disclosed for the first time that he was not actually working with a "financing source" or

2  obtaining loans or investments to underwrite a portion of the purchase price, as his agent had

3  represented during the negotiations, but instead Masters apparently had been conspiring with

4  EBTM, a direct competitor of Loserkids, to immediately sell Lowlife and its rights to the Atticus

5  brand to EBTM. (Compl. ¶¶ 8, 25.)

6  　　　On June 1, 2007, EBTM publicly announced that it had acquired Lowlife. (Id. ¶ 26.) In

7  connection with the sale, Masters became the largest single shareholder of EBTM as well as a

8  member of its Board of Directors. (Id. ¶¶ 7-8.) As a result, Lowlife and Masters served and

9  continue to serve as EBTM's agents. (Id. ¶ 12.)

10  　　C.　　**EBTM Commits Numerous Intentional Acts Aimed At Harming
           RLP By Stealing Its Business And Trade Secrets**

11

12  　　　EBTM immediately commenced intentional acts, both directly and through its agents,

13  aimed at unfairly competing in the marketplace and otherwise harming RLP for the benefit of

14  EBTM. As alleged in the Complaint, EBTM engaged in numerous intentional acts directly

15  causing injury to RLP, including but not limited to the following: causing the closure of

16  Plaintiffs' website at www.loserkids.uk.com; secretly plotting to take over fulfillment services

17  for Plaintiffs' website through a fraudulent scheme relating to such website closure;

18  misappropriating Plaintiffs' customer data; refusing to ship product for sale on Plaintiffs'

19  websites (because it was selling the same products on EBTM's own competing website), and

20  unlawfully using the name, likeness and celebrity of Plaintiffs' founder and his former band in

21  advertising EBTM's website and products in an attempt to improperly divert sales from

22  Plaintiffs' websites.

23  　　　***EBTM's Secret Plot To Shut-Down RLP's Website***

24  　　　On June 6, 2007 (five days after EBTM publicly announced it had acquired Lowlife),

25  EBTM commenced a secret plot to shut down RLP's website, Loserkids.uk.com, by falsely

26  informing the website fulfillment provider, Andy Murray ("Murray") at Trinity Street Direct

27

28

A/72419472.4

1   ("Trinity Street"),[3] that EBTM had purchased the website, that fulfillment would be switched

2   from Trinity Street to EBTM, and that Loserkids.uk.com would be shut down. (Compl. ¶¶ 71-

3   81; Declaration of Andy Murray ("Murray Decl.") ¶ 3 and Ex. A.) This was strictly prohibited

4   by the Loserkids.uk.com Wind-Down Agreement, which required the consent of RLP for any

5   such changes to its fulfillment provider. (Compl. ¶ 71; Murray Decl. ¶ 2.) EBTM then secretly

6   discussed logistics for transitioning the loserkids.uk.com business from Trinity Street to EBTM,

7   including a planned launch date, logistics for sending all loserkids.uk.com inventory to EBTM,

8   and plans to shut down the site. (Compl. ¶ 72-81; Murray Decl ¶¶ 3-7, 10 and Exs. A-D.) Only

9   after the Loserkids.uk.com site had been shut down, on August 6, 2007, did EBTM contact RLP

10  about these actions, falsely and fraudulently alleging that there was an emergency and that

11  Trinity Street had forced the closure of the site on virtually no notice. (Compl. ¶ 77-79;

12  Crawford Decl. ¶ 2 and Ex. A; Murray Decl. ¶¶ 10-11.) These actions and false statements were

13  intentionally undertaken to fraudulently induce RLP to agree to turn the operation of the

14  loserkids.uk.com site over to EBTM, a direct competitor of RLP. (Compl. ¶ 77-79; Murray Decl

15  ¶¶ 10-11; Crawford Decl. ¶¶ 2-4 and Exs. A-D.) RLP was harmed by, among other things, no

16  commercial traffic on its website during the time that it was shut down and the loss of consumer

17  goodwill and interest due to their inability to access the site or place orders during the outage.

18  (Compl. ¶ 81.)

19          ***EBTM's Theft Of RLP's Customer Data***

20          In connection with this same fraudulent scheme and having intentionally and

21  misleadingly informed Trinity Street that EBTM "owned" the Loserkids.uk.com site, EBTM

22  misappropriated RLP's trade secret protected customer data. (Compl. ¶¶ 133-142.) More

23  specifically, on July 4, 2007, at Lowlife's request, Trinity Street sent to Lowlife the

24  www.Loserkids.uk.com customer data, which included names, shipping addresses and email

25  addresses for any customers that were shipped product ordered from www.Loserkids.uk.com and

26

27  ---
    [3] Trinity Street provides fulfillment, digital platform, customer care and reporting services for
    Loserkids.uk.com. (Murray Decl. ¶ 2.)

28

A/72419472.4                              - 7 -

1   those customers who registered for the website's mailing list.  (Murray Decl. ¶ 8 and Exs. E-F.)[4]

2   Thereafter, EBTM accessed and misappropriated RLP's trade secrets including its customer list

3   and data knowing they did not own or have rights to disclose that information to EBTM and

4   were under a duty as the operator of RLP's website not to do so.  (Compl. ¶ 135-139; Murray

5   Decl. ¶ 9 and Ex. F.)

6       Moreover, EBTM director Hatty Fawcett emailed Lowlife about the data, making clear

7   that EBTM was is possession of it and had or has plans to use it:  "I've now had a chance to

8   look at the Loser kids ... customer data from Trinity Street. ... I was also expecting to see both

9   billing and shipping information - but have only been provided with one address.  Can you

10  confirm whether Loser Kids customers can provide a different delivery address to their billing

11  addresses.  If so, we need to get both addresses from Trinity Street. ..."  (Murray Decl. ¶ 9 and

12  Ex. F.; Rofer Decl. ¶ 12 and Ex. K.)

13      ***EBTM's Acts To Divert Business From Loserkids.uk.com To EBTM.com***

14      The Loserkids.uk.com Wind-Down Agreement expressly requires Lowlife to use

15  commercially reasonable efforts to promote Loserkids.uk.com by developing agreements with

16  other related sites to cause a hyperlink to be created from such sites to the Loserkids.uk.com site.

17  (Compl. ¶ 63.)  However, contrary to that clear contractual obligation, and in contravention of

18  past practice, EBTM caused its subsidiary Lowlife to delete a Loserkids.uk.com hyperlink from a

19  site they operated, Atticusclothing.com, and add a new hyperlink from Atticusclothing.com to

20  EBTM.com, violating the express terms of the Loserkids.uk.com Wind-Down Agreement and

21  intentionally diverting commercial traffic to EBTM.com that otherwise would have gone to

22  Loserkids.uk.com.  (Id.;  see also Swart Decl. ¶ 6 and Ex. D.)

23      Similarly, in contravention of past practice and in violation of its contractual obligations

24  to promote Loserkids.uk.com, Lowlife cancelled some or all of the existing orders from third

25  _____

26  [4] Under the terms of the www.Loserkids.uk.com Wind-Down Agreement, that information was
    clearly the exclusive property of RLP and could only be used by Lowlife in connection with

27  ordinary course operation of the www.Loserkids.uk.com website, for the benefit of RLP.
    (Compl. ¶ 134.)

28

1  party manufacturers whose products had historically been sold on Loserkids.uk.com, failed to

2  order products from third party manufacturers consistent with past practices, and/or failed to post

3  product from such orders for sale on Loserkids.uk.com. (Compl. ¶ 65.) At the same time EBTM

4  and Lowlife were starving the Loserkids.uk.com site for fresh product, those same products were

5  being ordered for and sold on EBTM.com. (Id.) This harmed RLP by not only loss of sales and

6  customer traffic to Loserkids.com but also permanent loss of good will based on customers who,

7  unsatisfied with the website's stale content, have abandoned its use. (Id. at ¶ 66.)

8      When EBTM and Lowlife did belatedly post new product for sale on Loserkids.com, they

9  did so in a paucity of sizes in a transparent attempt to further harm the site while allowing EBTM

10  and Lowlife to argue that they did post some new product. (Id. at ¶ 68.) For example, as of

11  September 21, 2007, the Macbeth Fall 2007 Manchester shoe was available for purchase on

12  Loserkids.com in only two sizes—six and eleven—with nothing in between, omitting entirely the

13  range of sizes that would account for the vast majority of sales, despite the fact that the full range

14  of sizes were in Lowlife's possession. (Id.)

15      ***EBTM's Failure To Ship Atticus For Sale On RLP's Websites***

16      Additionally, Lowlife —as an agent of EBTM—failed to timely ship Atticus product to

17  Loserkids.com in the United States and failed to ship and/or post Atticus and Macbeth Fall 2007

18  product on Loserkids.uk.com. EBTM and Lowlife intentionally engaged in those actions or

19  omissions in an attempt to cause commercial harm to RLP and its affiliates and to gain an unfair

20  competitive advantage in the marketplace, since RLP is a competitor of EBTM and EBTM was

21  at the same time receiving and selling the same products on its own website. (Compl. ¶¶ 46-51,

22  58-62, 65, 67-70; Rofer Decl. ¶ 4 and Ex. B (EBTM press release, dated August 15, 2007, stating

23  that it had recently acquired Atticus).) Moreover, on August 31, 2007, Masters told RLP that

24  Lowlife refused to ship Atticus product to RLP despite the prior agreement to do so, because

25  Loserkids was a competitor of EBTM. (Compl. ¶ 61.)

26      ***EBTM's Use Of The Name And Likeness Of RLP's Owner***

27      EBTM also intentionally sought to divert sales from RLP and its affiliates' websites

28  through a stealth scheme to misappropriate Tom DeLonge's and Blink 182's names and

A/72419472.4                                    - 9 -

1  celebrity[5] by referencing them in the meta data for the Atticus webpage on EBTM.com. (Compl.

2  ¶¶ 166-173.) This meta data was known by EBTM to be read and indexed by search engine

3  algorithms employed by Google and other major internet search providers and must be

4  intentionally coded by the owner of a site. (Compl. ¶ 170; Swart Decl. ¶ 4.) More specifically,

5  EBTM intentionally and knowingly included in its meta data for the Atticus web page,

6  http://www.ebtm.com/m-7-atticus-clothing-at-ebtm.aspx, the following phrases: "Atticus

7  Clothing. Designed by Tom DeLonge" and "Atticus Clothing T Shirts T-Shirts tshirts blink

8  182." (Id.)

9       RLP is informed and believes and on that basis alleges that EBTM intentionally and

10  knowingly inserted these phrases in its website meta data as a stealth means to gain an unfair

11  competitive advantage in the marketplace and to improperly advertise and divert commercial

12  traffic from Loserkids.com sites to the EBTM.com site, as EBTM knew that this meta data is

13  read and indexed by search engine algorithms employed by Google and other major internet

14  search providers. (Compl. ¶ 170.) Indeed, on or about October 4, 2007, when the words

15  "Atticus clothing" were typed into the Google search engine, the sixth website listed in the

16  search result was a link to the Atticus webpage on EBTM.com, http://www.ebtm.com/m-7-

17  atticus-clothing-at-ebtm.aspx, with the phrase "Atticus Clothing. Designed by Tom DeLonge" in

18  the search result:

19       **Atticus Clothing** at EBTM
         Atticus Clothing. Designed by Tom Delonge. ... Atticus
20       Clothing. New Season on stock and ready to ship now! Don't see
         what you want? ...
21

22  _____

    [5] As noted above, RLP businesses have been quite successful, in significant part due to their
23  affiliation with RLP's owner Tom DeLonge and RLP's historical affiliation with his current and
    former bands, including Blink-182. (Compl. ¶¶ 167-168.) Indeed, the websites for Mr.
24  DeLonge's current band, Angels & Airwaves, and former band, Blink-182, both link to
    Loserkids.com. (Id.) Accordingly, to insure RLP's rights are protected, and that Lowlife was
25  under no illusions that the Atticus assets RLP sold to Lowlife included any rights to use or
    exploit RLP's relationships with Mr. DeLonge, Blink 182 or any of its other popular music
26  affiliations, Section 4.4 of the Atticus Asset Purchase Agreement provides that "the Purchased
    Assets do not include, and expressly exclude for all purposes, any use or right to use or reference
27  the name or likeness of Tom DeLonge . . . or the bands or musical groups commonly known as
    'Blink 182.'" (Id.)
28

1    www.ebtm.com/m-7-atticus-clothing-at-ebtm.aspx- 56k -

2    (Id.; Arroyo Decl. ¶ 2.)  This statement by EBTM in its meta data besides being expressly

3    prohibited by Atticus Asset Purchase Agreement (see fn 5, supra) was also patently false, as

4    none of the clothing on EBTM's website was designed by Tom DeLonge.  (Compl. ¶ 171.)

5    Thus, EBTM intentionally misappropriated the name and likeness of Plaintiffs' owner and his

6    former band in order to unfairly compete and to cause commercial harm to Plaintiffs by diverting

7    sales and consumers from Plaintiffs' websites to EBTM.com.

8    **III.    RLP NEED ONLY MAKE A "PRIMA FACIE" SHOWING OF
         PERSONAL JURISDICTION, AND THE COURT IS REQUIRED
9        TO ACCEPT ITS UNCONTROVERTED ALLEGATIONS AS
         TRUE**

10       "Motions to dismiss under Rule 12(b)(2) may test either plaintiff's theory of jurisdiction

11   or the facts supporting the theory.  In evaluating plaintiff's jurisdictional theory, the court need

12   only determine whether the facts alleged, if true, are sufficient to establish jurisdiction; no

13   evidentiary hearing or factual determination is necessary."  Schwarzer et al., Cal. Practice Guide:

14   Federal Civil Procedure Before Trial (The Rutter Group 2008) § 9:114 at p. 9-33 (citing Credit

15   Lyonnais Securities (USA), Inc. v. Alcantara, 183 F.3d 151, 153 (2nd Cir. 1999)).

16       When a defendant's motion to dismiss is made as its initial response and the court

17   decides the motion without conducting an evidentiary hearing, a plaintiff need only make a

18   prima facie showing that personal jurisdiction exists.  See Schwarzenegger v. Fred Martin Motor

19   Co., 374 F.3d 797, 800 (9th Cir. 2004); Ballard v. Savage, 65 F.3d 1495, 1498 (9th Cir. 1995);

20   Data Disc, Inc. v. Sys. Tech. Ass'n, Inc., 557 F.2d 1280, 1285 (9th Cir. 1977).  In deciding

21   whether a prima facie case has been made, uncontroverted allegations in the complaint are

22   deemed true and factual conflicts in the parties' declarations are resolved in plaintiff's favor.  See

23   Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1129 (9th Cir.

24   2003).[6]

25   _____

26   [6] In its motion to dismiss, EBTM mistakenly argues that RLP must establish necessary
27   jurisdictional facts by a preponderance of the evidence.  See Mot. to Dismiss at 2:18-21.  To the
     contrary, "Plaintiffs cannot be required to 'preponderate' where limited to written materials.

28                                          (Footnote Continued on Next Page.)

1    Here, RLP's factual allegations in support of its jurisdictional theories are

2    uncontroverted. For instance, EBTM does not dispute the factual allegations demonstrating that

3    it engaged in wrongful intentional acts targeted at RLP, whom EBTM knew to be a resident of

4    California.

## IV.    THIS COURT HAS GENERAL JURISDICTION OVER EBTM

6    At this early stage in the litigation, RLP does not have all the facts in support of the

7    existence of personal jurisdiction over EBTM. Nevertheless, based on the facts currently in its

8    possession, and as demonstrated below, RLP easily makes a "prima facie" showing, if not a

9    conclusive one, of facts establishing that EBTM is subject to both general and specific personal

10    jurisdiction in this state.

11    EBTM is subject to general jurisdiction based on its continuous and systematic contacts

12    with California. EBTM is also subject to general jurisdiction due to the continuous and

13    systematic activities of its subsidiary and general agent, Lowlife, with the state of California as

14    described above and in the Complaint.

### A.    EBTM Is Subject To General Personal Jurisdiction In California Because Of Its Extensive Business Activities In This State

17    "A nonresident may be subject to local general jurisdiction even if its forum activities are

18    but a small percentage of its nationwide business. The relevant inquiry is whether its forum

19    operations are 'continuous and systematic.'" Schwarzer et al., Cal. Practice Guide: Federal Civil

20    Procedure Before Trial at § 3:105.2 at p. 3-44 (citing Dorsey v. American Golf Corp., 98

21    F.Supp.2d 812, 815 (E.D. Mich. 2000) (holding defendant conducted a continuous and

22    systematic part of its general business in the forum state and was subject to general personal

23    jurisdiction where it managed 257 golf courses nationwide, only 7of which were in forum state)).

24    _____

25    (Footnote Continued from Previous Page.)

26    Otherwise, defendants could prevent plaintiffs from meeting their burden simply by
contradicting whatever was in plaintiffs' affidavits . . . ." Schwarzer et al., Cal. Practice Guide:

27    Federal Civil Procedure Before Trial § 9:118 at p. 9-35 (citing Farmers Ins. Exchange v. Portage
La Prairie Mut. Ins. Co., 907 F.2d 911, 912 (9th Cir. 1990); Data Disc, supra, 557 F.2d at 1285).

28

1    When conducting the general jurisdiction analysis for an "e-tailer," it is not enough to find that

2    an interactive website has the "potential to reach a significant percentage of the forum state's

3    population. Instead, for the contact to be continuous and systematic, there must be proof that the

4    website is actually reaching a portion of the state's population." Coastal Video Commc'ns,

5    Corp. v The Staywell Corp., 59 F. Supp. 2d 562, 571 (E.D. Va. 1999) (citations omitted). See

6    also id. at 572 ("It is also significant that defendant's site is commercial in nature, in that it is

7    designed to not only advertise and solicit sales, but also provides a direct method by which a

8    customer may purchase defendant's products.") "As with traditional business contacts, the most

9    reliable indicator of the nature and extent of defendant's Internet contact with the forum state

10   will be the amount of sales generated in the state by or through the interactive website." Id.

11       Here, EBTM admits that it has frequently made sales to California consumers through its

12   virtual store, including up to two hundred separate transactions between 2005 and 2007. (See

13   Breeden Decl. ¶ 10.) EBTM's website advertises as doing business in the United States and

14   provides conversions for prices in the U.S. dollar. (Compl. ¶ 6.) The website is open 24-hours,

15   seven days a week, for California consumers to visit the website, purchase merchandise and have

16   the product shipped to their home. See www.ebtm.com.

17       In addition to EBTM's frequent sales to California consumers, EBTM has other extensive

18   contacts with California as evidenced by its website and other publicly-available documents.

19   EBTM sells on its website clothing lines of more than twenty companies based in California,

20   including Adeline, Adio, Alliance, Bench, DC Clothing, DC Shoes, Dekline Shoes, Draven,

21   Eastpak USA, Fender, Hurley International LLC, Iron Fist, Junk Food, Level 27, Lost Property,

22   Macbeth, Rockett, To Die For, Vans Clothing, Vans Shoes, Vestal Watch, Inc. and Vintage.

23   (Rofer Decl. ¶ 3.) Thus, a significant portion of EBTM's revenue appears to be generated by its

24   sale of California products.

25       Two recent announcements from EBTM further emphasize its contacts with California.

26   On September 5, 2007, EBTM announced that it had entered into "wholesale and online retail

27   agreements" with Adeline, a California business. (Rofer Decl. ¶¶ 10-12, Exs. I-L.) This contract

28   was listed among the "Key Points" for EBTM's interim results for the six months ended October

A/72419472.4

- 13 -

1    31, 2007. (Id. at ¶ 10 and Ex. I.) On November 19, 2007, EBTM announced "the launch of its

2    US webstore for Atticus Clothing" in partnership with Music Today, part of the Live Nation

3    Group of companies. Live Nation is headquartered in California.[7] (Rofer Decl. ¶ 5 and Ex. C.)

4    EBTM stated that "[t]o work with Live Nation is a significant step for EBTM." (Id.) EBTM

5    further stated that the demand for its Atticus product in North America was "strong" and that

6    "the launch of the US webstore is in line with our strategy for future growth." (Id.) Not

7    surprisingly given all of the above, EBTM's representatives and agents apparently travel

8    frequently to California on business. Indeed, on December 11, 2007, when RLP attempted to

9    serve the summons and complaint in this action upon Breeden in the United Kingdom, he was

10   traveling in California. (Satchell Decl. ¶¶ 3-4; Arroyo Decl. ¶ 3.)

11        In addition, Masters' contacts with California are imputed to EBTM due to the torts and

12   other intentional acts he committed or instigated within the scope of his employment as a

13   director of EBTM[8] and/or managing director of Lowlife. See Ochoa v. J.B. Martin & Sons

14   Farms, Inc., 287 F.3d 1182, 1189 (9th Cir. 2002). For example, Masters systematically

15   communicated[9] with California-based RLP regarding Atticus and the purportedly "emergency"

16   closure of the Loserkids.uk.com site described above in furtherance of EBTM's tortious conduct.

17   (Compl. ¶ 120. See also, e.g., Compl. ¶ 25-30, 61, 76; Crawford Decl. ¶¶ 2-4 and Exs. A-D.)

18   His email address for these communications was www.dale@ebtm.com. (Crawford Decl. ¶¶ 2-4

19   and Exs. A-D.) Furthermore, EBTM apparently assumed Lowlife's role with regard to

20   performance of the agreements at issue, as Masters informed RLP that they should correspond

21   with EBTM director Simon Hargreaves in response to RLP's complaints about Lowlife's

22   performance under the agreements. (Crawford Decl. ¶ 4 and Ex. D; Rofer Decl. ¶ 9 and Ex. H.)

23

24   [7] Live Nation is headquartered in Los Angeles, California, and its subsidiary, Music Today, lists

25   an address in Virginia. (See Rofer Decl. ¶ 5 and Exs. C-D.)

26   [8] As noted above, Masters is also the single largest shareholder of EBTM. (Compl. ¶ 26.)

27   [9] Masters' website address used for such communications was dale@ebtm.com. (See, e.g.
     Crawford Decl. ¶¶ 2-4 and Exs. A-D.)

28

1    Accordingly, EBTM is subject to general jurisdiction due to its extensive business

2    activities with the state of California.

3    **B.    Lowlife's Extensive Contacts With California Are Imputed To
         EBTM Since Lowlife Acts As EBTM's General Agent**

4

5    While a parent-subsidiary relationship alone is insufficient to attribute the contacts of the

6    subsidiary to the parent for jurisdictional purposes, a subsidiary's contacts are imputed to the

7    parent where the subsidiary acts as the general agent of the parent. <u>Harris Rutsky</u>, 328 F.3d at

8    1134-35 (internal citations omitted).  To satisfy the agency test, the plaintiff must make a prima

9    facie showing that the subsidiary represents the parent corporation by performing services

10   "sufficiently important to the [parent] corporation that if it did not have a representative to

11   perform them, the [parent] corporation . . . would undertake to perform substantially similar

12   services. <u>Id.</u> (internal citations and quotations omitted).  The agency test permits the imputation

13   of contacts where the subsidiary was either established for, or is engaged in, activities that, but

14   for the existence of the subsidiary, the parent would have to undertake itself. <u>Id.</u> (internal

15   quotations and citations omitted).  "The general agency test requires that the agent perform some

16   service or engage in some meaningful activity in the forum state on behalf of its principal such

17   that its 'presence substitutes for presence of the principal.'" <u>Doe v. Unocal Corp.</u>, 248 F.3d 915,

18   930 (9th Cir. 2001).  ***Whether a parent corporation uses its subsidiary as a general agent is a***

19   ***question of fact.*** <u>See</u> <u>Chan v. Society Expeditions</u>, 39 F.3d 1398, 1405 (9th Cir. 1994).

20   Here, even without the benefit of jurisdictional discovery, RLP has sufficiently shown

21   that Lowlife served and still serves as EBTM's general agent in connection with its business in

22   California.  Lowlife's acts regarding the Atticus clothing line were sufficiently important to

23   EBTM that if it did not have Lowlife to perform them, EBTM would have undertaken to perform

24   substantially similar services.  According to EBTM's website, "[EBTM] sells licensed

25   merchandise and branded clothing, accessories and footwear, enabling consumers to mirror the

26   identity of their favorite brands.  In June 2007 [EBTM] acquired Lowlife Corporation Ltd which

27   is a wholesaler and retailer of music inspired fashion.  Lowlife designs, manufactures and

28   distributes to retail a number of brands of clothing which are complementary to [EBTM's]

A/72419472.4                                    - 15 -

1    business." (Rofer Decl. ¶ 7 and Ex. F.)  EBTM further states that it "acquired the Atticus brand

2    clothing range," and that one of EBTM's highlights of the year was "an order of some £800,000

3    for Atticus clothing … ."  (Rofer Decl. ¶ 8 and Ex. G.)  Indeed, this was the only contract that

4    EBTM felt significant enough to list on its Investor Relations page.  (See id.)  Thus, actions

5    taken by Lowlife with regard to design, manufacture and distribution of retail clothing brands—

6    in particular, the Atticus brand—were sufficiently important that EBTM would have performed

7    the actions had Lowlife not done so.  Consequently, Lowlife's extensive business activities with

8    California[10] should be imputed to EBTM, subjecting it to general personal jurisdiction in this

9    state.

10   **V.    THIS COURT HAS SPECIFIC JURISDICTION OVER EBTM**
11          **BECAUSE IT INTENTIONALLY CAUSED INJURY TO A**
            **CALIFORNIA-BASED CORPORATION**

12          In order to meet the three part test of specific jurisdiction with respect to a nonresident

13   defendant's acts committed outside the forum state but causing effect therein, it must be shown

14   that (a) the act was "purposeful"; (b) that the lawsuit arises from such act; and (c) that the

15   exercise of jurisdiction "comports with fair play and substantial justice."  Schwarzer et al., Cal.

16   Practice Guide: Federal Civil Procedure Before Trial at § 3:168 at 3-65 (citing Burger King,

17   supra, 471 U.S. at 478; Sibley v. Superior Court, 16 Cal. 3d 442 (1976)).

18          **A.    EBTM's Actions Were Purposeful**

19          With respect to the purposeful requirement, specific jurisdiction is analyzed under the

20   "effects" test derived from Calder v. Jones, 465 U.S. 783 (1984).  The "effects" test requires that

21   the EBTM allegedly have (1) committed an intentional act, (2) expressly aimed at the forum

22   state, (3) causing harm that the EBTM knows is likely to be suffered in the forum state.  Dole

23   Food Co. v. Watts, 303 F.3d 1104, 1111 (9th Cir. 2002).[11]  Physical presence in the forum state

24   _____

25   [10] EBTM admits that "Lowlife has sufficient contacts for this court to exercise jurisdiction over
     it …."  Mem. of P & A's In Supp. of Mot. to Dismiss at 5.

26   [11] Examples of wrongful tortious acts aimed at forum residents that have subjected non-resident
27   actors to local jurisdiction include defamation, intentional infliction of emotional distress, and
     invasion of privacy (see Calder, supra, 465 U.S. at 785); trademark infringement and attempt to

28   (Footnote Continued on Next Page.)

A/72419472.4                           - 16 -

is not required as long as the defendant's efforts are "purposefully directed" toward forum residents. Ballard, supra, 65 F.3d 1498 (quoting Burger King, supra, 471 U.S. at 476). The "expressly aimed" requirement is satisfied when it is alleged that the nonresident engaged in "wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." Bancroft, supra, 223 F.3d at 1087.

As detailed in the Fifth, Seventh, Eighth and Ninth Causes of Action in the Complaint and as described above, RLP has adequately alleged that EBTM committed numerous intentional acts toward RLP knowing they would case harm in California, including misappropriation of trade secrets, aiding and abetting breach of fiduciary duty, intentional interference with contract, and unfair competition. For example:

- EBTM's secret plot to shut-down RLP's website and take over fulfillment (Compl. ¶¶ 71-81; Murray Decl. ¶¶ 3-7, 10-11 and Exs. A-D);

- EBTM's theft of RLP's customer data (Compl. ¶¶ 132-142; Murray Decl. ¶¶ 8-9, 12 and Exs. E-F, H);

- EBTM's various acts to divert business from Loserkids.uk.com to EBTM.com (See, e.g., Compl. ¶¶ 28-29, 65-66, 71-81, 153-54, 160-61; Swart Decl. ¶ 6 and Ex. D);

- EBTM's failure to ship Atticus for sale on RLP's websites (Compl. ¶¶ 46-51, 58-62, 65, 67-70; Rofer Decl. ¶ 4 and Ex. B (EBTM acquired Atticus);[12] and

- EBTM's use of the name and likeness of RLP's owner in advertising EBTM's website and products in an attempt to divert sales and consumers from Plaintiffs' websites. (Compl. ¶¶ 167-170; Swart Decl. ¶¶ 2-4 and Exs. A-B.)

---

(Footnote Continued from Previous Page.)

misappropriate California resident's name (Bancroft, supra, 223 F.3d 1087-88); and fraudulent communications intended to induce California managers into detrimental contract arrangement. Dole, supra, 303 F.3d at 1112.

[12] Furthermore, as noted above, EBTM apparently assumed Lowlife's role with regard to performance of the agreements at issue, as Masters informed RLP that they should correspond with EBTM director Simon Hargreaves in response to RLP's complaints about Lowlife's performance under the agreements. (Crawford Decl. ¶ 4 and Ex. D; Rofer Decl. ¶ 9 and Ex. H.)

1   See also Compl. ¶¶ 160-162 (alleging that EBTM caused Lowlife to breach the various

2   agreements causing harm to RLP).  These intentional acts aimed at RLP, both individually and

3   taken together, are sufficient for this Court to assert personal jurisdiction over EBTM.  See

4   Calder, supra, 465 U.S. 783; Dole Food, supra, 303 F.3d 1104; Bancroft, supra, 223 F.3d 1082.

**B.   This Lawsuit Arises From EBTM's Unlawful And Intentional Acts**

7        As demonstrated above, RLP's claims in this action arise from EBTM's intentional acts.

8   Thus, the second element required to establish specific jurisdiction over EBTM is also satisfied.

**C.   Personal Jurisdiction Over EBTM Is Reasonable**

10       As for the reasonableness factor, jurisdiction must comport with "fair play" and

11   "substantial justice."  See Burger King, 471 U.S. at 476-77.  Due process does not require

12   substantial contacts or the selection of the best forum.  Importantly, if a nonresident, acting

13   outside the state, intentionally causes injuries within the state, local jurisdiction is ***presumptively***

14   ***not unreasonable***:  Under such circumstances, defendant must "reasonably anticipate" being

15   haled into court in the forum state.  Calder, supra, 465 U.S. at 790; Gordy v. Daily News, L.P.,

16   95 F.3d 829, 834 (9th Cir. 1996).  In such cases, "A single act by a defendant can be enough to

17   confer personal jurisdiction if that act gives rise to the claim being asserted."  Lewis v. Fresne,

18   252 F.3d 352, 359 (5th Cir. 2001).  Moreover, the district court must presume an otherwise valid

19   exercise of specific jurisdiction is reasonable.  Ballard, supra, 65 F.3d at 1500.  Thus, a

20   ***defendant has the burden of demonstrating unreasonableness and must put on a "compelling***

21   ***case.***"  Id. (citing Burger King, supra, 471 U.S. at 477) (emphasis added).

22       Generally, the reasonableness determination requires the consideration of several factors:

23   (1) the extent of the defendant's purposeful interjection into the forum state, (2) the burden on

24   the defendant in defending in the forum, (3) the extent of the conflict with the sovereignty of the

25   defendant's state, (4) the forum state's interest in adjudicating the dispute, (5) the most efficient

26   judicial resolution of the controversy, (6) the importance of the forum to the plaintiff's interest in

27   convenient and effective relief, and (7) the existence of an alternative forum.  Bancroft, supra,

28   223 F.3d at 1088 (citing Burger King, 471 U.S. at 476-77).  Since none of the factors alone is

A/72419472.4                          - 18 -

1    dispositive, however, the Court must weigh all seven factors in each case. Ziegler v. Indian

2    River County, 64 F.3d 470, 475 (9th Cir. 1995). The Ninth Circuit adopts a "flexible approach"

3    that allows personal jurisdiction without meeting each of the above factors: "Jurisdiction may be

4    established with a *lesser showing* of minimum contacts if considerations of reasonableness

5    dictate." Ochoa, supra, 287 F.3d at 1188 (emphasis added) (internal quotes omitted).

### 1.    Purposeful Interjection

7        EBTM purposefully interjected itself into the forum state when it engaged in intentional

8    wrongful conduct targeted at RLP, whom it knew to be a resident of California. See Bancroft,

9    supra, 223 F.3d at 1087. For example, as noted above, EBTM secretly plotted to shut down

10   RLP's website and steal its customer data. (Compl. ¶¶ 71-81; Murray Decl. ¶¶ 3-12 and Exs. A-

11   H.) More specifically, EBTM's President, Breeden, and its Executive Director, Masters, falsely

12   and fraudulently informed the website's fulfillment provider that EBTM "owned"

13   Loserkids.uk.com and gave instructions to shut down the site and transfer all loserkids.uk.com

14   inventory to EBTM. (Id.) In another example, EBTM unlawfully used the name, likeness and

15   celebrity of RLP's founder Tom DeLonge and his former band Blink 182 in a stealth scheme to

16   promote its website, EBTM.com and divert sales and consumers from RLP's own competing

17   websites. (Compl. ¶¶ 166-170; Swart Decl. ¶¶ 2-4 and Exs. A-B; Arroyo Decl. ¶ 2 and Ex. A.)[13]

### 2.    Burden On EBTM In Defending In The Forum

19       The Ninth Circuit has repeatedly held that modern means of communications and

20   transportation have significantly reduced the burden of litigating in another country. Sinatra v.

21   Nat'l Enquirer, Inc., 854 F.2d 1191, 1199 (9th Cir. 1988); Insurance Co. of N. Am. v. Marina

22   Salina Cruz, 649 F.2d 1266, 1271 (9th Cir. 1981). The mere fact that local litigation is

23

24   ─────────────────

     [13] See also page 17, supra (listing other intentional acts by EBTM causing harm to RLP).
25   Moreover, EBTM purposefully injected itself into California when it reviewed and approved of
     the terms of Lowlife's agreements with RLP, including the provisions that California law would
26   govern, while knowing full well that it would cause Lowlife to breach the agreements. See page
     5, supra. See also Sunward Electronics, Inc. v. McDonald, 362 F. 3d 17, 34 (2nd Cir. 2004)
27   (holding that a choice of law clause is a significant factor in personal jurisdiction analysis
     "because the parties, by so choosing, invoke the benefits and protections of [forum] law").

28

1   inconvenient is not enough. Sher v. Johnson, 911 F.2d 1357 (9th Cir. 1990). Here, even without

2   the benefit of jurisdictional discovery, it is apparent that it would not be burdensome for EBTM

3   to litigate in California. For example, in just the last two months, Breeden has traveled to

4   California, and EBTM rented exhibition space and attended an industry trade show in California.

5   (Satchell Decl. ¶ 3-4; Arroyo Decl. ¶ 4.) EBTM's directors are able to speak, read and write

6   English with ease as evidenced by their communications with RLP and Trinity Street. See Dole,

7   303 F.3d at 1115. Furthermore, EBTM's lawyers are the same lawyers who represent Lowlife

8   and Masters in this action.

### 3.    Extent Of The Conflict With Sovereignty Of United Kingdom

11  EBTM does not suggest that California and United Kingdom law are in conflict. EBTM

12  also does not (and cannot) suggest that the United Kingdom has a greater interest in the

13  resolution of this dispute, especially considering that the underlying misappropriation of trade

14  secrets, aiding and abetting breach of fiduciary, intentional interference with contract, and unfair

15  competition was against a California based company. Moreover, EBTM purchased Lowlife

16  knowing that California law applied to agreements which it acquired in its acquisition of Lowlife

17  and subsequently caused Lowlife to breach.

### 4.    California's Interest In The Dispute

19  California maintains an interest in providing an effective avenue of redress for its

20  citizens, and therefore has a strong interest in adjudicating this dispute. See, e.g., Panavision

21  Intern., L.P. v. Toeppen, 141 F.3d 1316, 1323 (9th Cir. 1998) ("California maintains a strong

22  interest in providing an effective means of redress for its residents tortiously injured."); CFA N.

23  Cal., Inc. v. CRT Partners LLP, 378 F. Supp. 2d 1177, 1188 (N.D. Cal. 2005) ("California has a

24  strong interest in assuring that contracts made with its residents are not breached….").

25  Furthermore, RLP is headquartered in Carlsbad, California. (Compl. ¶¶ 1-4.) Thus, California's

26  interest in the dispute weighs heavily in RLP's favor. CFA Northern, 378 F. Supp. 2d at 1187.

27

28

A/72419472.4

- 20 -

### 5. The Most Efficient Judicial Resolution Of The Controversy

California, and the Southern District in particular, is the most efficient forum for this action. RLP's claims against EBTM's subsidiary, Lowlife, and EBTM's Executive Director, Masters, will be adjudicated in California, not the United Kingdom. Thus, both of them are already required to be in California to defend themselves in this action. Additionally, these claims involve the same and/or substantially similar evidence, witnesses, documents, etc. This Court will necessarily decide factual and legal issues closely related to the claims asserted against EBTM, for example, whether defendants conspired against RLP, misappropriated its trade secrets, or tortiously interfered with its contracts. Finally, all the Plaintiffs in this action are headquartered in Carlsbad, California.

### 6. The Importance Of The Forum To The Plaintiffs' Interest In Convenient And Effective Relief

Resolving this dispute in the Southern District of California is important to RLP's interest in convenient and effective relief. Most of its witnesses and documents are in the Southern District and, as noted above, it is already pursuing its claims here against Lowlife and Masters regarding the same transactions and occurrences.

### 7. The Existence Of An Alternative Forum

Even if an alternative forum were available in the United Kingdom, that by itself would not establish that this district is an unreasonable forum for this action. Ballard, 65 F.3d at 1502. However, it appears that an alternative forum is unavailable because RLP's claim for violation of California Business and Professions Code § 17200 et seq. is a cause of action specific to California.

In sum, EBTM "has not carried its heavy burden of presenting a 'compelling case' against jurisdiction." Id. Personal jurisdiction is *presumptively not unreasonable* because EBTM caused injuries within the state against California based corporations. In any event, consideration of the "reasonableness" factors weighs heavily in favor of personal jurisdiction over EBTM. Accordingly, EBTM is subject to specific personal jurisdiction in California.

A/72419472.4                                    - 21 -

1

2

## VI.   IN THE EVENT THE COURT DOES NOT DENY EBTM'S MOTION OUT OF HAND, IT SHOULD PERMIT RLP TO CONDUCT JURISDICTIONAL DISCOVERY

3       This Court has broad discretion to permit jurisdictional discovery. Data Disc, supra, 557

4   F.2d at 1285. When pertinent facts bearing on the question of jurisdiction are disputed, or a

5   more satisfactory showing of the facts is necessary, discovery should be permitted. Id.; CFA

6   Northern, supra, 378 F. Supp. 2d at 1182; Harris Rutsky, supra, 328 F.3d at 1135; Coastal Video,

7   59 F. Supp. 2d at 572.

8       At this early stage in the litigation, RLP does not have all the facts in support of the

9   existence of personal jurisdiction over EBTM. Furthermore, the declaration by Breeden

10   submitted in support of EBTM's Motion raises more questions than it answers due to its

11   omissions. For example, Breeden's declaration omits that he has recently been traveling in

12   California and does not state how many times he or EBTM's Executive Director Dale Masters

13   have been to California or why they have come to California. Similarly, the declaration states

14   that "as of the date that the Complaint was filed on November 13, 2007" it had not entered into

15   any contracts with California residents but omits that on November 19th it announced a contract

16   with a subsidiary of Live Nation, headquartered in California. (Breeden Decl. ¶ 10.) Surely

17   those negotiations began long before November 13th. Breeden further omits that EBTM entered

18   into "wholesale and online agreements" with California-based Adeline, announced on September

19   5, 2007, prior to the filing of the Complaint. (Rofer Decl. ¶ 10 and Ex. I.)

20       Breeden further declares in conclusory fashion that "Lowlife is a separate limited liability

21   company and its conduct is separate from the conduct of EBTM." (Breeden Decl. ¶ 9.) He

22   omits, however, numerous facts showing that Lowlife and EBTM's conduct have been in concert

23   and intertwined. For example, Mr. Breeden omits that he and Masters together and in person

24   falsely informed Trinity Street that EBTM had purportedly purchased Loserkids.uk.com, all as

25   part of a conspiracy and coordinated attempt to damage Loserkids.uk.com, to move the

26   Loserkids.uk.com fulfillment business to EBTM, a direct competitor, and to steal RLP's trade

27   secrets and customer data. (See supra.) As further example, Mr. Breeden omits that, when RLP

28

A/72419472.4                                        - 22 -

1   complained about Lowlife's performance under the relevant agreements, Masters directed RLP

2   to communicate with EBTM director Simon Hargreaves.  (Crawford Decl. ¶ 4 and Ex. D; Rofer

3   Decl. ¶ 9 and Ex. H.)

4        When pertinent jurisdictional facts are in doubt, or a more satisfactory showing of the

5   facts is necessary, the Court should permit discovery to aid in determining whether personal

6   jurisdiction exists.  Accordingly, to the extent that the Court does not deny EBTM's motion out

7   of hand, it should, at the very least, allow RLP to conduct jurisdictional discovery.

8   **VII.    CONCLUSION**

9        For the foregoing reasons, EBTM's motion to dismiss for lack of personal jurisdiction

10  should be denied.  In the event the Court does not deny EBTM's motion out of hand, Really

11  Likeable People respectfully requests the opportunity to engage in jurisdictional discovery to

12  determine the full extent of EBTM's contacts with California.

13  DATED:  February 15, 2008                 Bingham McCutchen LLP

14

15

16                                    By:  _____s/J. Warren Rissier_____
                                            Attorneys for Plaintiffs
17                                    Really Likeable People, Inc., Loserkids, Inc., Macbeth,
                                         Inc., Macbeth Optics, LP, and Really Likeable People
18                                       II, Inc. (formerly Atticus Clothing, Inc.)
                                         Email: warren.rissier@bingham.com
19

20

21

22

23

24

25

26

27

28